**15-1725**

# In the
# United States Court of Appeals
# for the Federal Circuit

UNWIRED PLANET, L.L.C.,

*Plaintiff-Appellant,*

v.

APPLE INC.,

*Defendant-Appellee.*

Appeal from the United States District Court for the Northern District of California
in No. 3:13-cv-04134-VC, Judge Vince Chhabria

**NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT
UNWIRED PLANET, L.L.C.**

<table>
<tr><td>

Theodore Stevenson, III
*Principal Attorney*
Douglas A. Cawley
McKool Smith, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4000

</td><td>

John B. Campbell
Kevin Burgess
Joel L. Thollander
McKool Smith, P.C.
300 W. 6th Street, Suite 1700
Austin, TX 78701
(512) 692-8700

</td></tr>
<tr><td>

September 9, 2015

</td><td>

*Attorneys for Plaintiff-Appellant,
Unwired Planet, LLC*

</td></tr>
</table>

# CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant Unwired Planet, L.L.C. certifies the following:

1.    The full name of every party or amicus represented by me is:

Unwired Planet, L.L.C.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Unwired Planet IP Manager, LLC and Unwired Planet IP Holdings, Inc., directly and wholly own Plaintiff Unwired Planet, LLC.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the District Court or agency or are expected to appear in this court are:

**MCKOOL SMITH, P.C.:** Theodore Stevenson III, John B. Campbell, Mitchell Sibley, Mario Apreotesi, Kevin Kneupper, James Quigley, Douglas Cawley, Lauren Fornarotto, Leah Buratti, Pierre Hubert, John Shumaker (no longer with the firm), Christopher Mierzejewski, Nicholas Mathews, John Garvish, Warren Lipshitz, Ashley Moore, David Sochia, and Kevin Burgess

**MCKOOL SMITH HENNIGAN, P.C.:** Courtland Reichman, Jennifer Estremera, and Mieke Malmberg (no longer with the firm)

**WATSON ROUNDS P.C.:** Ryan Cudnik and Michael Rounds (no longer with the firm)

i

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ................................................................. vii

**I.** STATEMENT OF JURISDICTION ....................................................................1

**II.** STATEMENT OF THE ISSUES ........................................................................1

**III.** STATEMENT OF THE CASE ...........................................................................2

    A.     Preliminary Statement ..........................................................................2

    B.     Unwired Planet Pioneers the Mobile Internet ......................................4

    C.     Unwired Planet Brings Suit; the District Court
           Construes the Patent Claims and Grants Summary
           Judgment ...............................................................................................5

**IV.** SUMMARY OF THE ARGUMENT .................................................................6

**V.** ARGUMENT ....................................................................................................10

    A.     Standard of Review ............................................................................10

    B.     The District Court Erred in Its Claim Construction
           and Summary Judgment Orders on the '446 Patent............................11

           1.    Additional facts relevant to the '446 patent..............................11

           2.    The district court erred in construing "voice
                 input" to require transmission over a "voice
                 channel" ...................................................................................14

           3.    The district court erred in granting summary
                 judgment after resolving factual disputes
                 against Unwired Planet .............................................................21

    C.     The District Court Erred in Its Claim Construction
           and Summary Judgment Orders on the '260 Patent............................28

           1.    Additional facts relevant to the '260 patent..............................28

2.    The district court erred in granting summary judgment after resolving factual disputes against Unwired Planet ............................................ 33

3.    The district court erred in construing "provisioning" so as to exclude disclosed embodiments ......................................................... 40

D.    The District Court Erred In Granting Summary Judgment of Noninfringement on the '831 Patent .............................. 45

1.    Additional facts relevant to the '831 patent .............................. 45

2.    The district court erred in granting summary judgment after resolving factual disputes against Unwired Planet ............................................ 50

E.    The District Court Erred in Granting Summary Judgment of No Indirect Infringement on the '092 Patent ........................................................................ 53

1.    Additional facts relevant to the '092 patent .............................. 53

2.    The district court erred in granting summary judgment after applying an incorrect legal standard ........................................................... 55

**VI.** CONCLUSION AND RELIEF REQUESTED ................................................ 61

## CONFIDENTIAL MATERIAL OMITTED

Unwired Planet has omitted materials from this brief that were designated as confidential by Apple under the protective order. The materials omitted on pages 9, 10, 58, 59, and 60 consist of details relating to discussions between the two parties. The materials omitted on pages 22, 31, 32, 33, 35, 39, 48, 49, 51, and 54 relate to the technical details of the design and operation of Apple's accused products.

# TABLE OF AUTHORITIES

**Page(s)**

C<span>ASES</span>

*Acumed LLC v. Stryker Corp.*,
  483 F.3d 800 (Fed. Cir. 2007) .....................................................18, 37

*Ancora Techs., Inc. v. Apple, Inc.*,
  744 F.3d 732 (Fed. Cir. 2014) ..............................................................20

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).............................................................................10

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006) ..............................................................19

*Broadcom v. Emulex Corp.*,
  732 F.3d 1325 (Fed. Cir. 2013) .....................................................42, 52

*Embrex, Inc. v. Serv. Eng'g Corp.*,
  216 F.3d 1343 (Fed. Cir. 2000) ...........................................................20

*Global-Tech Appliances, Inc. v. SEB S.A.*,
  131 S. Ct. 2060 (2011).................................................................56, 58

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
  769 F.3d 1371 (Fed. Cir. 2014) ...........................................................56

*Hill-Rom Servs. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014) ...........................................................44

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
  425 F.3d 1312 (Fed. Cir. 2006) ...........................................................16

*In re Papst Licensing Digital Camera Patent Litig.*,
  778 F.3d 1255 (Fed. Cir. 2015) ...........................................................11

*In re Seagate Tech., LLC*,
  497 F.3d 1360 (Fed. Cir. 2007) ...........................................................59

*Info-Hold v. Muzak LLC*,
  783 F.3d 1365 (Fed. Cir. 2015) .....................................................56, 59

*Int'l Rectifier Corp. v. IXYS Corp.*,
361 F.3d 1363 (Fed. Cir. 2004) ....................................................3, 21

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)....................................................................10

*PPG Indus. v. Guardian Indus. Corp.*,
156 F.3d 1351 (Fed. Cir. 1998) ....................................................3, 38

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................................41, 44

*PIN/NIP, Inc. v. Platte Chem. Co.*,
304 F.3d 1235 (Fed. Cir. 2002) .........................................................3

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
752 F.3d 807 (9th Cir. 2014) ......................................................11, 21

*Regents of the Univ. of Cal. v. Dako N. Am., Inc.*,
477 F.3d 1335 (Fed. Cir. 2007) .......................................................40

*Ring & Pinion Serv. Inc. v. ARB Corp. Ltd.*,
743 F.3d 831 (Fed. Cir. 2014) ........................................................10

*Smith & Nephew Inc. v. Arthrex, Inc.*,
2015 U.S. App. LEXIS 4291 (Fed. Cir. Mar. 18, 2015)
(unpublished) ...............................................................................57

*SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*,
859 F.2d 878 (Fed. Cir. 1988) ........................................................55

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
135 S. Ct. 831 (2015)....................................................................11

*Thorner v. Sony Computer Entertainment America LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ..................................................15, 41

*Verizon Servs. Corp. v. Vonage Holding Corp.*,
503 F.3d 1295 (Fed. Cir. 2007) .......................................................16

## STATUTES

28 U.S.C. § 1295(a)(1)..........................................................................1

v

28 U.S.C. § 1338(a) ...............................................................................................1

28 U.S.C. § 2107(a) ...............................................................................................1

**OTHER AUTHORITIES**

Fed. R. App. 4(a)...................................................................................................1

## STATEMENT OF RELATED CASES

No appeal in or from the same civil action was previously before this or any other appellate court. Counsel are not aware of any other case that may be directly affected by this Court's decision.

# I.  STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. § 1338(a), and this Court has jurisdiction under 28 U.S.C. § 1295(a)(1). The final judgment was entered on May 29, 2015, and the notice of appeal was timely filed under 28 U.S.C. § 2107(a) and Fed. R. App. 4(a) on June 5, 2015. A72–A73; A13027–A13030.

# II.  STATEMENT OF THE ISSUES

1. With respect to U.S. Patent No. 6,532,446 (the '446 patent), whether the district court erred in: (a) construing the term "voice input" to require the use of a "voice channel"—a separate limitation found in some claims, but *not* the claims asserted here; and (b) granting summary judgment of noninfringement by resolving disputed issues of fact (against the non-movant) as to whether Apple's accused Siri service satisfies the imported "voice channel" limitation.

2. With respect to U.S. Patent No. 6,647,260 (the '260 patent), whether the district court erred in: (a) construing the term "provisioning" as limited to "enabling or modifying communication capabilities," thereby excluding embodiments—such as address books—that do not affect communications capabilities of the mobile device; and (b) granting summary judgment of noninfringement by resolving disputed issues of fact (against the non-movant) as to whether Apple's accused App Store and iTunes Store products satisfy the claimed "user information" and "provisioning request" limitations.

1

3. With respect to U.S. Patent No. 6,317,831 (the '831 patent), whether the district court erred in granting summary judgment of noninfringement by resolving disputed issues of fact (against the non-movant) as to whether Apple's accused APNS product satisfies the claimed "narrowband channel" limitation.

4. With respect to U.S. Patent No. 6,321,092 (the '092 patent), whether the district court erred in granting summary judgment of no indirect infringement where the court mistakenly applied the objective-intent standard for willfulness rather than the subjective-intent standard for indirect infringement.

## III.  STATEMENT OF THE CASE

### A.    Preliminary Statement

The district court erred in both the claim construction phase and in the summary judgment phase of this patent-infringement case. A19–A46; A50–A71.

During the claim-construction phase, the court erred by importing unwarranted narrowing limitations into the disputed terms that, in some cases, read limitations from unasserted claims into the asserted claims or read out preferred embodiments. For example, the court construed "voice input" in the asserted claims of the '446 patent to require the use of a "voice channel"—an express limitation found in some claims, but *not* those asserted here. The court also misconstrued "provisioning" from the '260 patent as limited to "enabling or

modifying *communication capabilities*," thereby excluding certain embodiments—such as address books—disclosed in the specification. A19–A46; A3625(1:25-32).

During the summary-judgment phase, the district court erred when it impermissibly resolved disputed issues of material fact in comparing the claims to the accused products for three of the patents-in-suit (the '446, the '260, and the '831). A050–A071; *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1243 (Fed. Cir. 2002). As a result, the court converted the comparison of claims to accused products, which is a classic issue for the trier of fact, into a legal exercise. That was error. *Int'l Rectifier Corp. v. IXYS Corp.*, 361 F.3d 1363, 1374-75 (Fed. Cir. 2004). Whether the claims read on the accused products—even if the structure and operation of those products is not disputed—are questions of fact. *Id.* (rejecting argument that a stipulation as to the structure of the accused product for purposes of summary judgment made infringement a question of law). But the court saw it otherwise. A050-A071; *cf.* A1244–A1246; *see also PIN/NIP*, 304 F.3d at 1243; *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998).

With respect to the fourth patent-in-suit, the '092 patent, the district court applied the wrong legal standard in granting summary judgment of no induced infringement. A65. Applying an *objective*-intent standard, rather than the appropriate *subjective*-intent standard for indirect infringement, the court found

3

that Apple could not have intended to induce infringement because it had a reasonable basis for its noninfringement arguments. A65.

### B.    Unwired Planet Pioneers the Mobile Internet

Three engineers working out of a small office Redwood City, California, founded Unwired Planet in 1994 to develop software for use on mobile devices. Unwired Planet created a pioneering suite of applications that enabled mobile phones to perform many tasks we take for granted today, including using the Internet, checking stock quotes, and saving an address book on a phone. Unwired Planet became one of the first companies to enable mobile devices to access the Internet, growing to a company of more than 2,000 employees.

Unwired Planet invested more than $1 billion in research and development to develop its inventions. Its patent portfolio has been licensed by companies such as Microsoft, Lenovo, and Ericsson. During the late 1990s and early 2000s, Unwired Planet was one of the leading providers of software enabling the delivery of Internet-based services to mobile devices. Unwired Planet's customers included AT&T Wireless Services, GTE Wireless, Sprint PCS, Nextel Communications, T-Mobile, and others. By pioneering Internet-based mobile phone apps and services, including browsers and mail programs, Unwired Planet laid the foundation for today's mobile devices.

In the mid-2000's, the mobile-device market began to shift from a carrier-focused market to one based on smartphones. Unwired Planet's primary customers had been carriers who needed software on their phones, such as AT&T and Sprint. But smartphone manufacturers such as Apple began to develop software that performed much of the functionality Unwired Planet had invented and sold to carriers. Unwired Planet's revenues declined. Ultimately the company chose to break itself into pieces, selling off business units while retaining the patents. Today, Unwired Planet's products are still being sold as part of those business units, but Unwired Planet focuses on developing its patent portfolio.

## C.     Unwired Planet Brings Suit; the District Court Construes the Patent Claims and Grants Summary Judgment

Unwired Planet brought suit against Apple on ten patents in the District of Nevada on September 19, 2012. A1; A89. After transfer to the Northern District of California, the case was narrowed to the four patents at issue here. The district court construed terms from each of the patents, including the term "voice input" from the '446 patent and the term "provisioning" from the '260 patent. A22–A25; A38–A42. As to three of the patents-in-suit (the '260 patent, the '446 patent, and the '831 patent), the court granted summary judgment of noninfringement. A51–A63. And as to the fourth (the '092 patent) the court granted summary judgment of no indirect infringement. A63–A66. This appeal followed.

5

# IV.  SUMMARY OF THE ARGUMENT

The district court's errors fall into three categories: first, the court misconstrued claims terms drawn from two patents; second, it erroneously granted summary judgment of noninfringement on three patents based on a failure to properly apply the summary judgment standard; and third, it erroneously granted summary judgment of no indirect infringement on a fourth patent based on applying the wrong standard for evaluating intent to infringe.

While the errors in the first and third categories are each distinct, the errors in the second category all flowed from a central misunderstanding regarding the proper steps of an infringement analysis. In particular, the district court erred by treating the disputes over comparison of the undisputed operation of the accused products to the claims as a question of law to be resolved by the court. This misunderstanding caused the court to repeatedly resolve disputes of material fact against the non-movant. While these errors were related, for clarity Unwired Planet will present its arguments, with the relevant background facts, patent-by-patent.

*Errors Relating to the '446 Patent*.

The district court improperly imported a "voice channel" limitation from the specification into the asserted claims—a limitation that appears in some of the '446 patent's claims, but not the ones asserted against Apple. Even with this narrowing limitation, the accused Siri service on Apple's accused mobile devices infringes

6

because it uses a voice channel to send speech input from a user to Apple's central servers. Following claim construction, the district court erroneously granted summary judgment of non-infringement on the basis that Apple's accused Siri service did not satisfy the voice channel limitation. Unwired Planet's expert witness provided evidence, however, that Siri did in fact satisfy this limitation because Apple's products send the voice input of a Siri user to the Apple server for speech recognition in a manner nearly indistinguishable from a voice-over-IP call, which persons of skill in the art recognize as using a voice channel. In committing its errors, the district court discounted the evidence submitted by Unwired Planet while crediting competing testimony from Apple's expert—thus flipping the required summary-judgment approach on its head.

*Errors Relating to the '260 Patent.*

The district court erred in granting summary judgment of noninfringement on the '260 patent. In particular, the court concluded that the evidence did not show the accused products met the "user information" claim limitation of the '260 patent. The court adopted the opinion of Apple's expert that when Apple sends a hash, which is an encrypted string that includes the user's password, that does not satisfy the requirement of sending "user information" because the transmitted password is not in exactly the same format as when the user entered the password to establish an Apple account. Despite contrary statements in the specification of

7

the '260 patent and contrary testimony from Unwired Planet's technical expert, the district court granted summary judgment and usurped the jury's role of applying the claim language to the accused products.

The district court also erred in construing the term "provisioning" to mean "enabling or modifying communication capabilities." The claims and specification of the '260 patent describe "provisioning" more broadly to include providing any features and services available to mobile devices, such as downloading an address book or other applications, and not just features or services that enable or modify communication capabilities of the device. The district court's claim construction erroneously excludes embodiments of provisioning disclosed in the specification, such as an "address book"—a feature that has no communications capabilities.

*Errors Relating to the '831 Patent.*

With respect to the '831 patent, the district court concluded that the evidence did not show that the accused products satisfy the "narrowband channel" claim limitation. But the court reached this conclusion only after adopting the opinions of Apple's expert, who opined that Apple's limitation on the size of push notifications that can be sent to an Apple mobile device did not render the channel a "narrowband channel." The district court erroneously failed to credit a data transfer analysis of Apple's accused APNS product performed by Unwired Planet's expert, which proved that Apple's size limitations reduce the data transfer rate and render

8

the channel used for push notifications a "narrowband channel." Despite contrary testimony from Unwired Planet's technical expert, the court chose to discount the analysis and resolve the battle of experts against Unwired Planet on summary judgment.

*Errors Relating to the '092 Patent.*

The district court dismissed claims of indirect infringement of the '092 patent on the ground that Unwired Planet could not prove Apple's intent to infringe. But the court erred in relying on the *objective* merits of Apple's post-suit defenses, rather than deciding whether there was evidence of Apple's *subjective* intent. The district court based its decision entirely on its own assessment of the objective merits of the noninfringement defenses that Apple raised after this lawsuit was filed. Apple's motion for summary judgment combined the issue of intent for the purposes of indirect infringement with the issue of intent for willfulness, and cited the legal standard for willfulness in support. Based on Apple's briefing, the district court erroneously decided the issue of intent based on the objective prong of a willfulness analysis—when this issue of objective reasonableness has no bearing on the question of indirect infringement.

The district court also failed to consider the evidence of Apple's intent. Unwired Planet offered evidence of pre-suit knowledge of the '092 patent, ███████

█████████████████████████████████████████████████████████

█████████████, Apple's failure to offer an opinion of counsel, and Apple's deliberate ignorance of the '092 patent. Despite that evidence, the district court concluded that Apple's litigation defenses of non-infringement negated any pre-suit intent to infringe. But Unwired Planet's evidence created a fact issue for the jury as to whether or not Apple intended to induce infringement of the '092 patent. The district court erred by failing to consider that evidence and failing to draw inferences in Unwired Planet's favor as the non-moving party.

## V. ARGUMENT

### A.    Standard of Review

This Court reviews summary-judgment decisions under regional circuit law. *Ring & Pinion Serv. Inc. v. ARB Corp. Ltd.*, 743 F.3d 831, 833 (Fed. Cir. 2014). This case comes from the Ninth Circuit, which reviews summary-judgment decisions de novo. *Id.* The evidence, and inferences drawn therefrom, must be viewed in the light most favorable to the opposing party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When ruling on a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is only "appropriate if, in viewing the evidence in a light most favorable to the non-moving party, the court finds that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Absolute Software*, 659 F.3d at 1129 (internal quote omitted); *see also Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 818 (9th Cir. 2014) (stating that evidence is sufficient to raise a question of fact for the jury if a "reasonable jury viewing the summary judgment record could find by a preponderance of the evidence that the plaintiff is entitled to a favorable verdict").

This Court reviews the district court's ultimate interpretation of claim terms de novo. *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 839 (2015). The district court's resolution of an underlying factual dispute is reviewed for clear error. *Id.* at 842. If the district court relied on intrinsic evidence alone for its construction without reliance on extrinsic evidence, this Court reviews the district court's construction de novo. *Id.* at 840-42; *see also In re Papst Licensing Digital Camera Patent Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015).

## B. The District Court Erred in Its Claim Construction and Summary Judgment Orders on the '446 Patent

### 1. Additional facts relevant to the '446 patent

In the late 1990s, the industry began to recognize that speech recognition could provide an advantageous interface for mobile devices. A183–A201. But technical problems prevented widespread use of speech recognition on mobile devices. Such devices had limited processing and memory capability, making it

difficult to implement speech recognition programs (which were large, resource dependent programs) locally on the mobile device. A183–A201.

Unwired Planet solved the problems with speech recognition on mobile devices in 1999 by locating the speech recognition engine on a remote server, and sending voice input to the server where the recognition engine would convert it to text. A183–A201. A server has significantly more computational resources than a mobile device. A183–A201. Not only does this allow the speech recognition engine to be larger and run faster, it also permits user-specific files (for instance, user dictionaries) to be created and maintained that improve the speed and accuracy of the speech recognition engine.

Unwired Planet was awarded the '446 patent in 2003. In general, the claims describe sending voice input from a user's mobile device to a remote speech recognition server that translates the voice input into a symbolic data file. The data file is then sent back to the mobile device for possible review, editing, and use by the user. A192(2:46–50, 2:55–63). The specification of the '446 patent discloses that the mobile device can be a mobile phone, palm-sized computing device, or PDA with "voice transmission and/or reception capabilities." A193(4:67–5:6). "Voice capabilities are defined as the capabilities equipped in a mobile device that allow a user to communicate voice based information to and from remote destinations (e.g. to another user or a device)." A194(5:3–6).

12

Unwired Planet asserted claims 15 and 35 against Apple's Siri service, which is an application on iPhones and iPads that enables speech recognition. When an iPhone user wishes to ask Siri a question, the user holds down the home button and is prompted to provide voice input. The voice input is received by the iPhone, encoded into a digital representation, and sent to Apple's server.

The process Apple's devices use to transmit speech input to the server is remarkably similar to voice-over-IP telephone calls. First, the voice input is encoded, or converted into a digital representation, using Speex, a speech codec designed for voice-over-IP calls. A6192; A6072. After encoding the speech, the iPhone then streams the Siri user's speech, including any silent pauses, without delay to Apple's servers, with continuous packetization and transmittal. A6192; A5955. Again, this is the same process as used by voice-over-IP applications. The iPhone transmits the Siri user's speech over the DTCH/UL channel in LTE, which is the same cellular channel that is used when an iPhone user makes a cellular phone call. A6192; A5981–A5982. If the iPhone happens to transmit the Siri user's speech transmitting over a WiFi network, Siri uses the same channel to send the user's speech over WiFi that is used to make phone calls from iOS devices via Skype or FaceTime. A6192; A5980–A5981.

In the face of this evidence, the main fact the district court seized upon as contrary is that the iPhone places the encoded digital representation of the speech

into transmission packets using the TCP/IP protocol. Although the district court cited to the use of TCP/IP protocol in concluding that Apple's devices did not use a voice channel, Unwired Planet presented evidence that voice-over-IP applications, such as Skype, that use a voice channel also use the TCP/IP protocol in some circumstances. A58–A60; A6192; A5980–A5981.

## 2. The district court erred in construing "voice input" to require transmission over a "voice channel"

The district court construed the term "voice input" as "speech provided over a voice channel," as proposed by Apple. A38; A42. Unwired Planet proposed that the plain meaning of the term "voice input" was sufficient, or alternatively, that "voice input" be construed in a non-limiting way as "speech input." During claim construction, Unwired Planet specifically objected to the notion that the "voice input" was required to the transmitted over a particular type of channel, such as a voice channel. A38.

In its claim construction order, the district court agreed with Unwired Planet that a "voice channel" did not require placing an actual telephone call, as such an interpretation would exclude the disclosed use of palm-sized computing devices and personal digital assistants. A42. The district court attempted to reconcile its ruling with the specification by observing that "just because these devices do not make phone calls does not mean they do not make use of voice channels." A42.

14

The district court added a "voice channel" limitation to its construction of voice input based on "present invention" language in the '446 patent's specification. A42. But the '446 patent specification does not consistently use "present invention" to require a voice channel, and certainly not as part of a "voice input." The district court's contrary conclusion was in error for three reasons.

*First*, when the '446 patent refers to the "present invention," it is not referring to a "voice channel." The written description discloses a number of alternatives to a "voice channel" for communicating the "voice input," including "data communications," "voice capabilities," and "voice circuits." A192(1:15–18); A193–94(4:67–5:6); A197(12:40–46, 12:54–59); A198(13:8–12, 14:4–12). The claims, likewise, recite alternatives for communicating the "voice input": e.g., a "first communication path" in claims 1, 37, 48; and a "voice communication channel" in claim 21. A199–201. Some, like asserted claim 35, have *no* limitation governing communication of the "voice input." A200. The breadth of the '446 patent's description and the differences among its claims belie the notion that each of the patent's claims requires a "voice channel."

It is axiomatic that limitations should not be read into the claims from the specification. *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362 at 1366 (Fed. Cir. 2012). In limited circumstances, a limitation *consistently* referred to as the "present invention" may be imported into the claims. *Absolute*

15

*Software*, 659 F.3d at 1136; *Verizon Servs. Corp. v. Vonage Holding Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 425 F.3d 1312, 1318–19 (Fed. Cir. 2006). But using "this invention" or "present invention" language does not limit the claims when "the references to a certain limitation as being the 'invention' are not uniform, or where other portions of the intrinsic evidence do not support applying the limitation to the entire patent." *Absolute Software*, 659 F.3d at 1136–37.

The first use of "this invention" or "present invention" in the specification describes the use of *data communications*, not a voice channel: "This invention generally relates to *data communications*, and in particular to a two-way wireless communication device that utilizes network based speech recognition resources to augment the local user interface." A192(1:15–18) (emphasis added). Thus, the '446 patent explicitly describes "this invention" as using "data communications" to access "network based speech recognition resources." A192.

The '446 patent further explains that mobile devices have "voice capabilities," not that they necessarily use a "voice channel":

> Mobile devices 102 and 103 may be taken from a group, which includes mobile phones, palm sized computing devices and personal digital assistants with *voice transmission and/or reception capabilities*. *Voice capabilities* are defined as the capabilities equipped in a mobile device that *allow a user to communicate voice based information* to and from remote destinations ....

16

A193–194(4:67–5:6) (emphasis added). Furthermore, the patent does not describe "voice capabilities" as requiring a "voice channel," but as the ability "to communicate voice based information." A194(5:5). In contrast, "voice channel" is disclosed in a specific embodiment and "generally requires that the user and/or device be recognized by wireless carrier network 104." A194(5:7–9). The patent further describes a "voice channel" as generally being part of a wireless telephone call:

> The voice communication channel previously described is generally represented by voice channel 126. This communication channel is generally established and coordinated using the infrastructure and procedures generally known in the art for setting up a phone call.

A194(6:20–24).

The '446 patent uses "present invention" in the same sentence as "voice channel" only twice. In both instances, the sentence expressly describes a specific embodiment, not a limitation of the patent as a whole. A193(4:11–16) ("According to one embodiment of the present invention ..."); A194(6:35–39) ("According to the preferred embodiment of the present invention ..."). Instead, the patent generally uses "present invention" to describe the remote speech recognition aspect of the invention in the '446 patent:

> The *present invention* relates to a wireless communication system that utilizes a *remote speech recognition server* system to translate voice input received from mobile devices into a symbolic data file ... that can be processed by the mobile devices.

17

A192(2:46–50) (emphasis added). While these general descriptions may precede descriptions of specific embodiments, the specific embodiments are not described as the "present invention." A192(2:50–63) (discussing a specific embodiment without describing it as "this invention" or "present invention"). Critically, the specification's use of the "present invention" language does not suggest that entire paragraphs of limitations describing specific embodiments should be imported from the specification. Instead, the specification provides a one-sentence summary of the "present invention" as using a remote speech recognition server before discussing a specific embodiment that may be—but does not have to be—implemented as part of the invention. A192(2:46–50).

*Second*, "voice input" and "voice channel" are different terms with different meanings, and are used differently throughout the '446 patent specification. "Voice input" refers to the spoken input from the user—nothing more. A192(2:53–56). "Voice channel" refers to a connection over which a "voice input" may be transmitted, A193(4:17–19), which generally requires access to and recognition by a wireless carrier network, A194(5:7–9), and is generally "established and coordinated" in ways similar to a phone call, A194(6:20–24).

Patent specifications can show that different terms have "distinctly different meanings." *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007). Throughout the specification, "voice input" and "voice channel" are used to

18

express different concepts. "Voice input" is described as being received from the user, A194(6:57–58) ("user is prompted to provide voiced input (e.g. begin speaking)") or "received from mobile devices," A192(2:48); A197(12:49) ("user provides voice input"); A199(15:15) ("user can input a voice signal"). In contrast, a "voice channel" cannot be "received," rather a "voice channel" is *established* "between a mobile device and the speech recognition server." A192(2:51–53); A193(3:4–9); A194(6:20–24, 6:35–39). A "voice input" can be mapped or processed into a symbolic data file. A195(7:7–12). No similar mapping or processing of a "voice channel" is disclosed. A197(12:7-16) ("voice channels" are "established" or may be "maintain[ed]," "open," or "terminate[d]," but not "mapped," "processed," or otherwise changed into a symbolic data file); *see Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim").[1]

*Third*, the inventors of the '446 patent drafted some claims that include a "voice channel" limitation—which the court's construction renders superfluous—and other claims—whose meaning the court's construction improperly changes—

---

[1] Contrary to the district court's suggestion, treating "voice input" and "voice channel" as different terms with different claim coverage does not broaden the "voice input" claim term beyond the intrinsic record. A40. As noted below, the '446 Patent discloses alternative implementations—"paths" or "sessions"—that are distinct from a "voice channel." A199–201(claims 1, 37, 48 use "path"); A200(claim 29 uses "session").

that do not. The object of claim construction is to "elaborat[e] the normally terse claim language in order to understand and explain, *but not to change*, the scope of the claims" *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (citation and quotation omitted, emphasis added).

All six of the '446 patent's independent claims include a "voice input" or comparable limitation. A199–201. One independent claim requires a "voice communication channel." A199(claim 21). The remaining independent claims often include either a "path" or "session" limitation. A199–201("path": claims 1, 37, 48; "session": claim 29). The inventors included a "voice communication channel" limitation in independent claim 21, but did not incorporate a "voice channel" limitation into claims 1 and 31, which include "voice input" limitations, but no "voice channel" limitations. Nor did the inventors incorporate a "voice channel" limitation into the unasserted independent claims 29, 37, and 48, which also refer to a "voice input," but not a "voice channel." The use of different terms in different claims—even in two independent claims—indicates a difference in meaning. *Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014).

The '446 patent's provisional application included these differences in claim language when filed, which shows that the inventors intended these different terms would provide different claim coverage from the very start of prosecution. A14033; A14036–A14040.

20

### 3.    The district court erred in granting summary judgment after resolving factual disputes against Unwired Planet

While the district court misconstrued "voice input" to require the use of a "voice channel," its claim-construction order acknowledged that a "voice channel" in the '446 patent can exist outside of a telephone call, such as for palm sized computing devices and PDAs. A42. In granting summary judgment of noninfringement, the court held that a "voice channel" had to have the attributes of a telephone call. A55; A57. In making this decision, the court again improperly resolved material factual disputes regarding the comparison of the accused product to the claims against the non-movant Unwired Planet.

### a.    The district court erred in discounting the summary-judgment evidence provided by Unwired Planet

Disputes regarding the application of construed claims to the accused products raise issues of fact, not law. *Int'l Rectifier*, 361 F.3d at 1374-75. And on summary-judgment, the evidence of *non-movant*—here, Unwired Planet—is to be credited. *Pyramid Techs.*, 752 F.3d at 818. In considering Apple's motion for summary judgment as to the '446 patent, the district court erred when it credited the opinion offered by Apple's expert witness, Mr. Rysavy, over the opinion of Unwired Planet's expert. Unwired Planet's expert testified that the channel over which a Siri user's voice is transmitted to the Apple server for recognition is fairly considered a voice channel. A5979–A5984; A6012–A6021; A6070–A6073;

21

A6146–A6154. In support of his opinion, Unwired Planet's expert offered the following facts:

- Siri is very similar to Skype, a voice-over-IP protocol that uses a voice channel, and both implement the TCP/IP protocol in a voice channel. A6148.
- Siri streams a user's speech, including any silent pauses, without delay to Apple's servers, with continuous packetization and transmittal. A6192; A5955.
- Siri specifically configures the channel to transmit the user's speech, using the Speex codec specifically designed to encode and packetize speech or voice for transmission. A6147, A6150; A6019–A6020; A6072.
- Siri uses the same channel to send the user's speech over cellular that is used to make phone calls from iOS devices. A5981–A5982; A6150–A6153.
- Siri uses the same channel to send the user's speech over WiFi that may be used to make phone calls from iOS devices via Skype or FaceTime. A6192; A5980–A5981.
- ███████████████████████████████████████
  █████████████ A5979.
- For a channel, similar to that used by Siri, used by Apple for gaming applications, Apple's public documentation describes the channel as "a voice channel that allows a set of players in a match to speak with each other" without making a phone call. A5979; A6727–A6728.

The district court flipped the proper summary-judgment approach on its head. On summary judgment, the court was required to credit the evidence of the non-movant, Unwired Planet, and resolve all inferences in Unwired Planet's favor. The district court did not address all the evidence put forward by Unwired Planet, ignoring a number of important facts in its analysis. The court also made technical errors in statements outside the record, recounted below. Compounding those errors, the district court discounted the weight of the technical factors that

supported Unwired Planet's position, while according more weight to the factors identified by Apple. Finally, the court erred by crediting the testimony of Apple's expert, Mr. Rysavy, on the point of disagreement with Unwired Planet's expert.

*First,* the district court technically erred in its evaluation of the use of the TCP/IP protocol by Siri. Recognizing the importance of voice-over-IP applications to the characterization of a voice channel, after the summary judgment hearing the district court requested additional briefing answering the following question: "[d]oes VoIP technology send voice input over a voice channel?" Unwired Planet submitted a brief in which it responded "Yes" and pointed to its expert report in which its expert expressed the opinion that VoIP sends voice input over a voice channel. A13033–A13035. Skype is a well-known example of a VoIP application that sends voice input over a voice channel. A5980–A5981.

Yet in its order granting summary judgment, the district court disagreed with the testimony of Unwired Planet's expert. A6148. The district court attempted to distinguish Skype on the basis that Siri uses the TCP/IP protocol to send speech while Skype does not use TCP/IP as its preferred protocol. In making its distinction, the district court drew upon facts that were completely out of the record and made an unwarranted and unsupported assumption: "[n]o VoIP services use TCP in normal operation; rather, they only use TCP if the preferred protocol is not available, presumably because TCP/IP protocols do not include any of the

23

transmission protocol, error correction mechanisms,[2] or prioritization properties that are necessary for voice to be transmitted without delay." A58. In fact, the district court was technically incorrect to the extent it characterized the TCP/IP protocol as a data only protocol, and held that the TCP/IP protocol cannot be used to implement a voice channel. A55. Unwired Planet's expert opined to the contrary, noting that TCP/IP can implement a voice channel, and in fact, the voice-over-IP application Skype uses TCP/IP as a voice channel. A6148.

*Second*, the district court tried to distinguish the fact that Siri uses the same wireless channel as voice calls, the DTCH channel. A5981. In distinguishing this fact, the district court again made an unsupported, outside the record assertion, namely that "cellular networks provide an 'uplink channel' for all outgoing communications and a 'downlink channel' for incoming communications. So from this standpoint, of course voice calls and Siri speech input both use the 'uplink

---

[2] Skype uses both UDP and TCP as protocols, but will default to UDP, using TCP if UDP is unavailable. The district court's assumptions (completely outside the summary judgment record) about UDP being preferred because UDP has error correction mechanisms necessary for voice transmission that TCP lacks is incorrect. In fact, the opposite is true: TCP does have error control, while UDP does not have error control. Darin Swan, TCP's Built-in Error Control Mechanisms at 2, available at http://www.academia.edu/2614115/TCPs_Built-In_Error_Control_Mechanisms; Comparison of UDP and TCP, Wikipedia, https://en.wikipedia.org/wiki/User_Datagram_Protocol#Comparison_of_UDP_and_TCP (last visited Sept. 9, 2015).

channel' because they are both forms of outgoing communication." A59. The court again erred technically, because cellular networks do not provide just one uplink and one downlink channel, but rather provide multiple different logical uplink channels within LTE and the other cellular standards. A6150–A6153. The fact that voice telephone calls and Siri data are both sent across the same DTCH/UL channel—despite the presence of multiple other uplink channels—supports the conclusion that Siri uses a "voice channel." A5981.

*Third*, the district court tried to distinguish the fact that Siri streams voice input, which is a characteristic of a voice channel, by stating that there was "no evidence as to what Unwired means by 'streaming,' or how this type of streaming is any different from the way that data is streamed over a data channel." A59. To the contrary, Unwired Planet stated that "streaming" includes sending "user's speech, including any silent pauses, without delay to Apple's servers, with continuous packetization and transmittal," as is done for a phone call. A6192; A5955. A "data channel," in contrast, does not continuously transmit "silent" portions, consuming network bandwidth when there is no actual data to transmit.

*Fourth*, the district court improperly discounted, without justification, the evidence that Siri uses the Speex codec for encoding and packetizing the voice input. A59. The Speex codec is designed for transmitting voice input over a network, and demonstrates that Siri treats the transmission of the voice input as a

"voice" transmission, not a "data" transmission—thus the transmission uses a "voice channel," not a "data channel." A6147; A6150; A6019–A6020; A6072.

b.    **The district court erred in crediting the summary-judgment evidence provided by Apple**

While ignoring or discounting the substantial summary-judgment evidence submitted by Unwired Planet, the district court credited the summary-judgment evidence submitted by Apple. This evidence assumed that a person of ordinary skill would understand a "voice channel" to require all of the attributes of a telephone call. A57. The court thus focused on Mr. Rysavy's testimony regarding: (1) transmission interval, (2) error correction mechanisms, and (3) prioritization of network resources, all of which were proposed by Apple. A57. In so doing, the court treated "voice channel" as if it needed to be a telephone call between two individuals holding an interactive conversation, rather than a voice input signal sent in one direction from a user to a speech recognition server, as disclosed in the '446 patent. A57. The court's approach again required it to improperly resolve material factual disputes against Unwired Planet.

*First*, the court erred in accepting Apple's assertion that a 20 ms transmission interval would qualify as a voice channel, but Siri's 200 ms transmission interval would not, suggesting it introduces too much delay for two participants to "communicate effectively" via a telephone call. A57. The district court's conclusion is based on the erroneous assumption that a "voice channel"

must be two way, where both participants are speaking and need to avoid talking at the same time. With the '446 patent, there is no back-and-forth conversation between the participants. Instead, the '446 patent transmits a user's voice input to a speech recognition server, where the user does all the speaking and the server just listens then sends back a text representation of the speech. As there is no back-and-forth conversation, just a unidirectional voice input, the marginal delay before a speech packet is sent (200 ms—just 1/5th of a second, versus 20 ms) is irrelevant.[3]

*Second*, the court erred in crediting Apple's assertion that Siri does not have a voice channel due to the fact that it uses the TCP/IP protocol error correction. A57. But this conclusion is contradicted by evidence submitted by Unwired Planet that Skype, a voice over IP telephone service, will use TCP/IP and thus error correction under certain conditions, such as when the default protocol, UDP, is unavailable. A6148. The district court admitted that in the case of Skype over TCP/IP, that it is "not clear" whether or not a voice channel is used, A58, thus a reasonable jury could decide that TCP/IP can transmit a voice channel, even with TCP/IP's error corrections.

---

[3] The district court did not analyze the transmission interval for anything other than the delay it causes. A57–A58. But if such a delay precluded the presence of a "voice channel," telephone calls relayed via satellite could be sufficiently delayed to no longer use "voice channels" under the district court's analysis.

*Third*, the district court erred in accepting Apple's assertion that a voice channel must have dedicated network resources or other prioritization over a carrier's network. A58. There is no evidence in the record that use of Skype on a mobile device has dedicated network resources or other prioritization over a carrier's network, but a reasonable jury could find Skype to use a "voice channel." A6148. Furthermore, Apple implements what it calls a "voice channel" over IP in its GameKit environment for mobile devices. A6191; A5979. There is no evidence of dedicated network resources or other prioritization for the "voice channel" created with Apple's GameKit, yet Apple engineers label it a "voice channel." A6727. This further shows how the district court ignored evidence of what would be characterized as a "voice channel" by persons of ordinary skill in the art, even Apple's own engineers. A6727. A reasonable jury could thus decide that a voice channel exists without dedicated network resources or transmission prioritization.

## C.    The District Court Erred in Its Claim Construction and Summary Judgment Orders on the '260 Patent

### 1.    Additional facts relevant to the '260 patent

Years before Apple began developing the first iPhone, Unwired Planet solved a problem of fundamental importance to the mobile-device industry: how to remotely provide new or updated features and services to a mobile phone, a process known as provisioning. Unwired Planet's provisioning invention enabled

the secure installation of content onto mobile devices—an invention that Apple would later use to power its App Store and iTunes Store.

In the mid-1990s, developers began to create the first apps and content for mobile devices. Mobile phones were becoming more than just phones: through Unwired Planet's inventions, they were connecting to the newly developed Internet, enabling a wide range of services. A3625(1:20-24). New devices combined both computing and communication capabilities, including personal digital assistants ("PDAs"), two-way pagers, and handheld computing devices. A3625(1:13-27). Those new devices were equipped with microprocessors and storage capacity—and software developers were quick to take advantage of the capabilities of this new hardware. A3625(1:25-29).

Software developers, including Unwired Planet, were creating the very first apps and content for mobile devices, such as web browsers, address books, and email, as well as apps to enable access to services on the Internet and private intranets. A3625(1:25-32). Unwired Planet's apps for mobile devices included a browser called UP.Browser, an e-mail program called UP.Mail, and a personal information application called UP.Organizer. But before a consumer could use such content on a mobile device, the content needed to be provided to the device, or if the content was previously provided, certain parameters were needed to enable the content. A3625(1:33-37). The prior art lacked a provisioning system

that offered both convenience for users and security for providers. A3625(1:43-59). Consumers wanted a system that did not require them to visit a retail store to provision their mobile device with features and services. A3625(1:43-48). And providers wanted a system that ensured that these features and services were not used or obtained in a fraudulent manner. A3625(1:49-55).

Unwired Planet addressed these concerns in the '260 patent. This patent taught a convenient and secure manner to provision mobile devices so that content could be remotely installed. Now consumers could wirelessly enable and modify a mobile device's features and services. A3625(2:38-47). They could also enable and modify the features and services associated with their mobile device after the initial provisioning. A3625(2:43-47). In addition, the provisioning was tied to a particular user account—so only an authorized user could provision the features and services, and, advantageously, the same features and services could also be provisioned to the user's other devices.

The invention allows a user to view a list of available features and services on the mobile device. A3625(2:1-4). The user is prompted to input "user information" to create or verify an account. A3625(2:7-11). The mobile device next establishes a secure communications session with a provisioning server device; the user information and the user's selection of features and services are then forwarded to a provisioning server device. A3625(2:4-13); A3627(5:51-65).

30

The provisioning server device processes the information and generates provisioning content and notifications for the mobile device. A3625(2:13-16). The provisioned content includes software applications, activation information to initialize previously installed applications, requests to register a new user for particular services, notifications and information required to access services, software modules and information required to communicate with limited access servers, and any required security information. A3625(2:13-18); A3627–A3628(6:49-7:2).

This invention is central to Apple's App Store and iTunes Store. The App Store allows iOS device users to search for, download, and update applications on iOS devices. A6387. Similarly, the iTunes Store allows iOS device users to search for and purchase music, movies, and TV shows to download to their devices. Through the App Store or iTunes Store, iOS device users can also update their downloaded applications or download previously purchased content. A6387.

App Store or iTunes Store[4] users must have an iTunes account, which requires a password. A6390–A6392. To purchase content from the App Store or iTunes Store, the iOS device user must be signed in to an iTunes Store account by providing her password. There are two scenarios under which a user might

---

[4] ████████████████████████████████████████████████████
████████████████████████████████████  A6390.

provision a phone that Unwired Planet accused of infringement that must be analyzed separately.

The first provisioning scenario occurs when an App Store or iTunes user has not recently (within the last 15 minutes) entered her password into her mobile device (the "Greater Than 15 Minutes scenario"). In that scenario, after the user selects an app or other content to provision onto the mobile device, the iOS device requests the user to enter her password. A6396–A6398. After receiving the password, the iOS device generates an authenticate request that includes the user's password. A6394–A6396. The iOS device transmits the authenticate request to Apple servers, and if the user's sign-in information is successfully authenticated by the servers, an authenticate response is returned to the iOS device. A6394–A6396. The authenticate response includes an X-token, which is a hashed version of the password just received and ████████████████████████████ ███████████████████████ A6395. The hash which comprises the X-token contains a hash of the user's password and a time stamp, ███████████████ ████████████████████████████████████████ A6395. After successfully receiving the X-token, the iOS device then automatically, without any further user involvement, generates a request to the Apple server to provision the iOS device (which Apple terms a "buyProduct" request) that includes the X-token for authentication. A6431–A6432. After

generating the buyProduct request, the iOS device transmits it to Apple's servers.

A6397–A6398. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ A6399.

The second provisioning scenario occurs when a user has entered her password into the iOS device within the last 15 minutes (the "Less Than 15 Minutes" scenario). In that situation, the X-token is still live and valid, so there is no need to have the user re-enter her password. A6397–A6398. The buyProduct request will be sent with the valid X-token, and the response and download happen in the same way as described for the Greater Than 15 Minutes scenario.

### 2. The district court erred in granting summary judgment after resolving factual disputes against Unwired Planet

The district court erred in granting summary judgment of noninfringement based principally on the "user information" element. User information is required by claim 1 in the following two elements:

- receiving user information required to establish a user account; and

- generating a provisioning request comprising the user information and the user's selection.

A3629(9:15-39).

Apple's App Store and iTunes Store work in substantially the same way with regard to the elements of claim 1. Unwired Planet presented separate and

33

alternative infringement cases for both the Less Than 15 Minutes and Greater Than 15 Minutes scenarios. The district court granted summary judgment of non-infringement in favor of Apple with regard to both scenarios for different reasons, which will be discussed below.

First addressing the Less Than 15 Minutes scenario, Unwired Planet identified the X-token as satisfying the "user information" claim requirement of "generating a provisioning request comprising the user information and the user's selection." A password certainly comprises user information, and Unwired Planet identified the X-token as the user information because it contains the user's password in a hashed format. The district court rejected this argument on summary judgment, concluding because the password that is supplied by the user is subsequently hashed into the X-token when a provisioning request is generated (the buyProduct request), the hashed password cannot satisfy the "user information" limitation. A61–A62. The evidence submitted by Unwired Planet proved that when a user seeks to make a provisioning transaction on the App Store or on iTunes, causing a request named "buyProduct" to be generated and transmitted by the mobile iOS device, buyProduct request includes the hashed version of the user's password contained in the X-token. A6431–A6432; A6357–A6358. The X-token's hash is merely "a mathematical function applied to the user's password." A5766–A5767; A6396; A6431.

The dispute that the district court improperly resolved on summary judgment is whether merely hashing the user information along with a time stamp transforms it into something non-infringing. In resolving the fact issue, the district court first incorrectly concluded that "the user information included in the buyProduct request (the alleged 'provisioning request') is not the same user information required to establish the iTunes account (the alleged 'user account')." A61. The court reasoned that because "one can't even figure out the password from the hash" and "[t]he hash of a password in a buyProduct request is a proxy for the user's Apple ID password," there could be no infringement. A62.

The district court erred in resolving this fact issue because the X-token contains the same substantive content, only in a different (hashed) format. In fact,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ A6465–A6466. Accordingly, the X-token is not merely a "proxy" for the user's password, as the district court erroneously characterized it, but is a secure reproduction of the user's password, containing the *same* user information in a different form.[5] A6396; A6466; A5767.

---

[5] Contrary to the district court's suggestion, Unwired Planet's infringement theory is not a doctrine of equivalents theory dressed up as a literal infringement theory. A62. As explained above, Unwired Planet points to the same information to satisfy both claim limitations regarding "user information."

Merely hashing a transmission should not be enough to avoid infringement, given the character and scope of the claims of the '260 patent. Nothing in the claims or specification requires that the user information be represented in exactly the same way when received by the device and included in the provisioning request. As an example, the patent describes that user information may be provided as voice through an Interactive Voice Response Unit (IVRU). A3625(2:33-37). The user's information is provided in voice form, but then changed by the provisioning server to put it in in digital form. A3626(3:40-43). Although the representation of the user's information has changed, it is still the same information.

Addressing now the Greater Than 15 Minutes Scenario, the difference is that in this scenario Unwired Planet presented an alternative infringement analysis that does not require the X-token to satisfy the user information. In the Greater Than 15 Minutes scenario, where a user requests to provision her iOS device with content from Apple but has not entered her password within the last 15 minutes, the iOS device prompts the user to enter her password. A6396. Upon receipt of the password, the iOS device generates an authenticate request in which the password (in a non-hashed format) is sent to Apple servers. A6394–A6396. In this scenario, the analysis regarding the X-token undertaken by the district court does not apply because the password is sent to Apple as part of the provisioning request in a non-

36

hashed form. Unwired Planet identified the provisioning request, which must comprise both "the user information and the user's selection" pursuant to the claims, as a combination of both the authenticate request (which contains the password, or user information) and the buyProduct request (which contains the user's selection of content).

For this Greater Than 15 Minutes scenario, the district court based its summary judgment on the conclusion that the "provisioning request" could not comprise both the Apple authenticate request and a buyProduct request, agreeing with Apple's expert that the two "are indisputably two separate requests, even if they occur successively without any action by the user, so they cannot be combined to meet the claim limitation of 'provisioning request.'" A62. Based on this reasoning, the district court granted Apple's motion for summary judgment of non-infringement. A63.

The district court again usurped the jury's role of determining whether the construed claims read on the accused products. The parties' experts disputed whether the operation of the accused products satisfied the "user information" and "provisioning request" claim elements. While acknowledging the "battle of the experts," A1245, the court elected to resolve that battle itself—against non-movant Unwired Planet, A50–A71. But the resolution of "line-drawing problems— especially easy ones like this one—is properly left to the trier of fact." *Acumed*,

483 F.3d at 806; *PPG Indus.*, 156 F.3d at 1355 ("[A]fter the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact."). Because a reasonable jury could find that Apple's iOS devices with the App Store infringe these claim limitations, summary judgment was improper.

Indeed, Unwired Planet's expert testified that although iOS devices may react to a purchase request from the user with two communications to Apple servers, an authenticate request that sends the password and a buyProduct request that sends the user's selection, these two transmissions constitute a single "provisioning request" because they occur close in time, successively, and without any further input from the user. A5770–A5774.

Unwired Planet's infringement theory against Apple is consistent with the specification of the '260 patent, which discloses generating a provisioning request through multiple network transactions. The patent explains that the invention uses "a secure communication session." A3627(5:6-11). The creation of a secure communication session requires successive transactions to occur between devices to fulfill a client request. A3628(8:16-28) (describing that after establishing a secure communications session (step 702), several transactions occur, including mutual authentication of both participants (step 704), forwarding of user

38

information and device information (step 708), and processing of the provisioning

request (step 714)). 

A5770–

A5774.

The district court's view that these technical disputes related to claim

application raised only questions of law led the court to improperly weigh and

credit the movant's evidence on summary judgment, and to usurp the jury's role in

determining whether the accused products read on the asserted claims of the '260

patent.

### 3.    The district court erred in construing "provisioning" so as to exclude disclosed embodiments

The district court construed the central term "provisioning" as "enabling or modifying communication capabilities."[6] A25. Rather than defining the verb "provisioning," the court focused on "*what* is enabled or modified." A22. The claims themselves specify that the mobile device is provisioned "with a feature or service," but the district court found that "an examination of the claims is not particularly helpful, because they make no attempt to define 'provisioning' and provide little guidance as to what 'provisioning' refers to." A22. The court instead focused on the specification. A23–A24. But while the specification teaches provisioning the mobile device with content that does not have communication capabilities—such as address books, A3625(1:25-32)—the district court suggested that this disclosure "appears to refer to the types of applications that *exist* on these mobile communication devices, not the types of applications that are enabled through the provisioning process." A24–A25. The court further found that the

---

[6] The court's grant of summary judgment as to the App Store ultimately did not depend on the construction of "provisioning." Unwired Planet's infringement allegation for iTunes does depend on the construction of "provisioning." Because the App Store and iTunes Store process download requests similarly, A6390, Unwired Planet's infringement theories for the iTunes Store are similar to those for the App Store. Accordingly, this Court's resolution of the proper construction of the term "provisioning" promotes the efficient and judicially economic resolution of the parties' dispute. *Regents of the Univ. of Cal. v. Dako N. Am., Inc.*, 477 F.3d 1335, 1336-37 (Fed. Cir. 2007).

extrinsic evidence presented by the parties was "not precisely on point" and provided little assistance. A23.

Claim 1 of the '260 patent is directed to "[a] method for provisioning a two-way mobile communications device," including the step of "provisioning the two-way mobile communications device with a feature or service based on the reply." A3629(9:15-39). The intrinsic evidence shows that the provisioned features and services are those *available* to the mobile device, without restriction to communication capabilities. A3625(1:7-10). Because the district court failed to "read the claim term … in the context of the entire patent," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc), its construction of "provisioning" as "enabling or modifying communication capabilities" is improperly narrow.

The '260 patent, taken as a whole, supports construing "provisioning" to include all features and services available to mobile devices, such as downloading an address book or music files, and not just enabling or modifying communication capabilities. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning unless the patentee explicitly redefines the term or disavows its full scope.").

Claim 1 states that "features and services" are provisioned, without limiting the capabilities of the features and services. A3629(9:15-39). The Background of

41

the Invention provides a similarly broad description, explaining that the "present invention" relates "to a method and system for provisioning the features and services *available* to the two-way mobile communication devices," without limiting the types of features and services that qualify. A3625(1:7-10) (emphasis added); A3627(5:51-65) (describing the "provisioning application" of an embodiment "allow[ing] the user to pick and choose desired device features and services").

The specification gives examples of features and services that might be available to mobile devices, including "micro-browsers, address books, and email clients." A3625(1:28-32). Address books do not enable or modify a device's communication capabilities. The patent further explains that the provisioned mobile devices include Personal Digital Assistants (PDAs) and handheld computing devices, A3625(1:16-20), which provide applications such as address books, calendars, and word processors that do not modify or enable communication capabilities. Accordingly, limiting "provisioning" to communication capabilities improperly excludes express examples of *available* features and services that could be provisioned onto a mobile device. *Broadcom v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("This court has clarified that an interpretation which excludes a disclosed embodiment from the scope is rarely, if ever, correct.").

The district court incorrectly concluded that these passages refer to "applications that *exist* on these mobile communication devices, [not] the types of applications that are enabled through the provisioning process." A24–A25. The patent is describing example applications "*used in*" mobile devices and services to which the devices "*ha[d] access*," not merely features and services existing on mobile devices. A3625(1:28-32) (emphasis added). The specification further explains that "[c]hanges to the features or services may be initiated at any time," A3628(7:65-67)—and those changes could affect *any* of the device's features and services. A3627(6:50-53) (provisioning content "takes the form of software modules, which *modify the resident features* of the mobile device") (emphasis added); A3623(step 740) ("receive/implement feature modification").

The patent's discussion of initial provisioning does not support the court's construction. The specification explains that "[b]efore a consumer can use one of these devices, a number of parameters must be provisioned in order to enable communication services and applications and in order to distinguish the device from others within the communications network." A3625(1:32-37).[7] While this

---

[7] The district court also quoted the statement that "[i]n addition to provisioning the two-way mobile communications device, it is also necessary to provision network elements in the communications network which are responsible for effecting mobile communications services and applications (e.g., billing plan, voice mail, call forwarding, email, information services, etc.)." A3625(1:37-42). However, this sentence addresses provisioning *network elements*, not mobile devices.

indicates the "communication services and applications" must be provisioned initially, it does not suggest that "provisioning" is limited to "communication capabilities." Common sense dictates that a mobile device requires initial programming of certain parameters to enable communications over wireless networks. However, as discussed above, "provisioning" in the context of the '260 patent is not limited to "communication capabilities," nor to "initial provisioning." It also includes subsequent provisioning with changes to the device's features and services. Accordingly, the court failed to "avoid the danger of reading limitations from the specification into the claim." *Phillips*, 415 F.3d at 1323; *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014).

The district court's reliance on the discussion of "mobile communications devices" to limit "provisioning" to communication capabilities is also meritless. A24. The court is correct that "mobile communications devices," as opposed to devices without communication capabilities, are provisioned. This is because only communication-capable devices can be *wirelessly* provisioned. But this does not limit "provisioning" to features or services with communication capabilities; it merely identifies the type of devices that are provisioned.

### D.     The District Court Erred In Granting Summary Judgment of Noninfringement on the '831 Patent

#### 1.     Additional facts relevant to the '831 patent

In the late 1990s, the tremendous growth of the Internet led to providing mobile devices, such as cell phones and PDAs, with access to information and services on the Internet. A6704(1:55-60). In this environment, mobile devices interacted with wireless networks to receive emails, news updates, and various types of notifications. A6704(1:45-47).

Mobile devices receive notifications and other data over radio signals. A6704(1:26-36, 1:61-62). Although mobile devices use the same circuitry to process radio signals, the radio signals contain different channels with varying characteristics. A6704(1:61-2:7). Some of the different characteristics include one-way versus two-way communication and narrowband versus wideband, where a narrowband channel has a meaningfully lower data transfer rate than a wideband channel. A6704¬A6705(1:61-2:3, 2:60-3:20). Mobile devices use the different channels based on tradeoffs between cost, speed, availability, and resources. A6705(3:9-11).

Secure connections are important to protect private or confidential data included in the notifications and to minimize the risk of notification senders flooding mobile devices with unwanted notifications, which could overload the device's resources and battery. A6704(2:25-38). Establishing a secure channel

typically involves exchanging security information between the sender and recipient. A6704(2:51-55). Back in the 1990's, some of the available channels could not establish a secure channel by traditional security measures, because a secure connection could not be established over a one-way channel and could be problematic over narrowband channels. A6704(2:51-59).

With the '831 patent, Unwired Planet invented the secure delivery of messages to mobile devices over both one-way and narrowband channels. A6705(3:25-27). The invention initially uses a two-way or wideband channel to exchange security information between the mobile device and a message provider. A6705(3:28-39). The information provider then uses that security information to encrypt or sign messages it sends to the mobile device over a one-way or narrowband data channel. A6705(3:28-39). Unwired Planet's invention allows secure messages to be sent over one-way channels, which was not possible before, because security protocols require the sender and recipient to exchange security information over a two-way data channel. A6705(3:28-39). In addition, Unwired Planet's invention gives message providers the option to send messages to mobile devices over multiple secure data paths, which can be selected based on cost, speed, and resource availability. A6705(3:6-11, 3:36-43).

The '831 patent covers a system for pushing data to mobile devices. A6707(8:64-66). Mobile devices receive messages from wireless networks, and

these messages "include a header portion and a data portion. The header portion includes an address of the destination, and the data portion contains data." A6704(1:26-32). The push data received by mobile devices can pertain to various types of notifications, alerts, e-mail, news, configuration information, data files, content, and software applications. A6704(1:45-47).

A server and mobile device can connect over one-way or two-way data channels. A6704(2:60-67). A representative network, like the GSM network described in the patent, could use a Short Message Service (SMS, often referred to as text messages) channel to provide a one-way channel for sending text messages. A6704(2:63-67). Communication channels can have varying bandwidth or data transfer rate characteristics, where "wideband channels" transfer data at meaningfully higher rates than "narrowband channels." For example, the SMS channel "has a relatively small packet size (*e.g.*, 140 bytes)," limiting the data transfer rate of SMS messages and making it a narrowband channel. A6704(2:3-15). One-way channels are often narrowband channels. A6705(3:1-3).

A secure connection is required when the data to be transmitted is private or confidential. Setting up a secure channel normally requires two-way communication for handshaking and exchange of security information, but the '831 patent discloses establishing secure data transmissions over one-way channels by performing the security handshake operations necessary to secure a one-way

47

channel over a companion two-way channel. A6705(3:25-34). Once the handshake is complete, data can be transmitted over the one-way channel securely. A6705(3:34-36).

Apple's Push Notification Service (APNS) uses a secure narrowband channel. A5847; A5862. APNS is the centerpiece of Apple's push notification feature on iOS devices. A5847. Through APNS, application providers—such as Facebook, Twitter, or ESPN—send notifications to the user. A5848–A5850. The notifications can be messages, calendar reminders, or URL links. A5848. Application providers connect to APNS through a persistent secure channel that

███████████████████████████████████████████████████████

██████████████████████████████████████ A5850. A push notification

includes a payload. A5858. The payload is the content of the notification delivered to the user. A5858. APNS restricts the size of a payload to 256 bytes. A5859.

The district court construed "narrowband channel" as a "channel with a meaningfully lower data transfer rate or bandwidth than the wideband channel," and Unwired Planet presented evidence that APNS met this limitation as construed. A20; A5885–A5891. In particular, Unwired Planet showed that APNS uses two separate channels that differ in source, addressing, path, and data transfer rates: (1) a wideband channel that carries communications between APNS servers and users; and (2) a narrowband channel that carries communications between

provider servers and users at a meaningfully lower data transfer rate. A5744–A5746.

In support of the characterization of APNS as using a narrowband channel, Unwired Planet's expert explained that APNS places a 256-byte data limit on the size of push notification, which meaningfully restricts APNS's data transfer rate. A5747–A5749; A5886–A5891. ███████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ A5889–A5890. He explained that the significant overhead results in a meaningfully lower data transfer rate compared to a wideband channel that carries standard TCP/IP traffic. A5889–A5890; A5781 ("The percentages that I give [in my report] are the overhead which has a direct effect on the data transfer rate."). Unwired Planet's expert explained that this amount of header data associated with a notification impacts the data transfer rate because header information is not data and, thus, is not proper to include in the data transfer rate. A5747–5749; A5782; A6704(1:28-32); A6721 ("The TCP Length is the TCP header plus the data length in octets"). APNS's data-size restriction causes push notifications to be transmitted less efficiently, and thus at a meaningfully lower transfer rate. A5747–A5749 (discussing impact header information on transfer rate and that "the efficiency of a channel in transmitting data … can impact the data transfer rate of the channel").

49

The district court again discounted Unwired Planet's summary-judgment evidence. A51–A54. Confirming that it would give no weight to the testimony of Unwired Planet's expert regarding the 256-byte data limit on push notifications, the court assumed—without any supporting evidence—that an APNS push notification "includes all the content that an application provider sends to an iOS device. It is not as if an application provider intends to send 1000 bytes of data and therefore must send four push notifications to the iOS device." A52. Notwithstanding that the construction of "narrowband channel" turned only on a "meaningfully lower data transfer rate," A51, the court faulted Unwired Planet for not analyzing "the *capacity* of the alleged narrowband channel," A54. And in the absence of evidence that the APNS channel "itself is not capable of transferring data at" higher rate, the district court granted summary judgment of noninfringement on the asserted claims of the '831 patent. A54.

### 2.     The district court erred in granting summary judgment after resolving factual disputes against Unwired Planet

The district court erred in granting summary judgment of noninfringement on the '831 patent for three reasons.

*First*, the district court's analysis was premised on the wrong question. The court faulted Unwired Planet's expert for failing to offer testimony regarding "the *capacity* of the alleged narrowband channel to transfer data at a lower rate." A54. But the district court's construction of "narrowband channel" does not refer to

"capacity"—it requires a "channel with a meaningfully lower data transfer rate or bandwidth than the wideband channel." A51. Thus, "[t]he primary difference the two types of channels is the rate at which they transfer data." A51. However, in reaching its decision, the district court improperly added to this construction a limitation regarding the channel's *capacity*. A54.

Unwired Planet's expert performed an analysis of APNS's data-size restriction and concluded that the data-size limit meaningfully restricts the data transfer rate of the channel. Specifically, Unwired Planet's expert explained that APNS's 256-byte data limitation, ██████████████████████████ ██████, "will result in a meaningfully lower data transfer rate, or bandwidth, compared to a wideband channel that carries standard TCP/IP traffic." A5889–A5890; A5781 ("The percentages that I give [in my report] are the overhead which has a direct effect on the data transfer rate."); A5747–A5749 (discussing impact header information on transfer rate and that "the efficiency of a channel in transmitting data … can impact the data transfer rate of the channel").[8]

*Second*, summary judgment was improper because the district court drew inferences in Apple's—the movant's—favor. As discussed above, Unwired

---

[8] Unwired Planet's expert also explained that additional factors related to APNS's receipt, processing, and retransmission of push notifications further slow the data transfer rate of this channel. A5890–A5891. Unwired Planet's expert opined that "[a]ll these factors would negatively affect the bandwidth of the APNS channel in addition to the added header bytes." A5891.

Planet's expert presented evidence and analysis that APNS's limitations on the size of push notifications result in a lower data transfer rate. Furthermore, Unwired Planet presented evidence that the payload-size limitations were created by Apple and enforced by Apple's APNS. A5858–A5859. Thus, an inference to be drawn from the evidence and opinion provided by Unwired Planet's expert is that Apple imposed the size limitation to limit the data transfer rate for the APNS channel.

*Third*, the district court's summary judgment order also ignores a disclosed embodiment of the patent that mirrors Apple's implementation. APNS's data-size restriction is similar to the data-size restriction on SMS messages discussed in the '831 patent. SMS messages have restrictions on size similar to APNS messages, so if the restrictions on APNS messages do not result in a narrowband channel, then the restrictions on SMS do not result in a narrowband channel either and the result is that the preferred embodiment has been held to be outside the scope of the claims. *Broadcom v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("This court has clarified that an interpretation which excludes a disclosed embodiment from the scope is rarely, if ever, correct.").

The '831 patent describes that the narrowband SMS channel "has a relatively small packet size (*e.g.*, 140 bytes)." A6704(2:3-15). The patent further identifies the SMS channel as a narrowband channel. A6711 ("In this embodiment, the SMSC connections to the carrier networks are one-way, narrowband

52

channels"). SMS data-size restrictions impact the data transfer rate of SMS messages in the same way as described above with regard to APNS. A5892. Focusing on the theoretical capacity of the physical channel, as the district court did, results in evaluating the issue of whether the channel is narrowband at the wrong level of abstraction, as shown by the specification.

### E.    The District Court Erred in Granting Summary Judgment of No Indirect Infringement on the '092 Patent

#### 1.    Additional facts relevant to the '092 patent

Accurate information about a mobile device's location can be critical. Software ranging from maps programs to weather apps require a user's location, and the better information the device has about its location, the more useful the software. The '092 patent teaches increasing the accuracy of a device's location information by relying on multiple inputs. These inputs originate from "Location Finding Equipment" (LFE). A3602(1:44-64). Mobile devices will generally have access to multiple inputs which could be used to determine the device's location—GPS coordinates, the location and identity of nearby cellular towers, or information about nearby WiFi systems. A3602(1:44-64).

Unwired Planet's invention involves using multiple inputs, or LFEs, to generate more accurate information about the device's location, which is then provided to any software requesting location information. A3602(2:23-41). By using multiple sources, the invention increases the accuracy and reliability of

estimates of the device's location. A3602(2:23-41). One input may have situations in which it is inaccurate or not useful: for example, WiFi may be a reliable input in urban areas, but inaccessible in a rural location. A3602(1:44–2:19). GPS may work well outdoors, but can work poorly indoors. By combining multiple sources, Unwired Planet's invention made it easier to determine location where, as in the real world, the availability and fidelity of individual location inputs varies widely. A3602(2:23–41).

Apple's Location Services uses multiple inputs to determine a mobile device's location. . A6487. Apple provides a variety of user guides and manuals to both its customers and to third party app developers describing how to use Location Services. A6529–A6531. A6532.

On summary judgment, the principal infringement dispute related to whether Apple's Location Services uses "location inputs." A63. While the district court suggested that this dispute might also involve only legal issues, A65, it properly denied summary judgment on direct infringement of the '092 patent. A63–A66. With respect to the indirect infringement claims, however, the district court granted

summary judgment on the ground that Unwired Planet had not shown that Apple either knew of or was willfully blind to its customers' direct infringement. A65.

### 2. The district court erred in granting summary judgment after applying an incorrect legal standard

The district court concluded that Apple's noninfringement argument that "its devices only use one location input rather than a plurality of inputs" was "strong enough that no reasonable juror could conclude that Apple acted with actual knowledge that it was inducing or contributing to infringement." A65. The court similarly concluded that as to willful blindness, "there was no high probability of wrongdoing given the strength of Apple's noninfringement argument." A65. The court did not, however, discuss or analyze any of the evidence of intent offered by Unwired Planet. A65. And the court did not consider any evidence of Apple's subjective pre-suit intent—its discussion of indirect infringement was limited to the objective strength of Apple's post-suit noninfringement defenses. A65.

The district court erred insofar as it (a) applied the wrong standard of review to Unwired Planet's evidence of intent, and (b) failed to properly credit Unwired Planet's evidence of intent. Willfulness and indirect infringement are governed by separate bodies of case law and different burdens of proof. Unlike willfulness, which is subject to the clear and convincing evidence standard, indirect infringement need only be proven by a preponderance of the evidence. *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988). And

unlike willfulness, indirect infringement has no objective prong—it is only a question of Apple's own *subjective* intent. *Info-Hold v. Muzak LLC*, 783 F.3d 1365, 1374 (Fed. Cir. 2015) (holding that the issue was the defendant's "subjective belief regarding its infringement").

The district court's grant of summary judgment on indirect infringement was erroneous as a matter of law because the judgment turned solely on the district court's own estimation of the strength of Apple's noninfringement defense. A65. In other words, the court held that because Apple's post-suit noninfringement defense was objectively "strong enough," Unwired Planet could not prove that Apple had previously intended to infringe or willfully blinded itself to infringement. A65. But indirect infringement is not the same as willful infringement. Willful infringement "requires a two-prong analysis entailing an objective and a subjective inquiry." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1381-82 (Fed. Cir. 2014). Indirect infringement, by contrast, focuses solely on the subjective knowledge of the accused infringer, and has no objective prong. *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2067-71 (2011). The district court erred by following Apple's lead and treating indirect infringement as if it were the same issue as willfulness, focusing on the *objective* merits of Apple's post-suit litigation defenses rather than Apple's own *subjective* knowledge.

In an unpublished decision, this Court recently rejected the precise argument relied upon by the district court. *Smith & Nephew Inc. v. Arthrex, Inc.*, 2015 U.S. App. LEXIS 4291, at *20-22 (Fed. Cir. Mar. 18, 2015) (unpublished). In that case, the defendant argued that a good-faith belief in non-infringement was "established as a matter of law" by the district court's ruling that it did not infringe. This Court rejected that argument, holding that "such a good-faith belief presents a factual question." *Id.* The Court continued that "the district court's ruling and pronouncement could, at most, create a factual question, not an entitlement to a non-knowledge finding as a matter of law." *Id.* The Court further criticized the logical implications of the suggestion, noting that it would mean that "liability for indirect infringement can turn successively off and on, based on the knowledge requirement, when a trial court reaches one conclusion but the conclusion is then reversed on appeal." *Id. Smith & Nephew* was unpublished, but the Court should take a similar approach here. The district court's conclusion that Apple's non-infringement defenses were strong enough at most created a factual question as to Apple's own subjective beliefs. And liability for indirect infringement cannot turn on court rulings that come long after a party's subjective intent was formed.

Unwired Planet may satisfy the knowledge requirement of indirect infringement by proving knowledge of the patent coupled with willful blindness, which requires proof that the defendant took "deliberate actions to avoid

confirming a high probability of wrongdoing." *Global-Tech*, 131 S. Ct. 2060 at 2070-71.

The summary-judgment record offered ample evidence from which a reasonable jury could have concluded that Apple willfully blinded itself to the possibility of infringement by its customers. ██████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████ A12921.

Apple was certainly aware of the existence of the '092 patent prior to the lawsuit, because Apple disclosed the '092 patent on February 3, 2012 as prior art

to one of its own patent applications. A6863–A6870. But despite this pre-suit knowledge, and despite ████████████████████████████████████ ██████████████████████████████████████, Apple never disclosed an opinion of counsel in this case. █████████████████████ ███████████████████████████████████ A12830. These facts suggest willful blindness. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1369 (Fed. Cir. 2007).

On similar facts, this Court has previously vacated summary judgment and held that there was an "issue of material fact" for the jury. *Info-Hold v. Muzak LLC*, 783 F.3d 1365 (Fed. Cir. 2015). There, the plaintiff "repeatedly contacted" the defendant alleging that the patent had been infringed. *Id.* The defendant stated that it would look at the plaintiff's patent, but there was no evidence the defendant ever did so. *Id.* This Court held that these facts raised issues of material fact as to whether the defendant had willfully blinded itself, and it reversed the district court's decision to grant summary judgment on induced infringement.

Here, █████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ █████████████████████████████████████████████ ██████████████████████████████████ A3478(180:17–181:7).

And Apple then cited the '092 patent specifically to the patent office as prior art
████████████████████████████████████████, proving that it was aware of
the patent's existence. A6863–A6870. Despite being aware of the '092 patent and
of Unwired Planet's infringement allegations, Apple never investigated or obtained
an opinion of counsel as to any of Unwired Planet's patents. In fact, Apple offers
no evidence that it did anything at all ████████████████████████████
████████████████████████████.

Considering this evidence in the light most favorable to Unwired Planet, as
must be done on this motion for summary judgment, a reasonable jury could
conclude that Apple reviewed Unwired Planet's portfolio ████████████████
████████████ and was aware of the '092 patent and aware it was infringing, but
chose not to investigate further in order to willfully blind itself to its infringement.
But the district court did not consider any of these facts. Instead, it relied solely on
its own assessment of the merits of Apple's post-suit litigation defenses to
conclude that the subjective intent element could not be met. Because this is
legally erroneous, and because Unwired Planet offered sufficient evidence under
the proper subjective standard for indirect infringement, the district court's
decision granting summary judgment on indirect infringement should be reversed.

## VI.  CONCLUSION AND RELIEF REQUESTED

For all of these reasons, the Court should reverse the district court's erroneous claim constructions and reverse the summary judgment orders on direct and indirect infringement, and remand the case for proceedings consistent with Unwired Planet's proposed claim constructions.


Date: September 9, 2015                    Respectfully submitted,


*/s/ Theodore Stevenson, III*

Theodore Stevenson, III
   *Principal Attorney*

McKOOL SMITH, P.C.
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4000
Fax: (214) 978-4044

*Attorneys for Plaintiff-Appellant*
*Unwired Planet, L.L.C.*

# ADDENDUM

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNWIRED PLANET, LLC,

      Plaintiff,

    v.

APPLE INC,

      Defendant.

Case No. 13-cv-04134-VC

**CLAIM CONSTRUCTION ORDER**

## I. INTRODUCTION

The parties have proposed constructions for ten different terms, which appear in the following ten claims:

      U.S. Patent No. 6,647,260 ('260 Patent) – claims 1 and 16

      U.S. Patent No. 6,321,092 ('092 Patent) – claim 20

      U.S. Patent No. 6,317,831 ('831 Patent) – claims 17, 23, and 25

      U.S. Patent No. 6,532, 446 ('446 Patent) – claims 15 and 35

      U.S. Patent No. 6,813,491 ('491 Patent) – claims 15 and 26

Prior to the *Markman* hearing, Unwired Planet agreed to adopt Apple's proposed construction for two of the previously-disputed terms: "second communication path," found in claims 15 and 35 of the '446 Patent, and "determining whether the mobile device is proximate to its owner," found in claim 15 of the '491 Patent. The parties agreed to construe "second communication path" as "communication path that is separate from the first communication path." The parties agreed to construe "determining whether the device is proximate to its owner" as "determining if the mobile device is, or is not, close to the individual who owns the device." The Court accepts the parties' agreed-to construction of these terms.

At the *Markman* hearing the parties agreed to the construction of a third term, "narrowband channel," found in Claims 17, 23, and 25 of the '831 Patent. The '831 Patent discloses a technology for enabling secure data transactions to occur over a narrowband channel. Unwired Planet proposed construing "narrowband channel" as "channel with a lower data transfer rate or bandwidth than the wideband channel," while Apple proposed adding the word "significantly" as a modifier, construing the claim as "channel with a significantly lower data transfer rate or bandwidth than the wideband channel." At the *Markman* hearing, the Court suggested using the modifier "meaningfully" instead of "significantly," and the parties agreed. Therefore, "narrowband channel" is construed as "channel with a meaningfully lower data transfer rate or bandwidth than the wideband channel."

There are seven remaining terms to be construed.

## II. LEGAL STANDARD

Claim construction is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995). The construction of "a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

Claim construction begins by looking to the language of the claims themselves, which "define the invention to which the patentee is entitled the right to exclude." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). A claim term should be construed in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13. At times, the ordinary and customary meaning of a claim term can be determined solely by viewing the term within the context of the claim's overall language. Further, the use of the term in other claims can provide guidance regarding its proper construction, as terms are typically used consistently from one claim to the

United States District Court
Northern District of California

1   next. *Id.* at 1314.

2           In addition to considering the claims themselves, a Court construes the term in light of the

3   patent's specification, which "is the single best guide to the meaning of a disputed term." *Vitronics*

4   *Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). In limited circumstances, the

5   specification may be used to narrow the meaning of a claim term that otherwise would appear to

6   be susceptible to a broader reading. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys.,*

7   *Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). But in general, a Court should not import limitations

8   from the specification and apply those limitations to the claim term. *See Comark Commc'ns., Inc.*

9   *v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("[W]hile…claims are to be interpreted in

10  light of the specification, it does not follow that limitations from the specification may be read into

11  the claims."). Finally, the prosecution record, as well as any statements made by the patentee to

12  the United States Patent and Trademark Office ("PTO"), can be another source of intrinsic

13  evidence.

14          In addition to intrinsic evidence, the Court may consider extrinsic evidence, such as

15  dictionaries or technical treatises, particularly if those sources are "helpful in determining 'the true

16  meaning of language used in patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52

17  F.3d at 980). But while extrinsic evidence can be useful for construing disputed terms, it cannot be

18  used to contradict the plain and ordinary meaning of a claim terms as defined within the intrinsic

19  record. *Phillips*, 415 F.3d at 1322–23.

20

21  **III.    DISCUSSION**

22      **A.  PATENT NO. 6,647,260 (the '260 Patent)**

23          The '260 Patent discloses an invention for "provisioning" the features and services that are

24  available on mobile communication devices. As the patent describes, a number of parameters on a

25  mobile device must be provisioned before that device can be used. The Background of the

26  Invention identifies two problems the '260 Patent was intended to overcome. First, at the time of

27  the invention, customers had to go to a physical store in order to provision their mobile device,

28  which could be inconvenient and subject customers to the unwanted pressures of salespeople.

United States District Court
Northern District of California

United States District Court
Northern District of California

Second, there was a significant amount of fraud in the telecommunications industry due to the lack of security. The invention of the '260 Patent provides a solution by allowing users to provision the phone themselves, without the need to come into a store, and to do so in a secure manner. The parties dispute two terms from the '260 Patent: "provisioning" and "provisioning server," both of which appear in Claim 1 and dependent Claim 16.

      1.   "Provisioning"

      The parties disagree over whether "provisioning" refers only to telecommunications capabilities, as Apple proposes, or to all services and features available to a wireless device, as Unwired Planet proposes. They also disagree about whether provisioning is limited to "enabling" those capabilities, as Apple suggests, or applies to Unwired Planet's more expansive construction of "providing, enabling, or modifying."

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| provisioning | providing, enabling, or modifying | enabling telecommunication capabilities on |

      To begin, in its responsive brief Apple concedes that the claim uses "provisioning" to refer not only to the initial configuration of the mobile device, but also to subsequent modifications to the device. Therefore, Apple agrees to add the verb "modifying" to its proposed construction. The Court believes this construction more accurately reflects the process of provisioning, and because there is no compelling argument for the additional inclusion of "providing," the Court adopts the verbs "enabling or modifying."

      The remaining dispute is the primary one: *what* is enabled or modified – only telecommunications capabilities, or all mobile device capabilities? Claim 1 describes a "method for provisioning a two-way mobile communications device having a display and user interface," and concludes with the step of "provisioning the two-way mobile communications device with a feature or service." '260 Patent (Claim 1) 9:16–17, 38–39. Here, an examination of the claims is not particularly helpful, because they make no attempt to define "provisioning" and provide little guidance as to what "provisioning" refers to. Rather, because "provisioning" appears so often and

United States District Court
Northern District of California

1   almost always without context, it appears the Patent assumes that the user of the invention will

2   know what "provisioning" means, which suggests that the term had a well-understood, ordinary

3   meaning in the art. This notion is further supported by the prosecution history, which lacks any

4   indication that Unwired Planet or the Patent Examiner attempted to define "provisioning" or

5   disputed its meaning.

6       Citing to its expert as well as to two technical dictionaries provided by both Apple and

7   Unwired Planet, Apple claims that "provisioning" was well understood in the telecom industry at

8   the time of the invention to refer to supplying telecommunication capabilities, and that since the

9   Patent itself assumed that "provisioning" has a well-understood meaning in the art, this extrinsic

10  evidence should play a key role in the claim construction process.

11      Unwired Planet counters that the relevant field is not the telecommunications industry, as

12  Apple suggests, but rather the field of two-way mobile communication devices. Therefore,

13  according to Unwired Planet's expert, the telecommunications dictionaries cited by Apple are

14  unnecessarily limiting and even irrelevant, as their definitions of provisioning are "clearly focused

15  on providing physical, wired service to a customer location" rather than to a wireless mobile

16  communication device, as envisioned by the '260 Patent. Unwired Planet Opening Brief, Decl. of

17  Mark Jones, ¶ 15. And, Unwired Planet argues, it is particularly problematic to use these

18  definitions since the invention occurred at a time when the field of wireless mobile communication

19  devices was undergoing dramatic changes and wireless devices were able to access a range of

20  services and features, not just those pertaining to telecommunications.

21      While Unwired Planet has convincingly argued that Apple's extrinsic evidence is not

22  precisely on point – particularly the definitions provided by the telecom technical dictionaries – it

23  has failed to offer any compelling evidence of its own to support its much broader construction. In

24  fact, other than citing to the *same* dictionaries used by Apple, the only extrinsic evidence provided

25  by Unwired Planet are general purpose dictionaries, which provide less assistance in

26  understanding the way "provisioning" is used in the '260 Patent.

27      More importantly, the specification – the one piece of intrinsic evidence that is helpful –

28  supports a construction of "provisioning" that more closely aligns with Apple's proposal. The

specification uniformly states that "provisioning" is related to enabling or modifying the communication services and features of a mobile device. In the Background of the Invention, the patent identifies why a mobile device needs to be provisioned: "Before a consumer can use one of these devices, a number of parameters must be provisioned in order to enable *communication* services and applications and in order to distinguish the device from others within the *communications* network." '260 Patent 1:32-37 (emphases added). The next sentence continues, "[i]n addition to provisioning the two-way mobile communications device, it is also necessary to provision network elements in the communications network which are responsible for effecting mobile communications services and applications (e.g., billing plan, voice mail, call forwarding, email, information services, etc.)." *Id.* 1:37-42. These provisioned capabilities are communication capabilities, and the same is true when "provisioning" is used at other points throughout the specification. *See, e.g.*, *id.* 1:56-59, 1:62-66, 2:40-43.

Unwired Planet points to two places in the specification to argue that "provisioning" was intended to include more than just telecommunication capabilities. First, it cites to a sentence that describes the provisioning content, which "takes the form of software modules, which modify the resident features of mobile device or activation information required to initialize previously installed non-operational applications." *Id.* 6:51-55. But this sentence does not undermine Apple's proposed construction. It simply identifies the type of content that can be included in a provisioning package. The examples given – "software modules" and "activation information" – could be used to enable telecommunication capabilities to the device.

Second, Unwired Planet directs the Court to the third paragraph of the Background of the Invention, which describes the type of software applications that run on a mobile device: "Examples of software applications used in these devices include micro-browsers, address books, and email clients. Additionally, this generation of two-way mobile communication devices has access to a plurality of services via the Internet and Intranets." *Id.* 1:28-32. Unwired Planet contends that these software applications are the types of things that are enabled through the provisioning process, and therefore "provisioning" is not limited to only telecommunications capabilities. But this seems incorrect, as this paragraph appears to refer to the types of applications

United States District Court
Northern District of California

that *exist* on these mobile communication devices, not the types of applications that are enabled through the provisioning process.

As a final matter, even though the Court is inclined to adopt Apple's proposed construction, the Court finds that the phrase "communication capabilities," rather than Apple's proposed language of "telecommunication capabilities," is more accurate for describing the type of content that is provisioned onto mobile devices, as the specification consistently uses the term "communication" rather than "telecommunication." The Court therefore adopts the following construction of "provisioning": "<u>enabling or modifying communication capabilities</u>."

### 2. "Provisioning Server"

The second term in dispute from Claim 1 of the '260 Patent is "provisioning server," with the parties disagreeing over its functionality. Unwired Planet argues that the "provisioning server" is the server which receives the provisioning request, whereas Apple contends that it has a more specific role, namely, that it generates and delivers the provisioning content.

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| provisioning server | server that receives the provisioning request | server that generates the provisioning content and delivers it to the two-way mobile communications device |

The term "provisioning server" clearly needs to be construed. The parties seem to agree that it does not have a precise, technical meaning outside the context of the '260 Patent, and without a claim construction the jury would likely be uncertain of its meaning. Further, the claims and the specification distinguish the provisioning server from other servers – such as the proxy server or the service server – suggesting that the 260' Patent ascribes a specific meaning to the provisioning server.

Claim 1, which, as indicated above, describes a method for provisioning a two-way mobile communications device, references the "provisioning server" in two places. The method described by Claim 1 consists of the mobile communications device (1) "establishing a communications link with the *provisioning server*," *id.* (Claim 1) 9:30-31, and (2) "sending the provisioning request to

1   the *provisioning server* over the communications link," *id.* (Claim 1) 9:35-36.

2          Unwired Planet proposes construing "provisioning server" as "server that receives the

3   provisioning request." But this would be a superfluous construction, because rather than adding

4   clarity it would simply repeat the same limitation already found in Claim 1, which already teaches

5   that the mobile communications device sends the provisioning request to the provisioning server.

6   *See, e.g.*, *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330–31 (Fed. Cir. 2008); *Merck &*

7   *Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005). Further, not only would

8   Unwired Planet's construction be redundant, but it would arguably be inaccurate. In nonasserted

9   Claims 7 and 8,[1] a "proxy server" sits between the mobile communications device and the

10  provisioning server; in Claim 7, the proxy server is used to establish the communication link, and

11  in Claim 8, "the proxy server acts as a gateway to bridge communications between an airnet with

12  which the two-way mobile communications device communicates and the wide area

13  communications network with which the provisioning server communicates." *Id.* (Claim 8) 9:60-

14  64. In this embodiment, as well as in embodiments described in the specification and illustrated by

15  Figure 1 below, it is the proxy server, not the provisioning server, that receives the provisioning

16  request from the mobile communications device. Therefore, Unwired Planet's construction that the

17  provisioning server receives the provisioning request would be both redundant and potentially

18  inappropriately limiting.

19

20

21

22

23

24

25

26

27

United States District Court
Northern District of California

28  _____

[1] Claim 8 is dependent on Claim 7, which is dependent on Claim 6, which is dependent on Claim 5. Claim 5 is dependent on Claim 1, so all of the claims are dependent on Claim 1.



U.S. Patent

Nov. 11, 2003

Sheet 1 of 9

US 6,647,260 B2

*Fig. 1*

*Id.*, Fig 1.

Apple's construction assigns a more active role to the provisioning server. Under Apple's proposed construction, the provisioning server (1) generates the provisioning content and then (2) delivers that content to the mobile communications device. With respect to the second role – delivering the provisioned content to the device – Apple's construction is incorrect for the same reason that Unwired Planet's is: in certain embodiments, including the one depicted by Figure 1 above and in Claims 7 and 8, the proxy server, not the provisioning server, delivers the provisioned content. While the provisioning server may send the provisioned content to the proxy server, it is the proxy server that ultimately delivers that content to the mobile device. And because the specification and claims use "provisioning server" in such a way that suggests it has a specific, defined role throughout the patent, a construction of provisioning server which excludes certain

United States District Court<br/>Northern District of California

embodiments is not correct. *See, e.g.*, *Phillips*, 415 F.3d at 1314–15 ("Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."); *Broadcom v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("This court has clarified that an interpretation which 'excludes a [disclosed] embodiment from the scope of the claim is rarely, if ever, correct.'")(internal quotation marks omitted).

The first part of Apple's proposed construction identifies the provisioning server as the server that generates the provisioning content. The Abstract states, "The provisioning server device processes the received information and generates provisioning packages, registration requests, and notifications for the subject mobile device and for any associated server device providing services." '260 Patent, Abstract. Further, the Summary of the Invention describes the provisioning server in essentially the same way: "The provisioning server device processes the received information and generates provisioning content and notifications for the subject mobile device and for any associated server device providing service(s)." *Id.* 2:13-16.

Without question, the provisioning server *can* generate provisioning content. The question, however, is whether this is always the task of the provisioning server, as used in Claim 1. Unwired Planet makes two arguments against this aspect of Apple's proposed construction. First, it claims that Apple's construction improperly limits the claim term by importing a limitation from an embodiment. In particular, Unwired Planet argues that when the specification describes the provisioning server as generating the provisioning content, it does so in a paragraph that begins, "According to one aspect of the present invention…." *Id.* 2:1. But this introductory phrase does not modify the role of the provisioning server. In fact, in the very next paragraph, which begins, "[a]ccording to another aspect of the present invention," the provisioning server is described in the exact same way – as the server that "processes the received information and generates provisioning packages and notifications." 2:38-39. In each embodiment described in the Summary of the Invention, the provisioning server generates the provisioning content.

Second, Unwired Planet argues that Apple's proposed construction would improperly exclude a disclosed embodiment, as the specification describes how the provisioning content may

be located on a server that is not the provisioning server. *Id.* 6:45-48 ("It is important to note at this point that the provisioning content required to process the request may be resident on the provisioning server receiving the request or on any server device accessible via landnet."), 7:25-27 ("The content relating to the features and services listed in database **542** need not be resident on provisioning server **530**."). According to Unwired Planet, the specification also describes how the service server, not the provisioning server, may generate the provisioning content. Unwired Planet points to the following language from the specification:

> User information and information relating to requested services is stored in database **642**. The information is forwarded to service server **660** where it is stored in storage **668** and used to register the user for the requested services. Acknowledgments regarding the user's registration and provisioning content **672** (e.g. passwords security information, etc.) are forwarded to provisioning server **630** by a register kernel **664** via message send manager **674** and message receive manager **646**. Provisioning server **630** forwards the provisioning content and any related notifications to the requesting mobile device.

*Id.* 7:52-62. This method is illustrated by the following figure.



Fig. 6

Apple and Unwired Planet dispute the technical details of the method illustrated by this figure. Unwired Planet argues that the service server is generating the provisioning content, whereas Apple argues that the provisioning server still generates the content but is accessing information needed to generate that content from the service server. In its responsive brief, Apple offered a modified construction of provisioning server which seems to satisfy both parties' interpretation: "server that generates *or obtains* the provisioning content."

In the embodiment described above, as well as in every embodiment throughout the specification and the claims, this construction accurately captures the role of the provisioning server. Therefore, "provisioning server," as used in Claim 1, is construed as follows: "<u>server that generates or obtains the provisioning content</u>."

### B. PATENT NO. 6,321,092 (the '092 Patent)

This patent discloses an improved technology for identifying the location of a wireless station, such as a cell phone or pager. In order to more accurately locate a wireless station, the invention gathers inputs about the location of the wireless station from multiple Location Finding Equipment, or LFEs (such as GPS, time difference of arrival, etc), and then responds to a location request by providing the location information that is responsive to the request.

The parties dispute three terms from the '092 Patent, all of which appear in Claim 20: "wireless station," "location input," and "selectively retrieving data from said memory based on said device independent location request."

### 1. "Wireless Station"

The first dispute over Claim 20 of the '092 patent concerns the phrase "wireless station," which appears in the preamble of Claim 20. As an initial matter, the parties dispute whether "wireless station" limits the scope of Claim 20 since it appears in the preamble of the claim. Because the term "wireless station" is critical for understanding the limitations in the body of the claim, it limits the claim scope even though it appears in the preamble. *See, e.g.*, *Catalina Mktg Intern. v. Coolsavings.com*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("[W]hen the preamble is essential

to understand limitations or terms in the claim body, the preamble limits claim scope.");

*Seachange Inter., Inc. v. C-Cor, Inc.*, 413 F.3d 136, 1376 (Fed. Cir. 2005) ("The preamble provides the only antecedent basis and thus the context essential to understand the meaning of [a term at issue that appears in claim body].").

With respect to their proposed constructions, both parties agree that a wireless station has "wireless voice and/or data communication capabilities," but they disagree on two points. First, and most important, they disagree on whether a wireless station, as used in claim 20, is always mobile, with Apple arguing that is and Unwired Planet that it is not. Second, they disagree over whether to refer to a wireless station as a terminal, as Apple proposes, or as a device, as Unwired Planet proposes.

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|------|---------------------------|-------------------------------|
| wireless station | device with wireless voice and/or data communication capabilities | mobile terminal with wireless voice and/or data communication capabilities |

   a.   *Whether wireless stations are mobile*

In terms of the first dispute, the Court agrees with Apple: wireless stations, as used in claim 20 of the '092 patent, are mobile.

Asserted claim 20 uses "wireless stations" as follows: "A method for use in a wireless network to obtain requested location information regarding a *wireless station* and provide the requested location information to a wireless location application, the wireless network being associated with location finding equipment for providing information regarding locations of *wireless stations* in a network service area" '092 Patent (Claim 20) 16:12-18 (emphases added). In Claim 20 the wireless station needs to be found, which implies that a wireless station is mobile. Unwired Planet has offered no compelling argument as to why the invention disclosed by the '092 Patent would be used to find the location of a fixed, rather than mobile, object.

Other claims of the '092 patent confirm this same understanding of "wireless stations." For instance, nonasserted Claims 5, 11, and 17 refer to the travel speed, travel direction, and movement of wireless stations. These claims, much like Claim 20, only make sense if a wireless

station is mobile. Because the same term is normally used in the same way throughout the patent,

claims 5, 11, and 17 add further support for construing "wireless station" in claim 20 as mobile.

*See, e.g.*, *Phillips*, 415 F.3d at 1303' *Catalina Mktg.*, 289 F.3d at 808.

Unwired Planet treats Claim 11 differently. In Claim 11, a dependent claim of Claim 1, the

location output includes "one of a speed of travel and direction of travel for the wireless station."

'092 Patent (Claim 11) 14:28-30. According to Unwired Planet, because Claim 20 does *not* include

this same limitation regarding speed and direction, that suggests the "wireless station" in Claim 20

is not necessarily mobile. But this distinction between the two claims simply means that the

location output for finding the wireless station in Claim 20 may not use speed or direction. It in no

way suggests that Claim 20's wireless station is not mobile.

Reading the claim term in light of the specification further confirms this. The specification

includes many examples of tracking a wireless station and improving its location accuracy. *Id.*

2:39-40, 2:47, 3:27, 3:34. At one point, the specification even substitutes the term "mobile station"

for "wireless station." 3:52-61.[2] Unwired Planet agrees that the specification teaches that some

wireless stations are mobile, yet it argues that "those particular embodiments should not be read

into the claims to the exclusion of other embodiments." Unwired Planet Responsive Brief, 8. But

there are no embodiments of non-mobile wireless stations. Every example the Patent gives of a

wireless station is mobile. This is true beginning with the first sentence with the Background of

the Invention, which reads, "Wireless communications networks generally allow for voice and/or

data communication between wireless stations, e.g. wireless telephones (analog, digital cellular

and PCS), pagers or data terminals that communicate using RF signals" – all of which are mobile

– and remains the case throughout the patent. '092 Patent, 16-19.

Unwired Planet directs the court to technical dictionaries, which define "station" as a

device and are agnostic as to whether that device is mobile or not. But as Apple points out, the

---

[2] "The associated method includes the steps of receiving a first LFE input including second location information for the wireless station, and using the first and second inputs to derive tracking information for the *wireless station*. The tracking information preferably includes information regarding the *mobile station's* speed of travel and direction of travel." *Id.* 3:52-61 (emphases added).

singular term "station" is irrelevant since the term at issue is "wireless station," and, even if the

defined term was relevant, the dictionary definition would still be unhelpful in this case because

extrinsic evidence cannot be used to overcome intrinsic evidence. *See Phillips*, 415 F.3d at 1322-

23. Unwired Planet also points to Apple's product literature for Apple's own AirPort router – a

non-mobile device which Apple described in its literature as a "wireless base station" – to make

the case that a wireless station can be non-mobile. Again, though, this argument is irrelevant since

Apple's AirPort router is not related to the claim at issue. Further, the AirPort product description

could in fact undermine Unwired Planet's argument, because Apple's literature describes the router

not as a "wireless station," but as a "wireless *base* station." Unwired Planet Opening Brief, Ex. 1 at

2, AirPort Technical Fact Sheet (1999) (emphasis added). The use of the term "base" could be

understood to mean that the router is not mobile; at a minimum, it distinguishes the description of

the AirPort router from the phrase "wireless station" as used in the '092 Patent.

Unwired Planet also makes a textual argument by pointing to the following language from

the specification: "Because wireless stations are generally mobile, an additional element of

uncertainty is introduced." '092 Patent, 8:63-67. This sentence, Unwired Planet argues, proves that

wireless stations are not always mobile since the term "generally" allows for the possibility of

immobile wireless stations. But this argument ignores the context of this section of the

specification, which focuses on how wireless stations are typically in different places at different

points in time, and how the "multi-input processing facility" can reduce location uncertainty of the

wireless station by taking time into account. The use of "generally mobile" is not an indication of

the fundamental nature of a wireless station, such as whether it is mobile or not. Rather, it means

that wireless stations are typically on the move, rather than sitting still.

Neither the claims nor the specification of the '092 patent provide any reference to or

examples of a "wireless station" that is not mobile. Wireless station, as used in this patent, are

those devices that need to be located. Apple's construction is consistent with that use.

*b. "terminals" or "devices"*

The parties dispute whether wireless stations should be construed as "terminals" or as

"devices." While this distinction seems somewhat inconsequential, as Apple has pointed out, the

term "device" appears elsewhere in Claim 20 and therefore might be misleading to a jury. Because "terminal" does not have this same problem and is not unduly limiting, the Court adopts Apple's full proposed construction for "wireless station": "<u>mobile terminal with wireless voice and/or data communication capabilities</u>."

2. "<u>Location inputs</u>"

Unlike other claims at issue, here the parties appear to mostly agree on what "location inputs" in Claim 20 actually are. Their disagreement is over the best way to describe them. Apple proposes that location inputs should be construed as "determinations of the location of the mobile terminal," while Unwired Planet suggests that "determinations" is too narrow, and instead proposes "information regarding a wireless station's location."

| Term | UP's Proposed Construction | Apple's Proposed Construction |
| --- | --- | --- |
| location inputs | information regarding a wireless station's location | determinations of the location of a mobile terminal |

To begin, because the Court has construed the phrase "wireless station," and because its construction provides more clarity and explanation than the simple term "mobile terminal," the Court will adopt the term "wireless station." The only remaining disagreement, therefore, is the primary one: whether location inputs are "determinations of the location" or "information regarding…location."

Both parties cite to the same examples of "location inputs" to make their case. A location input can be any number of inputs to help identify the location of the wireless station; an input may be "a sector identifier or coordinates," "a sector identifier or coordinates and a radius," "angular measurements and corresponding cell site identifiers/coordinates," "multiple hyperbolae," or "geographic coordinates." 7:30-41. Different location inputs are more helpful than others in identifying the location of the wireless station.

As Apple acknowledges in its brief, some location inputs referenced in the patent are only "partial determinations" of location, and may not specify the location of the mobile terminal with complete accuracy. But Apple's proposed construction – "determinations of the location of a

United States District Court
Northern District of California

mobile terminal" – suggests a definiteness which might be misleading to a jury and result in excluding certain embodiments. Not all location inputs determine the location of the wireless terminal. Rather, they contain information about the location of the terminal, and, collectively, can be used to determine the terminal's location. This is precisely what Unwired Planet's construction suggests.

Apple argues that because Unwired Planet, in its brief, interprets the phrase "regarding…location" to include any information that "can be used" to determine location, that Unwired Planet's construction "would read the term 'location' out of the claim phrase 'location inputs.'" Apple Responsive Brief, 11. But this concern is misplaced. "Information regarding location" is a straightforward phrase that a jury would understand. A location input offers information about the location of the wireless station. If the input does not provide information about a wireless station's location then it is not a location input.

The Court adopts the following construction for "location inputs": "<u>information regarding a wireless station's location</u>."

3. "<u>Selectively retrieving data…</u>"

The final disputed term from the '092 Patent, also found in Claim 20, is "selectively retrieving data from said memory based on said device independent location request." Apple's proposed construction would place a number of limitations on the claim term, while Unwired Planet's proposed construction would essentially repeat the same language already present in the claim.

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|---|---|---|
| selectively retrieving data from said memory based on said device independent location request | selectively retrieving data from the memory based on a location request that is independent of the type of location finding equipment used | Choosing from the stored location data only the data that conform to the location request |

Unwired Planet's proposed construction does not serve the purpose of claim construction, which is to "determin[e] the meaning and scope of the patent claims asserted to be infringed."

*Markman*, 52 F.3d at 976. It merely repeats language already found in the claim, replacing "said device independent location request" with "a location request that is independent of the type of location finding equipment used." But the claim already explains what a "device independent location request" is, so Unwired Planet's construction does not offer any additional clarity. Further, and importantly, Unwired Planet's construction does not explain what it means to selectively retrieve data based on a location request. In its responsive brief and at the *Markman* hearing, Unwired Planet indicated that it was amenable to replacing the phrase "selectively retrieving" with "choosing," but without also clarifying *which* data is chosen, or *how* it is chosen – in other words, since it did not construe the phrase "based on" – Unwired Planet's substitution of "choosing" for "selectively retrieving" does not offer greater clarity.

Apple's proposed construction is more helpful than Unwired Planet's in that it provides a construction that explains the meaning and scope of the phrase and thus would be useful for the jury. But Apple has offered no real support for its construction, and it appears to be unduly limiting. Apple suggests that the claim term means that *only* the data that *conforms* to the location request is retrieved, but this construction is problematic for several reasons. First, there is nothing in the claim or the specification to suggest that the method described in Claim 20 requires "conformance" with the location request. Apple points to the following language in the Summary of the Invention:

> [T]he location request may include a specification regarding the desired location information, for example, indicating how recent or how accurate the information should be. If the memory includes information conforming to the specification, then such information is received and output to the requesting location.

'092 Patent, 2:62-3:1. Apple seems to suggest that this description from the Summary of the Invention describes the same method contemplated by Claim 20. But this language actually undermines Apple's argument. It indicates that the location request may include a specification or parameter, and that the information is received if it conforms with the particular specification or parameter. Claim 20, however, does *not* include a specification or parameter limitation. Rather, those limitations are included in nonasserted Claims 1 and 7, with Claim 7 requiring conformance with the parameter. *Id.* (Claim 7) 14:11-15 ("A method as set for in claim 1, wherein said step of

obtaining comprises identifying said parameter of the location request regarding the desired

location information and determining whether the stored data includes information conforming to

the parameter."). Because the only time the Patent uses the "conformance" limitation is with

respect to a specification or parameter, and because Claim 20 does not include a specification or

parameter limitation, Apple's attempt to require "conformance" in Claim 20 is misplaced.

Further, even if Claim 20 did require conformance, it is not clear why "selectively retrieve"

means that *only* the data that conforms to the location request would be chosen. At various points

the specification discusses how the invention processes numerous location inputs even if certain

inputs may not match a request. There is no evidence that Claim 20 excludes those inputs. Without

question, the word "selectively" must mean that not all data is retrieved, but it does not necessarily

mean that *only* the data that *conforms* to a location request is retrieved.

Therefore, because Unwired Planet's proposed construction is unhelpful, and because

Apple's proposed construction is unsupported and unduly limiting,[3] the Court declines to construe

the phrase at this juncture. If either of the parties believes that construction is necessary for any

dispositive motions, they should offer a new proposed construction in conjunction with the

dispositive motion, or at any time that construction of this phrase is necessary for resolving the

infringement claim.[4]


### C. PATENT NO. 6,532,446 (the '446 Patent)

The '446 Patent discloses an invention for extending speech recognition capabilities to

mobile devices without requiring additional computing resources to be added to the device. This is

accomplished by the mobile device connecting to an outside server system and sending the user's

---

[3] Unwired Planet also argues that Apple's proposed construction is incorrect because the words "stored location data" (1) do not have an antecedent basis in Claim 20 and thus would be confusing to the jury, and (2) suggest that the only data in memory are location determinations rather than data that is based on location inputs. The Court does not think these words would be confusing to a jury, and because it has construed "location inputs" as "information regarding a wireless station's location," Unwired Planet's second concern is mitigated.

[4] The parties may want to consider construing the phrase as "choosing from the stored location data only the data that are responsive to the location request."

United States District Court
Northern District of California

voice input to the server, which the server then translates into a data file and sends back to the mobile device.

1. "*Voice input*"

The one disputed term from the '446 Patent is "voice input," which appears in Claim 15, a dependent claim of Claim 1, and Claim 35, a dependent claim of Claim 31. Unwired Planet argues this is a straightforward and well-understood term that does not need construing, or could simply be construed as "speech input." Apple, on the other hand, contends that "voice input" always travels over a voice channel, and argues for a construction which provides for this stipulation: "speech provided over a voice channel."

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|------|---------------------------|-------------------------------|
| voice input | plain and ordinary meaning, no construction necessary<br><br>Or: speech input | speech provided over a voice channel |

The issue turns on how the Court interprets language from the specification. While the specification generally cannot be used to limit the meaning of claim terms that otherwise command a broader reading, there is an exception when statements referencing "the present invention" limit the scope of the claim terms and when the patent does not disclose any alternative embodiments. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holding Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When the patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 425 F.3d 1312, 1318 (Fed. Cir. 2006) ("We agree with the district court that the claim term 'fuel injection system component' is limited to a fuel filter…On at least four occasions, the written description refers to the fuel filter as 'this invention' or 'the present invention'….").

The first paragraph of the Summary of the Invention describes "the present invention" as follows:

The present invention relates to a wireless communication system that utilizes a remote speech recognition server system to translate voice input received from mobile devices into a symbolic data file (e.g. alpha-numeric or control characters)

United States District Court
Northern District of California

that can be processed by the mobile devices. The translation process begins by establishing a voice communication channel between a mobile device and the speech recognition server. A user of the mobile device then begins speaking in a fashion that may be detected by the speech recognition server system. Upon detecting the user's speech, the speech recognition server system translates the speech into a symbolic data file, which is then sent to the user through a separate data communication channel. The user, upon receiving the symbolic data file at the mobile device, reviews and edits the content of the symbolic data file and further utilizes the file as desired. For example a user could use the symbolic data file to fill in fields in an email or a browser request field.

'446 Patent, 2:45-63.

In both *Verizon* and *Honeywell*, the "present invention" language referred to the precise claim term at issue and added limitations to that term.[5] Here, by contrast, the "present invention" refers to the overall wireless communication system that performs the work of translating voice input into a data file. The task of "establishing a voice communication channel" – which is presumably used to send the voice input from the mobile device to the server – is one element of that process. The question, then, is whether this particular task falls within the scope of the "present invention" language and thus limits the scope of the claim term.

The Court believes that it does. The patent consistently maintains the distinction between voice input being sent over a voice channel to the server device, and a data file which is then sent back to the mobile device over a data channel. As Apple points out in its brief, "utilizing and establishing the 'voice channel' or 'voice communication channel' is mentioned no less than 16 times throughout the specification." Apple Opening Brief, 25. And the Patent never discloses an embodiment that would be excluded by the voice channel limitation.

Unwired Planet relies on claim differentiation by pointing to nonasserted Claims 21 and 23. These claims include the same voice channel limitation that Apple seeks to ascribe to asserted Claims 1 and 31. Claim 21, which describes a method of providing speech recognition services to

---

[5] In *Verizon*, the specification language stated, "Thus, in one aspect, the present invention relates to a localized wireless gateway system." The same paragraph then went on to describe "localized wireless gateway system," which was the disputed term, as having a particular limitation. *Verizon*, 503 F.3d at 1308. In *Honeywell*, the specification language stated, "This invention relates to a fuel filter for use in a fuel line that delivers fuel to a motor vehicle engine." This led the Federal Circuit to conclude "that a fuel filter is the only 'fuel injection system component' that the claims cover." *Honeywell*, 425 F.3d at 1318.

a wireless device, includes the following steps: "establishing a voice communication channel between the wireless communication device and the server device associated with the retrieved contact information; receiving input from a user using the wireless communication device, at least a portion of the input including a voice component." '446 Patent (Claim 21) 16:53-58. The same is true for Claim 23, which reads, "A method as recited in claim 21, wherein the voice communication channel is established on a wireless network." *Id.* (Claim 23) 17:6-8.

By contrast, asserted Claims 1 and 31 do not explicitly include this voice channel limitation. Claim 31 includes no information about the path over which voice input travel. And Claim 1 in fact includes a different limitation about the path over which voice input travels: "receiving a voice input signal associated with the request from a first communication path." *Id.* (Claim 1) 15:33-34. According to Unwired Planet, because Claims 21 and 23 include the voice channel limitations, and because Claim 1 includes a different comparable limitation and Claim 31 includes no such limitation, the Court should not construe voice input in Claims 1 and 31 as having the voice channel limitation.

But when comparing two independent claims, "claim differentiation as an interpretative principle is often of limited importance." *Ancora Techs. v. Apple, Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014). That is especially true here, as nonasserted Claim 21 does not even use the disputed term "voice input." More importantly, claim differentiation cannot be used to improperly broaden the scope of claims beyond that suggested by the intrinsic record. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998). Here, the intrinsic record – most particularly, the statement describing the "present invention" – suggests that voice input always travels over a voice channel.

Unwired Planet also argues that requiring the voice channel limitation would improperly exclude an embodiment. It points to a part of the specification which describes wireless carrier networks, which the patent teaches are used to establish the connection between the mobile device and the server system. The relevant portion of the specification reads as follows:

Wireless carrier network **104** may be any of the well known wireless communications network (e.g. cellular digital packet data (CDPD) network,

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> Global System for Mobile Communications (GSM) network, Code Division Multiple Access (CDMA) network, Personal Handy Phone System (PHS) or Time Division Multiple Access (TDMA) network).

Unwired Planet claims that when voice input is sent over CDPD, as contemplated by the language above, it is sent as data packets over a data channel rather than over a voice channel. But as Apple pointed out, CDPD technology was overlaid with existing cellular infrastructure, and thus networks with CDPD technology had both voice and data capabilities. Therefore, voice input would still be sent over voice channels. As demonstrated by the following figure from the '446 Patent, Apple's argument on this point seems correct.



Figure 1

U.S. Patent    Mar. 11, 2003    Sheet 1 of 8    US 6,532,446 B1

As the specification describes, line 126 in the figure above represents the voice channel. *Id.* 6:20-21 ("The voice communication channel previously described is generally represented by voice channel 126."). Therefore, even if wireless carrier network 104 is CDPD, voice input is still sent to voice recognition server system 109 over voice channel 126. Accordingly, there is nothing about the use of CDPD as a wireless carrier network which suggests that voice input is not transmitted via a voice channel.

Finally, Unwired Planet makes much of the fact that Apple argued in its brief that a voice channel is the same channel used to make telephone calls, and since the patent clearly contemplates wireless communication devices which *do not* make phone calls – including palm sized computing devices and PDAs – there should be no requirement that voice input travels over a voice channel. But just because these devices do not make phone calls does not mean they do not make use of voice channels. Indeed, the relevant section of the specification states, "Mobile devices…may be taken from a group, which includes mobile phones, palm sized computing devices and personal digital assistants *with voice transmission and/or reception capabilities*." *Id.* 4:67-5:3 (emphasis added).

The specification describing "the present invention" includes the limitation that voice input travels over a voice channel, and this limitation is present in all embodiments. Accordingly, the limitation should be included in Claims 1 and 31, so the Court adopts the following construction of "voice input": "<u>speech provided over a voice channel</u>."

### D. PATENT NO. 6,813,491 (the '491 Patent)

The '491 Patent discloses an invention for adapting the settings of a mobile device based on whether that device is proximate to a user or owner, which, among other methods, can be determined based on whether the device is in motion or not. The Patent discusses settings that a user may prefer depending on whether the device is proximate to a user, such as whether the device is in vibrate-mode or ring-mode, and, if in ring-mode, the volume level of the ringer. The parties initially disputed two terms from the '491 Patent, but Unwired Planet agreed to Apple's proposed construction of "determining whether the mobile device is proximate to its owner," so the only remaining dispute is over the term "stationary/active preferences," which is present in asserted Claim 26, a dependent claim of Claim 21.

1. "<u>Stationary preferences and active preferences</u>"

The parties dispute two aspects of the terms "stationary preferences" and "active preferences." First, they disagree over whether they are limited to user-selectable settings, as

1    Apple proposes, or any type of settings regardless of whether a user can select them, as Unwired

2    Planet proposes. Second, they disagree over when the stationary and active preferences are set,

3    with Apple arguing that it's when the device is actually stationary or active, and Unwired Planet

4    arguing that it is once the device makes a determination that it is stationary or not.

| Term | UP's Proposed Construction | Apple's Proposed Construction |
|------|---------------------------|-------------------------------|
| stationary preferences/active preferences | configuration of settings that may be set when the mobile device determines that it has been/has not been stationary | configuration of user-selectable settings the user wants when the device is stationary/active |

9        *a. Whether stationary/active preferences are user-selectable*

10       Claim terms should be given their ordinary and customary meaning as understood by

11   someone skilled in the art at the time of the invention. *Phillips*, 415 F.3d at 1312–1313. The term

12   "preferences" appears to have had a clear meaning in the art: those aspects of a device or program

13   that a user can tailor to her desired configuration. This understanding of "preferences" creates "an

14   objective baseline from which to begin claim interpretation." *Id.* at 1313. And in this instance, that

15   baseline suggests that Apple's construction, which is consistent with the well-understood

16   definition of "preferences," is correct.

17       Unwired Planet argues that construing stationary and active preferences in this way is

18   inconsistent with the intrinsic evidence, as it both excludes an embodiment and imports a

19   limitation from an embodiment. First, Unwired Planet points to the claims themselves and argues

20   that, under the principle of claim differentiation, the stationary/active preferences in Claim 26

21   need not be user selectable. Claim 24 and Claim 29, which, like Claim 26, are dependent claims of

22   Claim 21, require "user-determined preferences." Claim 24, for instance, reads: "A method as

23   recited in claim 21, wherein the stationary preferences and the active preferences are user-

24   determined preferences for the one or more mobile device settings." '491 Patent (Claim 21) 12:64-

25   67. According to Unwired Planet, because this limitation is not found in Claim 26 (or independent

26   Claim 21), and because a limitation in a dependent claim creates the presumption that the

27   limitation is not present in the independent claim, the stationary and active preferences in Claim

28   26 are not necessarily user-selectable. *See Phillips*, 415 F.3d at 1314–15 ("[T]he presence of a

1  dependent claim that adds a particular limitation gives rise to a presumption that the limitation in

2  question is not present in the independent claim.").

3      This argument would be persuasive if Apple had proposed that stationary and active

4  preferences be construed as "a configuration of user-*determined* settings." But that is not Apple's

5  proposed construction. Rather, Apple's proposed construction allows the user to select the

6  stationary and active preferences, but does not require that the user do so. This construction is

7  consistent with the claims.

8      The same rationale applies to Unwired Planet's embodiment argument that relies on

9  language from the specification, rather than the claims. Unwired Planet points to several examples

10  from the specification to make this same point:

11      In one embodiment, the stationary preferences and the active preferences can be
       user provided. For example, a user of the mobile device can interact with the
12      mobile device to set the stationary and active preferences.

13  *Id.* at 7:46-47

14

15      The stationary preferences can, for example, be user provided.

    *Id.* at 7:21-22.
16

17      This language could be interpreted in one of two ways. One possibility is that it describes

18  an embodiment in which *it is possible* for the user to provide the stationary and active preferences,

    in which case Apple's construction would improperly import a limitation from this particular
19
    embodiment into Claim 26. Alternatively, the examples describe an embodiment in which the
20
    stationary and active preferences *are* provided by the user, meaning that Apple's construction is
21
    not unduly limiting, as it does not require that the settings in fact be provided by the user, but only
22
    that the user has the *option* to select them. The Court acknowledges that both interpretations of
23
    these examples could be correct. But given the remainder of the intrinsic evidence, as well as the
24
    strong presumption that the term "preferences" implies that users can select them, the Court
25
    believes the latter interpretation is most appropriate.[6]
26

27  _____

    [6] Unwired Planet also makes an embodiment argument by citing the following language from the
28  specification: "The settings of the wireless communication device that are adapted can vary. In one
    embodiment, one or more of the settings pertain to user preferences." *Id.* 3:67-4:1. This language

United States District Court
Northern District of California

After all, the '491 Patent consistently uses the term "preferences" to refer to those settings that are user-selectable, such as "ringer mode, voice mail greeting, call forwarding, email forwarding, etc." *Id.* 4:4-5. The Patent never uses the term "preferences" in a way that suggests it should be interpreted differently from its ordinary meaning, namely, as favoring one set of configurations over another. In fact, the only way to both adopt Unwired Planet's construction and also stay true to the well-understood definition of "preferences" is to interpret stationary and active preferences as referring to the preferences *of the device itself*. But this not only defies logic, it is also inconsistent with the claims and the specification, which consistently use "preferences" to mean the preferences of the user, not the device.

Apple's construction has further support because Claim 21 distinguishes between "settings" and "preferences." The method in Claim 21 describes "(c) setting one or more mobile device *settings* to stationary *preferences*" and "(d) setting one or more mobile device *settings* to active *preferences*." *Id.* (Claim 21) 12:48-49, 12:52-53. In this Claim, the terms "settings" and "preferences" seem to have different meanings. *See Applied Med.* 448 F. 3d at 1333 n.3 ("[T]he use of two terms in a claim requires that they connote different meanings."). But under Unwired Planet's construction they would mean the same thing, as it replaces "preferences" with "settings that may be set." If the inventor intended to describe a method in which the configuration of the phone while stationary or active could not be chosen by the user, there was a clear option available: "setting one or more mobile device settings to stationary/active *settings*." This is not the language the inventor used. The term preferences must be given effect, and therefore the Court adopts the construction of "user-selectable settings the user wants."

*b. When stationary/active preferences are set*

The second dispute is whether the stationary and active preferences are set when the device is stationary or active, as Apple argues, or when the device determines that it has been or has not been stationary, as Unwired Planet argues. Clearly, the preferences are set when the device itself

---

would be helpful for Unwired Planet if the sentence had read, "In one embodiment, one or more of the *preferences* pertain to user preferences." Indeed, if the sentence had been constructed as such, it would have indicated that not all preferences are user selectable. But, as is, it merely suggests that not all settings are user selectable, which does not undermine Apple's proposed construction.

makes a determination, as both parties seem to acknowledge. Apple argues, however, that

Unwired Planet's construction would be redundant because this fact is already explicit in Claim

21, which reads, "setting one or more mobile device settings to stationary preferences when said

determining (b) determines that the mobile device has been stationary for at least the first

predetermined period of time." *Id.* (Claim 21) 12: 48-49. But this is not the exact same

requirement, as the Claim language discusses the device determining it has been stationary after a

period of time. The additional clarity offered by a construction which explicitly states that the

stationary or active preferences are triggered by the device's determination may be helpful to a

jury.

Accordingly, the Court adopts the following construction of "stationary/active

preferences": "<u>configuration of user-selectable settings the user wants when the device determines</u>

<u>that it is/is not stationary</u>."

**IT IS SO ORDERED.**

Dated:  November 3, 2014

_____

VINCE CHHABRIA
United States District Judge

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNWIRED PLANET, LLC,

        Plaintiff,

    v.

APPLE INC,

        Defendant.

Case No.  13-cv-04134-VC

**ORDER DENYING MOTION FOR LEAVE**

Re: Dkt. No. 266

Unwired Planet's motion for leave to add new products to this patent infringement suit is denied. Unwired Planet acted with diligence in seeking to add the iPhone 6, iOS 8 software, the iPad Air 2, and the iPad Mini 3, as it initiated discussions with Apple about adding the new products a few days after Apple released them, and then filed this motion roughly a month later. But at this stage, after fact discovery has already closed and with a trial date approaching, it would be unduly prejudicial to Apple to allow Unwired Planet to add new products.

      **IT IS SO ORDERED**.

Dated: December 8, 2014

_____

VINCE CHHABRIA
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNWIRED PLANET, LLC,

     Plaintiff,

    v.

APPLE INC,

     Defendant.

Case No. 13-cv-04134-VC

**ORDER GRANTING SUMMARY JUDGMENT RE WILLFUL INFRINGEMENT**

Unwired Planet has sued Apple for infringement of four patents (the '831 patent, '446 patent, '260 patent, and '092 patent). The parties have filed cross-motions for summary judgment. Included in Apple's motion is an argument that Unwired Planet cannot establish willful infringement as a matter of law. Although the other issues presented by the parties' cross-motions remain under submission, the Court hereby rules on Apple's motion with respect to willful infringement.

"Establishing willful infringement of a valid patent requires a two-prong analysis entailing an objective and a subjective inquiry." *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 769 F.3d 1371, 1381-82 (Fed. Cir. 2014). First, Unwired Planet must "show by clear and convincing evidence that [Apple] acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *In re Seagate*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). Second, if it can satisfy the first prong, Unwired Planet must then prove that Apple knew or should have known of the objectively high risk that it was infringing. *Id.*

Although the question whether Apple is entitled to summary judgment on noninfringement of the four patents is difficult, the question whether Apple *willfully* infringed is not. The evidence in the record clearly establishes that Unwired Planet cannot, as a matter of law, satisfy the first prong of the test for willfulness. As will be clear from the Court's forthcoming order on the

United States District Court
Northern District of California

1   remaining issues presented by the cross-motions, Apple has an objectively reasonable basis for

2   believing it does not infringe any of the four patents held by Unwired Planet, and no reasonable

3   juror could conclude otherwise by clear and convincing evidence. This is so with respect to all

4   four patents, regardless of whether the issues of infringement or invalidity of any of those patents

5   need to go to a jury. Accordingly, summary judgment is granted for Apple on Unwired Planet's

6   allegation of willful infringement of the patents-in-suit.

7

8       **IT IS SO ORDERED.**

9   Dated: April 23, 2015

10  _____

11                      VINCE CHHABRIA
                        United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNWIRED PLANET, LLC,

        Plaintiff,

    v.

APPLE INC,

        Defendant.

Case No.  13-cv-04134-VC

**SUMMARY JUDGMENT ORDER**

Docket No: 311, 317

## I. Introduction

Unwired Planet has sued Apple for patent infringement.  Unwired asserts claims from four different patents: U.S. Patent No. 6,317,831 ('831 patent), U.S. Patent No. 6,532,446 ('446 patent), U.S. Patent No. 6,646,260 ('260 patent), and U.S. Patent No. 6,321,092 ('092 patent).  The parties have cross-moved for summary judgment on various issues.

Apple's motion for summary judgment of noninfringement is granted with respect to the '831 patent, the '446 patent, and the '260 patent.  This means several of the parties' summary judgment arguments on those patents are moot.  Further, Apple has informed the Court that in the event the Court grants Apple's motions for summary judgment of noninfringement, Apple will no longer pursue its invalidity counterclaims with respect to those patents at the upcoming trial, provided that it can still pursue them if the case is remanded on appeal.  Therefore, the only remaining patent-in-suit will be the '092 patent.

And on the '092 patent, Apple's motion for summary judgment of noninfringement is denied with respect to literal infringement, but is granted with respect to induced and contributory infringement.  Unwired's motion for summary judgment on Apple's invalidity defense based on anticipatory prior art is granted.  And both parties' motions for summary judgment on Apple's on–

1   sale bar defense are denied.

2

3                            **II. '831 Patent**

4          The '831 Patent describes a technique for more efficiently enabling secure data transactions

5   using a narrowband channel.  Each of the asserted claims – claims 17, 23, and 25 – requires a

6   wideband channel to first exchange security information, and a narrowband channel to then

7   transmit the relevant data over the secure connection.  The primary difference between the two

8   types of channels is the rate at which they transfer data.  At claim construction, the parties agreed

9   to the Court's proposed construction of narrowband channel as "channel with a meaningfully

10  lower data transfer rate or bandwidth than the wideband channel."

11         Unwired Planet alleges that the Apple Push Notification System (APNS) infringes the

12  asserted claims of the '831 patent.  APNS is an Apple feature that allows app providers to send

13  push messages to an iOS device via APNS servers.  Rather than connecting with multiple app

14  provider servers, an iOS device need only connect to the APNS servers, because the app provider

15  servers send messages to the APNS servers, which then send messages on to the iOS device.  It is

16  undisputed that APNS servers send push notifications to iOS devices using TCP/IP protocols,

17  which are the standard communication protocols for transmitting data over the Internet.

18         When an APNS server sends a push notification to an iOS device, the message includes

19  both a "payload" and a "header."  The payload is the portion of the message that contains the

20  information to be presented to the user (if the push notification is from StubHub, for instance, the

21  payload might say "Tickets for tonight's Golden State Warriors game").  The header includes

22  information related to accurate delivery of the message, such as the identity of the iOS device that

23  should receive the message.

24         Apple contends that APNS does not meet the "narrowband channel" claim limitation as a

25  matter of law.  Unwired responds that the channel used to send push notification messages from

26  the APNS servers to an iOS device is a narrowband channel, and it contends that APNS uses a

27  wideband channel when APNS exchanges security information with an iOS device that later

28  allows the APNS servers to send the push notification to the correct device.

                                        2

As a threshold matter, to prevail on this infringement claim Unwired must be able to prove that APNS uses two separate channels, as required by the '831 patent. It's debatable whether Unwired has provided sufficient evidence of this. There is no dispute that the exchange of both the security information (performed by the alleged wideband channel) and the push notification message (performed by the alleged narrowband channel) occur over a single Internet connection using TCP/IP protocols, which seems to belie the suggestion that they occur over different channels.

Unwired contends these APNS channels are different because they have different endpoints. Unwired's expert, Dr. Mark Jones, claims the security information channel (alleged wideband channel) runs only from the iOS device to the APNS servers, whereas the push notification channel (alleged narrowband channel) extends back to the application provider servers. And he contends this makes them different channels. But as Apple correctly points out, "the asserted claims require *both* channels to connect to the same 'server' with the same 'client,' and Unwired contends that the 'server' is the APNS server and the 'client' is the iOS device." Therefore, all that matters is the channel between the APNS servers and the iOS device; the communication that extends from the APNS servers to the application provider servers is not part of the accused system. And Unwired has given no real explanation (or evidence) of how the back-and-forth communication between the APNS servers and the iOS device occurs over different channels.

But even assuming for the sake of argument that APNS does use two separate channels, these channels cannot be distinguished based on meaningfully different data transfer rates, which is the fundamental difference between a narrowband and wideband channel in the '831 patent. Dr. Jones asserts that push notification messages are sent at a lower data transfer rate than the security information, but his analysis is based on a faulty premise, and once this is recognized it becomes clear that there is no genuine issue of material fact.

Dr. Jones' analysis is as follows: Apple limits the size of push notification messages to 256 bytes, a limitation that is not present when the APNS servers exchange security information with an iOS device. This size limitation results in a higher percentage of header information than is

United States District Court
Northern District of California

typically present in TCP/IP data transmissions.  Further, header information should not be considered "data"; rather, only the payload – the portion of the push notification that includes the actual message to the user – should be considered data.  Therefore, because the push notification contains significant overhead in the form of header information, and because header is not data, the payload (or data) reaches the iOS device at a slower rate than it otherwise would in a message with a lower percentage of header information, and thus the data transfer rate is meaningfully lower.[1]

At oral argument, counsel for Unwired analogized its infringement theory to coal trucks transporting coal from Point A to Point B.  If the road between the two points only allows three coal trucks to travel at one time, and if each of those trucks includes a large engine that takes up space that could otherwise be filled with coal, then the overall amount of coal reaches Point B more slowly than if the road allowed ten trucks to travel at a time, or if the trucks had smaller engines and thus more space for coal.  Accordingly, under this theory, the transfer rate of coal is meaningfully lower due to the overhead of the large engines and the restrictions on the number of trucks.

Rather than supporting Unwired's infringement theory, this analogy shows why APNS does not infringe.  First, the scenario assumes a need to deliver more coal than what can be carried on three trucks.  But this is not the way APNS works.  A push notification is a self-contained message; it includes all the content that an application provider sends to an iOS device.  It is not as if an application provider intends to send 1000 bytes of data and therefore must send four push notifications to the iOS device.  Rather, one "trip" from the APNS servers (which receive the data from the app provider servers) to the iOS device contains the total amount of data.

---

[1] It is not clear why header information should not be considered data; after all, it is a critical part of the push notification message and is necessary to ensure the push notification gets delivered to the correct iOS device.  However, Unwired points to a section of the '831 Patent, as well as to a sentence in a technical reference, both of which might suggest that header should not be considered data.  So for purposes of summary judgment, the Court will assume that header information is not data.

United States District Court
Northern District of California

Second, the coal analogy is not reflective of the '831 patent because the analogy does not speak to the rate at which the trucks travel on the road; instead, the hypothetical lower coal transfer rate relies solely on the characteristics of the trucks themselves (bigger engines) and on a limitation restricting the number of trucks. Dr. Jones' infringement analysis suffers from the same defect. He opines that data-size restrictions and overhead in the form of header result in push notifications reaching an iOS device at an overall lower transfer rate. But this analysis has nothing to do with the *capacity* of the alleged narrowband channel to transfer data at a lower rate. Yet that is precisely how a narrowband channel is defined in the '831 patent. The '831 patent states, "As an example, narrowband channels can transfer data at a rate of about 400 bits per second (bps), while wideband channels can transfer data at a rate of at least 14400 bps." '831 Patent, 8:12-14. The distinction between a wideband and narrowband channel is the different data transfer abilities of the channels themselves. Unwired has introduced no evidence to suggest that (assuming there are really two channels) the data channel between APNS servers and an iOS device for delivering push notifications itself is not capable of transferring data at a rate similar to that of the channel between APNS servers and an iOS device used to exchange security information.

Accordingly, there is no evidence that APNS meets the "narrowband channel" limitation of the asserted claims. Apple's motion for summary judgment of noninfringement of the '831 patent is therefore granted.

### III. '446 Patent

*A. Noninfringement*

The '446 patent discloses an invention for extending speech recognition capabilities to mobile devices. Under the method taught by the patent, a user speaks into a mobile device, the user's speech is sent over a voice channel to a server, the server converts the speech into a symbolic data file, and the server then sends the data file back to the mobile device over a data channel. The use of two separate channels – a voice channel for sending voice input from the device to the server, and a data channel for sending the data file from the server back to the mobile device – is a core feature of the invention. As the Court noted in its claim construction order,

United States District Court
Northern District of California

"[t]he patent consistently maintains the distinction between voice input being sent over a voice channel to the server device, and a data file which is then sent back to the mobile device over a data channel."  Therefore, the court construed "voice input" as "speech provided over a voice channel."

Unwired has accused Apple's "Siri" feature of infringement of claims 15 and 35 of the '446 patent.  Much like the '446 patent, Siri provides for server-based speech recognition; a user speaks into an iOS device, that speech is sent to the Siri servers, and then text is returned to the iOS device.  But Apple argues that unlike the '446 patent, Siri does not use a voice channel to transmit voice input from the device to the servers.  Instead, Apple argues, Siri sends voice input over a data channel, and does so using TCP/IP protocol, which, as mentioned in the previous section, is a standard protocol for sending data (not voice) over the Internet.  As Apple notes, this is the same protocol Siri uses to send the data file *back* from the Siri servers to the iOS device.

There is no factual dispute about how Siri works, and Unwired acknowledges that Siri sends voice input using TCP/IP protocols.  Nonetheless, Unwired argues, Siri uses a voice channel because the channel between an iOS device and Siri servers has certain qualities that one normally sees in a voice channel.  This of course begs the question: what is a voice channel?  The patent uses the term no less than 16 times, and uses it in a way that suggests that one skilled in the art would know what it is.  Further, the patent states that a voice channel "is generally established and coordinated using the infrastructure and procedures generally known in the art for setting up a phone call."  '446 Patent, 6:21-24.  The patent also suggests, however, that other types of voice transmission can potentially be sent over a voice channel.  For instance, the patent teaches that "palm sized computing devices and personal digital assistants with voice transmission and/or reception capabilities" can send voice input over a voice channel to an outside server.  *Id.* at 5:1-3.[2]

---

[2] Apple's expert, Mr. Rysavy, provided examples of how, at the time the patent was prosecuted, these devices could access the same voice channels used for phone calls.  So it may be that the only example the patent provides of voice channel transmission is a phone call.  But the Court need not resolve that question to rule on the summary judgment motion.

United States District Court
Northern District of California

1    Unwired urges the Court to think about different types of transmissions as existing on a

2  spectrum; some types of transmissions clearly use voice channels, others clearly use data channels,

3  and still others are somewhere in between.  As Unwired states, different types of transmissions "lie

4  on a spectrum between a data transfer, on one end, and a telephone call over a voice channel, on

5  the other end.  Determining where a voice channel ends and becomes a data channel requires an

6  overall assessment of these factors."  And according to Unwired, this overall assessment involves

7  a "fact-intensive multifactor analysis."

8    Unwired's argument seems to belie the teachings of the '446 patent, which suggests that a

9  voice channel is a fairly simple and well-understood concept.  Indeed, the only description of a

10  voice channel from the patent is the basic one mentioned above: a voice channel "is generally

11  established and coordinated using the infrastructure and procedures generally known in the art for

12  setting up a phone call."  But regardless of whether Unwired is correct about the need for a multi-

13  factor analysis, there must still be some discernible limit as to what constitutes a voice channel.  In

14  other words, even if there is a spectrum where it is obvious that certain transmissions, such as cell

15  phone calls, use a voice channel, while for other transmissions that determination is a closer call,

16  there nonetheless must be a recognizable line that separates what is a voice channel from what is

17  not.  A voice channel must be an actual, identifiable type of channel, not some ambiguous channel

18  that can be labeled a voice channel merely because it transports voice.  Otherwise, the '446 patent,

19  which teaches the use of a voice channel, would be rendered meaningless.

20    This is underscored by a passage in Unwired's supplemental brief, which attempts to

21  explain how one would decide whether something is a voice channel or a data channel:

22

23        For example, one can analyze possible hypothetical variations of the
        example offered above of downloading a MP3 file of oral arguments
24        recorded the day before. A person of ordinary skill might come to a
        different conclusion if the user were listening to the MP3 file as it
25        downloaded, or if it was being streamed instead of downloaded, or if
        it was being streamed live during oral arguments, or if it was being
26        streamed live via Skype during the oral arguments, or if the user
        listened and responded using Skype, or if the user is listening and
27        responding by dialing in over a normal telephone line. Each of these
        variations presents a slightly different analysis, possibly yielding
28        different results dependent on the specific details of the
        hypothetical. All of these circumstances lie on a spectrum between

> a data transfer, on one end, and a telephone call over a voice channel, on the other end. Determining where a voice channel ends and becomes a data channel requires an overall assessment of these factors.

If Unwired is correct that the distinction between a voice channel and a data channel in the '446 patent is so blurry, it seems unlikely that a person skilled in the art could read the patent and determine (for purposes of avoiding infringement) what is and is not a voice channel. This would raise a serious concern that the patent could be invalid for indefiniteness. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).

But assuming for the sake of argument that the '446 patent delineates a "spectrum" between "voice channel" and "data channel," and even assuming, as Unwired asserts, that there is no clear dividing line on this spectrum, no reasonable juror could conclude, on this record, that Siri uses a "voice channel" as that term is used in the patent. Even adopting Unwired's construct, a voice channel is defined by how it treats voice communications. Namely, a voice channel transmits voice without delays; otherwise, two participants on a cellular phone call – the undisputed classic example of a voice channel – would be unable to communicate effectively. As explained by Apple's expert, Mr. Rysavy, a voice channel accomplishes this goal in three ways. First, it uses different transmission protocols from data channels. Specifically, voice channels use shorter transmission intervals, typically 20 millisecond intervals, to ensure that voice is transmitted without delay. Second, voice channels use different error correction mechanisms than data channels. A voice channel is more focused on transmitting information quickly, whereas a data channel is more focused on transmitting information accurately. As a result, a voice channel will tolerate errors in voice packets, because to retransmit those packets would cause delay. A data channel, on the other hand, will retransmit a data packet that contains errors, even if that retransmission causes delay, because retransmission is necessary for accuracy. Third, voice channels receive dedicated network resources from wireless carriers such that voice channels are prioritized over data channels. This ensures that voice transmission occurs first, and is not disturbed by data transmission. Otherwise, voice transmission could be interrupted and delayed.

With this understanding of some of the hallmarks of a voice channel, no reasonable juror could conclude that Siri transmits voice input over a voice channel, because it is undisputed that

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the Siri channel does not include these features.  With respect to transmission protocols, whereas a

2   voice channel typically uses 20 millisecond intervals for transmitting voice, Siri records 200

3   milliseconds of voice input before transmission to the Siri servers.  As for error correction

4   mechanisms, there is no evidence that Siri transmits packets including errors to ensure real-time

5   delivery.  And the Siri channel does not receive any priority from wireless carriers or any

6   dedicated network resources to ensure real-time transmission.  In fact, the opposite is true –

7   wireless carriers treat Siri usage as data usage, not as voice minutes, and Siri only works if an iOS

8   device is connected to the Internet.

9         Not only does the Siri channel lack these features, but, as even Dr. Jones acknowledges,

10   TCP/IP, the protocol used to send voice input over the channel, "is not concerned with whether it

11   is transmitting voice or non-voice data."  This indicates that the channel does not treat voice and

12   non-voice data differently, as would be the case if the channel was a voice channel.  What's more,

13   the '446 patent itself identifies TCP/IP as the type of protocol that can be used on the data channel

14   to send input back to the mobile device, not as the protocol that can exist on the voice channel.

15         Against all this, Unwired contends that the channel between an iOS device and the Siri

16   servers is a voice channel, both because a voice channel *can* exist over TCP/IP protocols, and

17   because the Siri channel includes a number of voice channel characteristics.  As to the first point,

18   Unwired points to Skype and other Voice-over-IP (VoIP) technology as examples of TCP/IP

19   protocols being used to transmit voice over a voice channel.  But reference to VoIP is largely

20   irrelevant.   No VoIP services use TCP in normal operation; rather, they only use TCP if the

21   preferred protocol is not available, presumably because TCP/IP protocols do not include any of the

22   transmission protocol, error correction mechanisms, or prioritization properties that are necessary

23   for voice to be transmitted without delay.  Therefore, it's not clear that a VoIP communication

24   which uses TCP/IP even uses a voice channel, at least as that term is used in the '446 patent.

25   Further, it is undisputed that Siri is not a VoIP service, so even if VoIP did stand for the general

26   idea that a voice channel and TCP/IP could coexist, it would not shed any light on the type of

27   channel that Siri uses.

28

United States District Court
Northern District of California

1    Unwired also argues that both voice input from Siri as well as cellular calls from an iOS

2  device, the latter of which obviously uses a voice channel, are sent over the same cellular channel.

3  It appears Unwired is referring to the fact that cellular networks provide an "uplink channel" for

4  all outgoing communications and a "downlink channel" for incoming communications.  So from

5  this standpoint, of course voice calls and Siri speech input both use the "uplink channel" because

6  they are both forms of outgoing communication.  But this has nothing to do with whether Siri uses

7  a voice channel.  And more to the point, in his deposition, Dr. Jones indicated that the "uplink

8  channel" is not, on its own, what he alleges to be the voice channel.  Therefore, this argument does

9  nothing to support the contention that Siri uses a voice channel.

10    Unwired also contends that Siri uses a voice channel because it configures the channel to

11  transmit speech, and this configuration is a characteristic of a voice channel.  Here, Unwired relies

12  on Siri's use of Speex codec to encode and packetize the user's voice, which, according to

13  Unwired, is a type of encoding and packetization designed for VoIP technology.  But this evidence

14  merely goes to how an iOS device encodes the user's speech prior to transmission, not to the type

15  of channel used between the iOS device and the Siri servers.

16    Finally, in his opening report, Dr. Jones makes a conclusory assertion that Siri constantly

17  streams the user's speech, including silent pauses, and suggests that this "streaming" is indicative

18  of a voice channel.  But there is no evidence as to what Unwired means by "streaming," or how

19  this type of streaming is any different from the way that data is streamed over a data channel.  In

20  short, this evidence, like the rest of the evidence presented by Unwired Planet, is insufficient to

21  lead a reasonable juror to believe that a channel which uses TCP/IP protocols, a channel which

22  does not distinguish between voice and non-voice data, and a channel which does any include any

23  of the properties needed to ensure real-time transmission, is a "voice channel" as that term is used

24  in the '446 patent.

25    Accordingly, because Siri does not use a voice channel, Siri does not infringe the '446

26  patent, and summary judgment is granted for Apple.

27

28

United States District Court
Northern District of California

*B. Invalidity*

Apple has also moved for summary judgment of invalidity on the '446 patent.  Apple alleges that U.S. Patent No. 5,956,681 (the "Yamakita patent") is anticipatory prior art.  Like the '446 patent and like Siri, the Yamakita patent teaches a system in which a mobile device sends voice input to a server to convert that speech into text and then send it back to the mobile device.  But unlike the '446 patent, the Yamakita patent sends speech input to the server using TCP/IP protocols, the same protocols used by Siri.  As discussed extensively in the previous section, this is not the approach taken by the '446 patent; rather, under the '446 patent, speech travels from the mobile device to the server over a voice channel.  Therefore, the Yamakita patent does not anticipate the '446 patent, and Apple's motion for summary judgment of invalidity is denied.

## IV. '260 Patent

The '260 Patent discloses an invention for "provisioning" the features and services available on a mobile communications device, and the Court has construed "provisioning" as "enabling or modifying communication capabilities."  Unwired has asserted claim 1, "[a] method for provisioning a two-way mobile communications device," which comprises, in relevant part, the following two steps: "[1] receiving user information required to establish a user account . . . [2] generating a provisioning request comprising the user information and the user's selection."[3]  '260 Patent, 9:19-20, 27-28.

Unwired accuses Apple of infringement via the App Store, which allows a user of an iOS device to purchase and download applications for her device.  To purchase apps from the App Store, a user must have an iTunes account, which "utilizes a user's Apple ID."  As Apple notes, "[a]n Apple ID is the email address you use as a login for just about everything you do with Apple, including . . . downloading apps from the App Store."

Dr. Jones argues that the claim term "user account" is met by an Apple user's iTunes account.  When a user sets up an iTunes account, she provides certain "user information required

---

[3] Unwired Planet has also asserted Claim 16, which depends from Claim 1.

to establish" the account: an email address which serves as the Apple ID, a password, birth date, country or region, challenge questions and responses, and billing information.  If a user is signed into iTunes and has recently provided her password, then when she requests to purchase an app from the App Store, the iOS device generates a buyProduct request for the app.  If the user is not signed into iTunes, then the device generates an "authenticate" request, which requires the user to enter her Apple ID and password, and then a buyProduct request.  Because the buyProduct request includes the user's selection of an app as well as information about that user – namely, an X-token which includes the user's Apple ID password in the form of a hash of that password – Unwired Planet argues that the buyProduct request meets the claim limitation of "generating a provisioning request comprising the user information and the user's selection."

But there's one problem – the user information included in the buyProduct request (the alleged "provisioning request") is not the same user information required to establish the iTunes account (the alleged "user account").  To establish an iTunes account, a user provides the information recited above (email address for use as Apple ID, password, birthdate, etc.).  The user information in the buyProduct request is different.  It includes a DSID, which is a unique identifier of an Apple user's account generated by Apple servers, as well as an X-token, which includes an encryption of the user's Apple password in the form of a hash.  The type of user information contained in a buyProduct request is not a disputed point.  Instead, Unwired contends that the hash of the password satisfies the claim limitation of "user information" because the hash is effectively the same thing as the user's password, just with "a mathematical function applied to [it]."

But this argument is insufficient in multiple respects.  The asserted claim requires that "the user information" in the provisioning request be the same "user information required to establish a user account."  This is evident because there is no type of "user information" mentioned in the claim other than that needed to establish a user account, because the inventor's use of "the" in "the user information" suggests a reference back to this earlier-cited user information needed to establish the account,[4] and because the same term should be given a consistent meaning within the

United States District Court
Northern District of California

---

[4] *See, e.g., Motorola Mobility LLC v. ITC*, 535 fed. Appx. 971, 975 (Fed. Cir. 2014) ("[T]he claim requires that 'the change' be communicated to the fixed portion of the wireless network.  Since the

same claim.[5] Yet here, the user information in the alleged provisioning request is not the same user information required to establish a user account. The hash of a password in a buyProduct request is a proxy for the user's Apple ID password. As Dr. Jones testified, one can't even figure out the password from the hash. At best, therefore, Unwired has a doctrine of equivalents argument, not a literal infringement argument. But Unwired has only alleged literal infringement against the App Store.

The above discussion applies to the situation where a user is already signed into iTunes and attempts to purchase a product from the App Store. Unwired also argues that infringement occurs when a user is *not* signed into iTunes, which results in the device generating both an authenticate request, in which the user enters her Apple ID and password, and then a buyProduct request. Unwired alleges that the combination of the authenticate request and the buyProduct request is a "provisioning request." But an authenticate request and a buyProduct request are indisputably two separate requests, even if they occur successively without any action by the user, so they cannot be combined to meet the claim limitation of "provisioning request." And neither of these requests contains both the user's selection and the user information needed to establish a user account. As explained, the buyProduct request does not contain the user information needed to establish a user account, and while the authenticate request contains at least some, but certainly not all, of this user information (Apple ID and password), it does not contain the user's selection.

Accordingly, because the user information in the buyProduct request is different from the user information needed to establish an iTunes account, the App Store does not meet the claim limitation of "generating a provisioning request comprising the user information and the user's

---

only antecedent basis for this change derives from the phrase 'a change in accessibility,' the change that causes an update to the application registry must be the same change that is communicated to the fixed portion of the wireless network.").

[5] *See, e.g.*, *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1345 (Fed. Cir. 1998) ("[T]he same word appearing in the same claim should be interpreted consistently."); *Phonometrics, Inc. v. Northern Telecom, Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998) ("A word or phrase used consistently throughout a patent claim should be interpreted consistently."); *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1377 (Fed. Cir. 2004) (the same term appearing in different portions of the claim should be presumptively given the same meaning).

United States District Court
Northern District of California

selection."  Summary judgment of noninfringement is granted to Apple with respect to the '260 patent. [6]

## V. '092 Patent

*A. Noninfringement*

The '092 patent discloses a technology for identifying the location of mobile terminals, such as cell phones.  To more accurately locate a mobile terminal, the invention gathers location inputs from multiple sources, and then responds to a location request by providing the location information that is responsive to that request.  The patent refers to the sources of the location inputs as "location finding equipment."  Unwired Planet alleges that the location-finding technology of iOS devices infringes claim 20 of the '092 patent, which is a method claim comprising, in relevant part, "receiving a plurality of device dependent location inputs provided by said location finding equipment."  '092 Patent, 16:19-20.

Apple has moved for summary judgment on the ground that the accused system does not use a plurality of location inputs; rather, Apple argues, its system only uses a single location input: GPS.  But in his expert report, Dr. Jones identified a number of different pieces of information which he alleges are part of Apple's system and which Dr. Jones identifies as "location inputs."  This is best illustrated by the chart which appears on pages 79-80 of Dr. Jones' opening expert report.

In its motion for summary judgment, Apple only focuses on two of these inputs – "BSSID," an identification number associated with a Wi-Fi router, and "cell ID," an identification number associated with a cell tower.  Apple contends that the remaining pieces of information in

---

[6] Because there is no direct infringement of the '831, '446, or '260 patents, Apple's motion for summary judgment is also granted on these patents with respect to indirect infringement.  *See, e.g.*, *In re Bill of Landing Transmission and Processing Sys. Patent Lit.*, 681 F.3d 1323, 1330 (Fed. Cir. 2012) ("a claim of indirect infringement can only arise when there is direct infringement); *see also Limelight Networks, Inc. v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) ("our case law leaves no doubt that inducement liability may arise if, but only if, [there is] . . . direct infringement") (internal citation omitted); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961) ("if there is no direct infringement of a patent there can be no contributory infringement").

United States District Court
Northern District of California

1    Dr. Jones' chart are either already covered by Apple's noninfringement arguments because they are

2    the same type of information as BSSID and cell ID – namely, equipment identifiers – or else

3    Unwired has presented no evidence that Apple actually uses that information as part of its

4    location-finding technology in iOS devices.  It is not clear that Apple is correct, and therefore

5    summary judgment is denied on this ground alone, because Apple has failed to demonstrate that

6    all of the inputs identified by Dr. Jones are not in fact location inputs.

7        But even with respect to BSSID and cell ID, there is a material dispute about whether they

8    meet the claim limitation of "location input."  At claim construction, Apple proposed construing

9    "location input" as "determinations of the location of a mobile terminal," but the Court found this

10   construction "suggests a definiteness which might be misleading to a jury and result in excluding

11   certain embodiments."  Instead, the Court adopted Unwired's proposed construction of

12   "information regarding location."  The Court stated: "'Information regarding location' is a

13   straightforward phrase that a jury would understand.  A location input offers information about the

14   location of the wireless station.  If the input does not provide information about a wireless station's

15   location then it is not a location input."

16       Here, the parties dispute whether BSSID and cell ID provide information regarding

17   location.  The parties agree about what BSSIDs and cell IDs are – the former are identification

18   numbers for Wi-Fi routers, and the latter are identification numbers for cell towers.  Apple

19   contends they are not, on their own, information regarding location, because these identification

20   numbers must be paired with Apple's own internal database to match up the router and cell ID

21   with specific latitude and longitude information.  But as Unwired correctly points out, even though

22   BSSIDs and cell IDs do not in themselves give the precise location of an iOS device, a reasonable

23   juror could still conclude that they provide information regarding location.  After all, they do

24   provide information about routers and cell IDs, both of which typically have fixed locations, and

25   the '092 patent itself discusses cell sector IDs as location inputs, so adopting Apple's argument

26   could arguably exclude a disclosed embodiment.[7]  *See Broadcom Corp. v. Emulex Corp.*, 732 F.3d

27

28   _____
     [7] Apple notes that cell ID, which Unwired contends is used by Apple's technology-finding system,
     and cell sector ID, which is disclosed as a location input in the '092 patent, are not the same thing.

United States District Court
Northern District of California

1   1325, 1333 (Fed. Cir. 2013).

2   Accordingly, because Apple has not demonstrated that it has addressed all of the alleged

3   location inputs, and because a reasonable juror might conclude that BSSIDs and cell IDs provide

4   information regarding location, Apple's motion for summary judgment of no direct infringement

5   with respect to the '092 patent is denied.[8]

6   Apple has also moved for summary judgment on Unwired's claim of induced or

7   contributory infringement. For Apple to be liable for indirect infringement, Unwired must show

8   that Apple had knowledge of the patent's existence as well as knowledge that Apple's induced or

9   contributory acts caused infringement. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct.

10  2060, 2067 (2011). Unwired can satisfy this knowledge requirement by showing either Apple's

11  actual knowledge of infringement or Apple's willful blindness toward infringement, which occurs

12  when a defendant "takes deliberate actions to avoid confirming a high probability of wrongdoing."

13  *Id.* at 2070-71.

14  Here, Apple's noninfringement argument – namely, that its devices only use one location

15  input rather than a plurality of inputs – is strong enough that no reasonable juror could conclude

16  that Apple acted with actual knowledge that it was inducing or contributing to infringement. Nor

17  could a reasonable juror conclude that Apple was willfully blind as to infringement, because there

18  was no high probability of wrongdoing given the strength of Apple's noninfringement argument.

19  Therefore, even though the question of literal infringement of the '092 patent should go to a jury,

20  the question of indirect infringement should not, and Apple's motion is granted with respect to

21  
22  And it argues that they are qualitatively different – a cell ID is an ID for a piece of equipment (a
    cell tower), whereas a cell sector ID identifies a geographical area. But Unwired has presented
23  evidence that a cell ID also identifies a geographical area, just in a less accurate way than a cell
    sector ID because a cell ID does not divide the relevant area into four sectors. Because the court
24  must consider the evidence in the light most favorable to Unwired, the Court will credit Unwired's
    description of a cell ID.

25  [8] The question whether BSSIDs are cell IDs are "location inputs," as that term is used in the '092
26  patent, is arguably one of further claim construction. However, the Court has already provided a
    claim construction, and there is no way for the Court to further construe the term except in light of
27  the accused device, which it should not do. *See Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d
    1317, 1324 (Fed. Cir. 2009). Therefore, the jury, armed with the Court's claim construction, must
28  decide whether the claim limitations are met by the accused device.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    contributory and indirect infringement.

2

3    B.   "Proposal for LFS" as anticipatory prior art

4           Unwired has moved for summary judgment on Apple's invalidity argument that "Proposal

5    for location finding system" ("Proposal for LFS"), a document authored by Bill Pierce of Motorola

6    in connection with the Motorola agreement discussed below, is a printed publication that

7    constitutes anticipatory prior art.  "Whether an anticipatory document qualifies as a 'printed

8    publication' under § 102 is a legal conclusion based on underlying factual determinations."

9    *Cooper Cameron Corp. v. Kvaerner Oilfield Prods.*, 291 F.3d 1317, 1321 (Fed. Cir. 2002).  To be

10   a prior publication, a document must be publicly accessible.  *See Norian Corp. v. Stryker Corp.*,

11   363 F.3d 1321, 1330 (Fed. Cir. 2004).  Here, no reasonable jury could find, by clear and

12   convincing evidence, that "proposal for LFS" was publicly accessible.  The only identified source

13   of the document came from the files of a former Unwired employee, James Fitch, who did not

14   recognize the document and testified that he did not know whether it had been publicly

15   disseminated.  Further, Apple has not identified any individual who is aware that the document

16   was disseminated, nor did Apple even take the deposition of Bill Pierce, the document's author.  In

17   fact, Apple's sole evidence is that the proposal states, on its face, that it was for "distribution" to

18   two working groups, and that the practice in these working groups was to circulate drafts of

19   proposals.  But this conclusory evidence is insufficient for Apple to show, by clear and convincing

20   evidence, that the proposal was *actually* publicly disseminated.  Accordingly, summary

21   judgment is granted for Unwired Planet.

22

23   C.   On-Sale Bar

24          Both parties have moved for summary judgment on Apple's on-sale bar defense.  Under 35

25   U.S.C. § 102(b), a patent is invalid if "the invention . . . was on sale in this country, more than a

26   year prior to the date of application for patent in the United States."  The '092 patent application

27   date is November 3, 1998, so the "critical date" for the on-sale bar is November 3, 1997.

28

Apple alleges that Unwired made nine different offers for sale prior to this date.[9]  In their summary judgment briefs, the parties primarily focus on one such alleged offer: a license and development agreement Unwired entered into with Motorola on March 29, 1996, in which Motorola sought to develop an LFS product that it could then market and sell to its customers.

i.  *Motorola agreement*

In the agreement, titled "License and Development Agreement," Motorola agreed to pay Unwired to develop "WLS Software" that would be compatible with Motorola's hardware and that could lead to an integrated LFS product.  Under the agreement, Unwired also gave Motorola a license to use the "WLS Software" that Unwired would develop.  And if Motorola sold the integrated product to its customers, Motorola would pay a per-unit fee to Unwired.  Apple contends the "WLS Software" covered by the agreement is the invention embodied by the '092 patent.  And Apple contends that because Unwired licensed this software to Motorola, Unwired made an offer to sell (indeed, sold) the invention embodied by the '092 patent before the critical date.

The on-sale bar applies when, prior to the critical date, (1) the invention is the subject of a commercial offer for sale, and (2) the invention is ready for patenting.  *Pfaff v. Wells Elecs., Inc.*, 525 U.S. 55, 67 (1998).  Here, Unwired does not dispute the "ready for patenting" prong, because documents preceding the critical date include drawings and descriptions that are almost identical to those included in the '092 patent.  *See id. at* 67-68 (ready for patenting may be shown "by poof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention.").  Therefore, the only dispute is whether Unwired made a commercial offer for sale of the invention embodied by the '092 patent.  This dispute consists of two parts.  First, was the Motorola agreement, which included a license to Motorola for the "WLS Software," a commercial sale of that software?  Second, if so, does "WLS Software," as that term is defined in the Motorola agreement, include the invention embodied by the '092 patent?

---

[9] Much like the parties, the Court uses "Unwired" or "Unwired Planet" to refer not only to the current company but also to its predecessor entities, including Signal Soft.

United States District Court
Northern District of California

On the first question, the Federal Circuit has fairly consistently held that a license to a patent right is not in itself a commercial sale that triggers the on-sale bar. *See, e.g.*, *Elan Corp. v. Andrx Pharms.*, 366 F.3d 1336, 1341 (Fed. Cir. 2004); *In Re Kollar*, 286 F.3d 1326, 1330 (Fed. Cir. 2002). But Unwired did not simply sell Motorola the rights to use a patent; rather, Unwired licensed the WLS Software to Motorola, and, as the Federal Circuit has acknowledged, a software license in which "[t]he product is . . . just as immediately transferred to the 'buyer' as if it were sold" can constitute a commercial offer. *In re Kollar*, 366 F.3d at 1330 n.3 (quoting *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1053 (Lourie, J., concurring)).[10] So the fact that this agreement was couched as a "license agreement" does not preclude application of the on-sale bar. The complicated part, however, is that the WLS Software was not immediately transferred to Motorola. In fact, it was never transferred, because Unwired never actually developed it, so the only product licensed to Motorola was a hypothetical one which never became a reality.

Given this, whether the license of the WLS Software constitutes a commercial sale of that software is a somewhat new question. The parties have not cited a case (and the Court is not aware of a case) directly on point.[11] But it is well established that an invention need not be reduced to practice for the on-sale bar to apply. *Pfaff*, 525 U.S. at 66. Rather, as long as the invention is conceived, there can be an offer for sale of it, so it seems immaterial that Unwired never actually developed the WLS Software. *See August Technology Corp. v. Camtek, Ltd*., 655 F.3d 1278, 1289 (Fed. Cir. 2011).

Further, it is hard to imagine how this agreement was not a commercial sale. It is undisputed that at the time of the agreement Unwired had been working on Location Finding System technology and was developing a suite of software products incorporating this technology. In the Motorola agreement, Unwired agreed to use its software technology to develop a software

---

[10] The agreement does, however, in Section 4(f), give Motorola "sole ownership of all right and title to any patents rights for any inventions or discoveries . . . developed under this Agreement."

[11] Apple argues that *Robotic Vision v. Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307 (Fed. Cir. 2001) is highly instructive. But as the Federal Circuit later clarified, *Robotic Vision* dealt only with the "ready for patenting" prong. *Sparton Corp. v. United States*, 399 F.3d 1321, 1324-26. Here, by contrast, the dispute centers on the on-sale prong.

United States District Court
Northern District of California

that was compatible with Motorola's hardware, and Unwired further agreed to give Motorola the right to use that software in exchange for per-unit royalty payments. This is clearly an effort by Unwired to make money off of its software technology. The fact that the Motorola agreement failed to yield an end product to sell to customers is irrelevant, because what matters is whether Unwired commercialized its software technology, which is exactly what it did with the Motorola agreement. What's more, around the same time as the Motorola agreement, Unwired entered into a number of other agreements with different companies, all of which related to Unwired's LFS software, further evidencing that Unwired was commercializing its software technology.

On the question whether the agreement reflects a sale, there is no factual dispute. The agreement speaks for itself. Therefore, the Court concludes there was a sale. The remaining question is whether WLS Software, as the term is used in the agreement, is the invention embodied by the '092 patent. On this point, the parties, both in their summary judgment briefs as well as in supplemental briefs ordered by the Court, have presented conflicting evidence. Accordingly, a jury must decide this question, and therefore the parties' cross-motions for summary judgment are denied.

### ii. Other Eight Alleged Offers for Sale

Unwired moved for summary judgment with respect to all nine alleged offers for sale. In its cross-motion for summary judgment, Apple only addressed three of those alleged offers: the Motorola agreement discussed above, the May 9, 1997 SCC Agreement, and the September 26, 1997 Agreement. Therefore, because Apple has not created a material dispute with respect to the other six alleged offers, summary judgment on those alleged offers is granted for Unwired. However, for the other two offers – the May 9, 1997 SCC Agreement and the September 26, 1997 AT&T Agreement – Apple provided some evidence that they constituted an offer of the invention embodied by the '092 patent, and Unwired did not address this evidence in its opposition, so both parties' motions for summary judgment are denied with respect to these two agreements.

United States District Court
Northern District of California

United States District Court
Northern District of California

*D. Marking*

Both parties have moved for summary judgment on Apple's marking defense on all four patents-in-suit. But because the Court has granted summary judgment of noninfringement on the '831, '446, and '260 patents, these patents are no longer in the case, pursuant to Apple's communication with the Court. Therefore, the parties' motions are moot with respect to those patents. The only remaining marking defense is against the '092 patent, but Unwired has only asserted method claims with respect to the '092 patent, and "[t]he law is clear that the [marking requirements] do not apply where the patent is directed to a process or a method." *Crown Packaging Tech., Inc., v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1316 (Fed. Cir. 2009). Accordingly, summary judgment is granted for Unwired with respect to Apple's marking defense on the '092 patent.

*E. Laches*

Unwired has moved for summary judgment on Apple's laches defense with respect to all four patents, but again only the '092 patent remains in the case. To succeed in its laches defense, Apple must prove by a preponderance of the evidence that (1) Unwired delayed filing suit for an unreasonable and inexcusable length of time from the time that Unwired knew of its claim against Apple, and (2) this delay prejudiced Apple. *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1032 (Fed. Cir. 1992). With respect to the first prong, while a determination of what constitutes an unreasonable or inexcusable delay is a question of fact, courts have typically found a period of delay could potentially be considered 'unreasonable' only if it substantially exceeded four years, and "a delay of three or four years has been deemed 'unreasonable only when that delay was accompanied by extraneous improper tactics or misleading conduct by the plaintiff.'" *Mformation Techs., Inc v. Research in Motion Ltd.*, 830 F. Supp. 2d 815, 824 (N.D. Cal. 2011) (quoting *IXYS Corp. v. Advanced Power Tech. Inc.*, 321 F. Supp. 2d 1156, 1163 (N.D. Cal. 2004). For the '092 patent, the relevant time period of delay is 4 years and 9 months. Even though Unwired Planet waited more than four years to sue Apple, there is no evidence that Unwired engaged in improper tactics or misleading conduct. But even if this delay could be considered

1  unreasonable or inexcusable, Apple cannot as a matter of law meet the second prong of the laches

2  analysis, because it has produced no evidence of material prejudice that it has suffered as a result

3  of Unwired's delay.  In its opposition brief, Apple argues that because Unwired sold its business

4  during the relevant time period, certain witnesses were not able to testify about products relevant

5  to this lawsuit.  But the 30(b)(6) witness Apple claims couldn't remember information about an

6  Unwired product wasn't even designated as a technical witness, and, in any event, such assertions,

7  unsupported by specific facts, are insufficient to demonstrate evidentiary prejudice.  *See Meyers v.*

8  *Asics Corp.*, 974 F.2d 1304, 1308 (Fed. Cir. 1992).[12]   Accordingly, because Apple's evidence is

9  insufficient to convince a reasonable juror that Apple suffered material prejudice as a result of

10  Unwired's delay, summary judgment is granted for Unwired Planet with respect to Apple's laches

11  defense on the '092 patent.

12

13       **IT IS SO ORDERED**

14  Dated:  May 22, 2015

15  _____

16  VINCE CHHABRIA
   United States District Judge

United States District Court
Northern District of California

---

[12] Unwired contends that the laches clock should not run during the time period that it was involved in both licensing discussions and different litigation with Apple, meaning that the relevant period of delay on the '092 patent should be roughly 3 years rather than 4 years and 9 months.  But Unwired has not presented evidence that it discussed licensing of the '092 patent in particular, nor was the '092 patent involved in other litigation with Apple, so it is not clear that this time period should be excluded from the laches analysis.  But in any event, whether the appropriate time period is 3 years or 4 years and 9 months is irrelevant since Apple has not suffered any material prejudice.

Courtland L. Reichman, SBN 268873
creichman@mckoolsmith.com
MCKOOL SMITH HENNIGAN, P.C.
255 Shoreline Drive, Suite 510
Redwood Shores, CA 94065
Telephone: (650) 394-1400
Fax: (650) 394-1422

Theodore Stevenson III (*pro hac vice*)
tstevenson@mckoolsmith.com
300 Crescent Court, Suite 1500
McKool Smith, P.C.
Dallas, Texas 75201
Telephone: (214) 978-4000
Fax: (214) 978-4044

Kevin Burgess (*pro hac vice*)
kburgess@mckoolsmith.com
John B. Campbell (*pro hac vice*)
jcampbell@mckoolsmith.com
McKool Smith, P.C.
300 W. 6th St., Suite 1700
Austin, Texas 78701
Telephone: (512) 692-8700
Fax: (512) 692-8744

*Attorneys for Plaintiff*

H. MARK LYON, SBN 162061
mlyon@gibsondunn.com
Y. ERNEST HSIN, SBN 201668
ehsin@gibsondunn.com
STUART M. ROSENBERG, SBN 239926
srosenberg@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Rd.
Palo Alto, CA 94304-1211
Telephone: (650) 849-5300
Fax: (650) 849-5333

TRACEY B. DAVIES (*pro hac vice*)
tdavies@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Ave., Suite 1100
Dallas, TX 75201-6912
Telephone: (214) 698-3100
Fax: (214) 571-2900

BROOKE MYERS WALLACE, SBN 259169
bwallace@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071
Telephone: (213) 229-7000
Fax: (213) 229-6074

*Attorneys for Defendant*

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNWIRED PLANET LLC, a Nevada limited liability company,**<br><br>        **Plaintiff,**<br><br>        **v.**<br><br>**APPLE INC., a California corporation,**<br><br>        **Defendant.** | **CIVIL ACTION NO.**<br><br>**3:13-CV-04134-VC**<br><br>**[~~PROPOSED~~] FINAL JUDGMENT**<br><br>**Judge: Hon. Vince Chhabria** |

For the reasons set forth in the Court's May 22, 2015 summary judgment order, and pursuant to the parties' May 28, 2015 joint stipulation seeking final judgment, the Court hereby enters FINAL JUDGMENT as follows:

1.   Unwired Planet's claim for direct infringement by Apple of U.S. Patent No. 6,321,092 is dismissed with prejudice.

2.   Apple's Declaratory Judgment counterclaims regarding U.S. Patent Nos. 6,321,092, 6,317,831, 6,532,446, and 6,647,260 are dismissed without prejudice.

3.   FINAL JUDGMENT of non-infringement is hereby entered for Apple on Unwired Planet's claims for infringement of U.S. Patent Nos. 6,317,831, 6,532,446, 6,647,260, and 6,321,092.

IT IS SO ORDERED AND ADJUDGED.

DATED: May 29, 2015

_____
HON. VINCE CHHABRIA
United States District Court Judge

FINAL JUDGMENT
3:13-CV-04134-VC

2

**A073**



US006317831B1

(12) **United States Patent**  (10) **Patent No.:  US 6,317,831 B1**
King  (45) **Date of Patent:  Nov. 13, 2001**

---

(54) **METHOD AND APPARATUS FOR ESTABLISHING A SECURE CONNECTION OVER A ONE-WAY DATA PATH**

(75) Inventor: **Peter F. King**, Half Moon Bay, CA (US)

(73) Assignee: **Openwave Systems Inc.**, Redwood City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/158,317**

(22) Filed: **Sep. 21, 1998**

(51) **Int. Cl.$^7$** ................................. **H04L 9/08**; H04L 9/16
(52) **U.S. Cl.** ........................ **713/171**; 713/151; 713/181; 380/223; 380/260; 380/262
(58) **Field of Search** .................................... 713/151, 170, 713/171, 176, 181; 380/223, 239, 257, 260, 262, 263, 270, 273; 455/3.1, 3.2, 6.1, 410, 411, 450, 509

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,657,390 * 8/1997 Elgamal et al. ................... 380/49
6,138,158 10/2000 Boyle et al. ...................... 709/225

FOREIGN PATENT DOCUMENTS

0 704 785 A2 * 4/1996 (EP) .......................... G06F/1/00
2 304 499 A * 3/1997 (GB) .......................... H04B/7/185

OTHER PUBLICATIONS

R. Jain et al., "Wireless Internetworking Architectures to Support Mobile IP over ATM," in Global Telecommunications Conference, 1997. GLO '97., IEEE, Nov. 8, 1997, pp. 1866–1870.*

"HDTP Draft Specification", Version 1.1, Unwired Planet, Inc. 1997.
"Wireless Application Protocol Wireless Transport Layer Security" (WAP WTLS), Wireless Application Forum, Apr. 30, 1998.
"Magellan SUGP Protocol" Draft Specification, Unwired Planet, Inc. 1997.
"Wireless Application Protocol Wireless Session Protocol Specification" (WAP WSP), Version 30, Apr. 1998.

* cited by examiner

*Primary Examiner*—Gail Hayes
*Assistant Examiner*—Justin T. Darrow
(74) *Attorney, Agent, or Firm*—Beyer Weaver & Thomas, LLP

(57) **ABSTRACT**

Improved techniques for facilitating secure data transfer over one-way data channels or narrowband channels are disclosed. Often, these channels are wireless channels provided by wireless data networks. The techniques enable cryptographic handshake operations for a one-way data channel to be performed over a companion two-way data channel so that the one-way data channel is able to effectively satisfy security protocols that require two-way communications for the cryptographic handshake operations. Once the cryptographic handshake operations are complete, data can be transmitted over the one-way data channel in a secure manner. Additionally, the techniques also enable the cryptographic handshake operations to be performed more rapidly because the two-way channel is typically a wideband channel. In which case, the use of a wideband channel instead of a narrowband channel for the cryptographic handshake operations results in latency reductions, regardless of whether the narrowband channel is a one-way channel or a two-way channel.

**32 Claims, 12 Drawing Sheets**





**[PRIOR ART]**        **Fig. 1**



*Fig. 2A*

Case: 15-1725    Document: 28    Page: 129    Filed: 09/09/2015



*Fig. 2B*



Fig. 3



*Fig. 4*



**Fig. 5**



*Fig. 6*



*Fig. 7*



Fig. 8



*Fig. 9*



*Fig. 10A*

Case: 15-1725    Document: 28    Page: 138    Filed: 09/09/2015



Fig. 10B

US 6,317,831 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# METHOD AND APPARATUS FOR ESTABLISHING A SECURE CONNECTION OVER A ONE-WAY DATA PATH

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is related to U.S. application Ser. No. 09/071,235, filed Apr. 30, 1998, and entitled "METHOD AND SYSTEM FOR INTEGRATING NARROWBAND AND WIDEBAND DATA TRANSPORTS", the content of which is hereby incorporated by reference. This application is also related to U.S. application Ser. No. 09/070,668, filed Apr. 30, 1998, and entitled "METHOD AND APPARATUS FOR PROVIDING NETWORK ACCESS OVER DIFFERENT WIRELESS NETWORKS", the content of which is hereby incorporated by reference.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to wireless networks, and more particularly, to secure data transmissions over wireless networks.

### 2. Description of the Related Art

Wireless networks are often used to transmit messages from one location in a network to a destination location in the network. These messages contain data to be supplied to the destination location. More specifically, the messages include a header portion and a data portion. The header portion includes an address of the destination location, and the data portion contains data. The destination location is, for example, a mobile device or a server. A mobile device typically interacts with wireless networks to receive various types of notifications or to request and receive data from another network to which the wireless network is connected.

FIG. 1 is a block diagram of a conventional wireless communication network 100. The wireless communication system 100 includes a sever 102, a wireless network 104, and mobile devices 106. There are n mobile devices 106-1 through 106-n. The server 102 is typically a computer system that operates to send and receive messages to and from the mobile devices 106. The messages are often blocks of data that are to be transmitted to the mobile device 106. As examples, the data can pertain to various types of notifications, electronic mail, news data, configuration information, data files, library files, program files, etc. The messages can also be requests for information (e.g., certain data) that are transmitted from the mobile devices 106 to the server 102. The server 102 may also connect to other wired or wireless networks to receive messages from or forward messages to other computer systems. As an example, the server 102 can be connected to the Internet. For example, the server 102 can be a proxy server (or link server) coupled to the Internet or a network gateway coupled to a network. The tremendous growth of the Internet in recent years has fueled the need to provide mobile devices such as mobile telephones, personal digital assistants (PDAs) and the like with access to information and services available on the Internet.

The wireless network 104 typically uses radio transmissions to communicate with the mobile devices 106. The wireless network 104 can use a variety of different networks and communication protocols. Examples of wireless networks include Cellular Digital Packet Data (CDPD), Global System for Mobile Communications (GSM), Code Division Multiple Access (CDMA) and Time Division Multiple

Access (TDMA) to name a few, and each of these wireless networks has different data transfer characteristics such as latency, bandwidth, protocols and connection methods. As examples, protocols can be Internet Protocol (IP), Short Messaging System (SMS) and Unstructured Supplementary Service Data (USSD), and connection methods can include packet switched or circuit switched.

As an example, a message to be sent by the server 102 to the mobile device 106-2 would contain an address that particularly identifies the mobile device 106-2. The message is then provided by the server 102 to the wireless network 104. For example, one wireless data network is a packet switched network using a Small Message Server Center (SMSC) which has a relatively small packet size (e.g., 140 bytes). The wireless network 104 causes the message to be properly routed to the mobile device 106-2 (i.e., in accordance with the address). The transmission between the wireless network 104 and mobile device 106-2 is wireless. The mobile device 106-2 receives the message that has been transmitted the wireless network 104. The mobile device 106-2 can then store the message and perform predetermined processing actions such as, for example, notifying a user of the mobile device 106-2 of the reception of the message.

Before transmitting messages or data between the server 102 and the mobile devices 106, a connection between the server 102 and the particular one of the mobile devices 106 needs to be made, unless already established. Additionally, when the data to be transmitted is private or confidential, then a secure connection is to be used. A secure connection is a type of connection in which security measures are taken so that only the sender and desired receiver can understand the data. The security measures are implemented by cryptographic techniques such as encryption. Cryptographic techniques are described in detail in Schneier, "Applied Cryptography," Second Edition, John Wiley & Sons, Inc. (1996), which is hereby incorporated by reference.

A secure connection is established in accordance with protocols concerning transmissions over wireless networks. Examples of protocols that are able to provide secure connections include Handheld Device Transport Protocol (HDTP) and Wireless Transport Layer Security (WTLS). HDTP is described in "HDTP Draft Specification," version 1.1 (1997), and is hereby incorporated by reference. The WTLS is the security layer protocol for Wireless Application Protocol (WAP). WTLS is described in "Wireless Application Protocol Wireless Transport Layer Security" (WAP WTLS), Wireless Application Forum, Apr. 30, 1998, and is hereby incorporated by reference.

One problem with the conventional approach to establishing a secure connection is that it requires a two-way data channel. As examples, both the HDTP and the WTLS protocols require a handshake operation between the server and a mobile device to establish a secure connection. Conventionally, the two-way data channel is needed to provide the handshake operation. As a result, one-way data channels have not been able to utilize the security features of protocols that require a handshake operation.

In some wireless networks, the server and the mobile devices can be connected by two or more channels. In one case, the server and mobile devices can be connected over a one-way data channel and a two-way data channel. A representative network (e.g., GSM) having such characteristics can use a Short Message Service Center (SMSC) to provide the one-way data channel and an Interworking Function (IFW) to provide the two-way data channel. In

US 6,317,831 B1

3

such a network, the one-way data channel is often considered a narrowband channel and the two-way data channel is often considered a wideband channel. As an example, the narrowband channel can transfer data at a rate of about 400 bits per second (bps), while the wideband channel can transfer data at a rate of at least 14400 bps. It is thus not uncommon that a server and a mobile device be connected (or connectable) by both a two-way channel and a one-way channel. Typically, the server and the client will decide to use either or both of the channels depending on the urgency of the data, the cost willing to incur, etc. Use of a two-way channel often causes the mobile device to incur charges (i.e., fees) from a carrier that provides the service to the mobile device. In contrast, use of a one-way, narrowband channel is often available at no cost or at a fixed cost regardless of usage. The one-way channel, however, is not able to establish secure connections because the conventional approaches to security require a two-way channel. This seriously impedes the secure transmission of data over one-way channels.

Thus, there is a need for improved approaches to providing secure data transmissions over one-way channels.

## SUMMARY OF THE INVENTION

Broadly speaking, the invention relates to improved techniques for facilitating secure data transfer over one-way data channels or narrowband channels. Often, these channels are wireless channels provided by wireless data networks. The invention enables cryptographic handshake operations for a one-way data channel to be performed over a companion two-way data channel so that the one-way data channel is able to effectively satisfy security protocols that require two-way communications for the cryptographic handshake operations. Once the cryptographic handshake operations are complete, data can be transmitted over the one-way data channel in a secure manner. Additionally, the invention also enables the cryptographic handshake operations to be performed more rapidly because the two-way channel is typically a wideband channel. In which case, the use of a wideband channel instead of a narrowband channel for the cryptographic handshake operations results in latency reductions, regardless of whether the narrowband channel is a one-way channel or a two-way channel.

The invention can be implemented in numerous ways, including as a method, a computer readable medium, an apparatus, and a system. Several embodiments of the invention are discussed below.

As a method for securely transmitting data between a client and a server over a narrowband channel, where the client and server are connectable by not only the narrowband channel but also by a wideband channel, an embodiment of the invention includes the acts of: connecting the client and server over the wideband channel; exchanging security information between the client and server over the wideband channel; encrypting data to be transmitted from the server to the client using the security information at the server; and transmitting the encrypted data from the server to the client over the narrowband channel.

As a method for transmitting data in a secure manner from a server to a client, an embodiment of the invention includes the acts of: exchanging security information between the client and the server over a two-way channel between the client and the server; encrypting data to be transmitted from the server to the client based on the security information; and transmitting the encrypted data from the server to the client over a one-way channel between the client and the server that carries data from the server to the client.

4

As a wireless communication system, an embodiment of the invention includes: a wired network having a plurality of server computers; a wireless carrier network operatively connected to the wired network, the wireless carrier network supporting a first channel and a second channel, at least the first channel is a two-way data channel; a network gateway coupled between the wired network and the wireless carrier network, the network gateway includes a secure connection processor that establishes a secure connection over the first channel by exchanging security information over the second channel; and a plurality of wireless mobile devices that can exchange data with the server computers on the wired network via the wireless carrier network and the network gateway. The messages are supplied from the network gateway to the wireless mobile devices over the secure connection established over the first channel.

As a mobile device capable of connecting to a network of computers through a wireless link, an embodiment of the invention includes: a display screen that displays graphics and text; a message buffer that temporarily stores a message from a computer on the network of computers, the message having a service identity associated therewith; an application that utilizes the message received from the computer on the network of computers; and a cryptographic controller that controls encryption or signature of outgoing messages and controls the decryption or authentication of incoming messages, the cryptographic controller operates to establish a secure connection over which it receives the incoming messages by using a one-way channel, wherein a companion two-way channel is used to exchange security information needed to establish the secure connection over the one-way channel.

As a computer readable medium including computer program code for securely transmitting data between a client and a server over a narrowband channel, where the client and server are connectable by not only the narrowband channel but also by a wideband channel, an embodiment of the invention includes: computer program code for connecting the client and server over the wideband channel; computer program code for exchanging security information between the client and server over the wideband channel; computer program code for cryptographically processing data to be transmitted using the security information; and computer program code for transmitting the cryptographically processed data from the server to the client over the narrowband channel.

As a computer readable medium including computer program code for transmitting data in a secure manner from a server to a client, an embodiment of the invention includes: computer program code for exchanging security information between the client and the server over a two-way channel between the client and the server; computer program code for cryptographically processing data to be transmitted from the server to the client based on the security information; and computer program code for transmitting the cryptographically processed data from the server to the client over a one-way channel between the client and the server that carries data from the server to the client.

The advantages of the invention are numerous. Several advantages that embodiments of the invention may include are as follows. One advantage of the invention is that a secure connection can be established over a one-way channel. Another advantage of the invention is that the establishment of a secured connection can be rapidly achieved, thus improving the latency for such operations as compared to conventional approaches. Yet another advantage of the invention is that a server is provided with the option of

**A154**

US 6,317,831 B1

5

6

additional secure data paths to a client (e.g., mobile device), whereby the server can use either or both of the paths depending on particular selection criteria including cost, speed and availability.

Other aspects and advantages of the invention will become apparent from the following detailed description, taken in conjunction with the accompanying drawings which illustrate, by way of example, the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein like reference numerals designate like structural elements, and in which:

FIG. 1 is a block diagram of a conventional wireless communication network;

FIG. 2A is a block diagram of a communication system suitable for coupling a mobile communication device to the Internet;

FIG. 2B is a block diagram of a communication system according to a basic embodiment of the invention;

FIG. 3 is a flow diagram of narrowband secure data transmission processing according to an embodiment of the invention;

FIG. 4 is a flow diagram of client-side secure connection processing according to an embodiment of the invention;

FIG. 5 is the flow diagram of server-side secure connection processing according to an embodiment of the invention;

FIG. 6 is a flow diagram of data transmission processing according to an embodiment of the invention;

FIG. 7 is a flow diagram of data reception processing according to an embodiment of the invention;

FIG. 8 is a block diagram of a communication system according to an embodiment of the invention;

FIG. 9 is a block diagram of a representative communication system for use with the invention;

FIG. 10A is a block diagram of a network gateway suitable for use with the representative communication system illustrated in FIG. 9; and

FIG. 10B is a block diagram of mobile device suitable for use with the representative communication system illustrated in FIG. 9.

## DETAILED DESCRIPTION OF THE INVENTION

The invention relates to improved techniques for facilitating secure data transfer over one-way data channels or narrowband channels. Often, these channels are wireless channels provided by wireless data networks. The invention enables cryptographic handshake operations for a one-way data channel to be performed over a companion two-way data channel so that the one-way data channel is able to effectively satisfy security protocols that require two-way communications for the cryptographic handshake operations. Once the cryptographic handshake operations are complete, data can be transmitted over the one-way data channel in a secure manner. Additionally, the invention also enables the cryptographic handshake operations to be performed more rapidly because the two-way channel is typically a wideband channel. In which case, the use of a wideband channel instead of a narrowband channel for the cryptographic handshake operations results in latency reductions, regardless of whether the narrowband channel is a one-way channel or a two-way channel.

Embodiments of the invention are discussed below with reference to FIGS. 2A–10B. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

FIG. 2A is a block diagram of a communication system 200 suitable for coupling a mobile communication device to the Internet. Specifically, the communication system 200 includes mobile communication devices 202A and 202B. These mobile communication devices 202A and 202B respectively couple through carrier networks 204A and 204B to a network gateway 206. The network gateway 206 facilitates the coupling of the mobile communication devices 202A and 202B with the Internet 208. As is common, various computer systems including computers supporting remote server A 210 and remote server B 212 are coupled to or form part of the Internet 208. The primary function of the network gateway 206 is to receive data requests from the mobile communications devices 202A and 202B via the carrier networks 204A and 204B, respectively, and convert them into Hyper Text Transfer Protocol (HTTP) requests for use with the Internet 208. Likewise, the network gateway 206 also receives HTTP responses from the Internet 208 and converts them to data responses with a format (e.g., protocol) suitable for use with the carrier networks 204A and 204B.

The network gateway 206 is connected to the carrier network A 204A by a first channel 214 and a second channel 216. The first channel 214 is a two-way channel or a bi-directional channel. The second channel 216 is a one-way channel or a unidirectional channel. In addition, the network gateway 206 is connected to the carrier network B 204B by a first channel 218 and a second channel 220. Both the first channel 218 and the second channels 220 are two-way channel or bi-directional channels. The carrier networks 204A and 204B then respectively connect to the mobile communication devices 202A and 202B in a wireless manner.

The transmission of data associated with data requests and data responses between the network gateway 206 and the mobile communication devices 202A and 202B is performed over connections. In some cases, when the data being transmitted is sensitive, the connections are secure connections through the Internet 208. A secure connection is a connection over which encrypted and or authenticated data is transmitted. To establish secure connections, security protocols for wireless networks require the exchange of cryptographic parameters in a handshake operation. With one-way channels, the handshaking operation could not conventionally be performed and thus secure connections could not be established over one-way channels.

According to the invention, secure connections are able to be established over one-way channels. In the embodiment of the communication system 200 illustrated in FIG. 2A, the second channel 216 is a one-way data channel which supports transmission of data from the network gateway 206 to the carrier network A 204A, and does not allow transmission of data from the carrier network A 204A to the network gateway 206. Hence, obtaining a secure connection over the second channel 216 is not possible because handshaking is not possible. However, the first channel 214 is a two-way data channel which supports transmission of data in both directions between the network gateway 206 and the carrier network A 204A. According to the invention, the first channel 214 is used to perform the necessary handshaking operations for the second channel 216 such that a secure

7

connection is able to be established over the second channel 216. Additional details on how the handshaking is performed are provided below.

Furthermore, according to the invention, secure channels are also able to be established more efficiently or rapidly over two-way channels. In the embodiment of the communication system 200 illustrated in FIG. 2A, the first channel 218 is a two-way, wideband data channel which supports high speed transmission of data in both directions between the network gateway 206 and the carrier network B 204B. The second channel 220 is a two-way, narrowband data channel which supports high speed transmission of data in both directions between the network gateway 206 and the carrier network B 204B. According to the invention, the first channel 218 is used to perform the necessary handshaking operations for the second channel 220 such that a secure connection is able to be more efficiently and rapidly established over the second channel 220. The improvement results from the use of a wider bandwidth channel to perform the handshaking operation. Additional details on how the handshaking is performed are provided below.

The communication system 200 is a representative communication system in which the network gateway 206 is coupled to the Internet 208 such that mobile communications devices 202A and 202B can interact with the Internet 208. The connection of the mobile communication devices 202A and 202B to the network gateway 206 is through one or more wireless networks supported by the carrier networks 204A and 203B. Although not illustrated, the communication system 200 can often support a large number of mobile communication devices. Further, the Internet 208 can more generally be any network (e.g., a private network, a public network, a Wide Area Network or a Local Area Network). The network gateway 206 typically operates as a proxy server, but more generally is a server.

FIG. 2B is a block diagram of a communication system 250 according to a basic embodiment of the invention. The communication system 250, for example, is a subsystem of a larger communication system such as the communication system 200 illustrated in FIG. 2A. The communication system 250 includes a server 252, a client A 254 and a client B 256. A server 252 can take a variety of forms including a proxy server or a network gateway. The server 252 interacts with the clients 254 and 256 to exchange data between the server and the client. Typically, the server 252 couples to a network and thus enables the clients 254 and 256 to interact with the network. The network can take a variety of forms include a Local Area Network (LAN), a Wide Area Network (WAN) or the Internet. Often the server 252 will support more clients than the two clients 254 and 256 illustrated in FIG. 2B.

Each of the clients 254 and 256 are connected the server 252 through a pair of communication channels. These communication channels are wireless channels and can be constantly connected (linked) or temporarily connected (linked). While these connections or links are preferably wireless (i.e., not wired), some portion of the connections can be wired as is known in the art. These wireless communication channels can be provided by a variety of wireless networks, including packet switched wireless data networks or circuit switched wireless data networks. More particularly, the server 252 is connected to the client A 254 through a narrowband channel A (NBC$_A$) 258 as well through as a wideband channel A (WBC$_A$) 260. Similarly, the server 252 is connected to the client B 256 through a narrowband channel B (NBC$_B$) 262 as well as through a wideband channel B (WBC$_B$) 264. The narrowband channel

8

A (NBC$_A$) and the wideband channel A (WBC$_A$) can be considered provided by a wireless network A, and the narrowband channel B (NBC$_B$) and the wideband channel B (WBC$_B$) can be considered provided by a wireless network B.

The wideband channels (WBC$_A$ and WBC$_B$) 260 and 264 support greater bandwidths or data transfer rates than do the narrowband channels (NBC$_A$ and NBC$_B$) 258 and 262. Accordingly, the ability to transfer data between the server and the client is significantly slower on the narrowband channels as opposed to the wideband channels. As an example, narrowband channels can transfer data at a rate of about 400 bits per second (bps), while wideband channels can transfer data at a rate of at least 14400 bps. The trade-off in bandwidth or transfer rate is typically reflected in the cost for use of the respective channels. In other words, it is often more expensive to transmit data over the wideband channel than the narrowband channel.

Often, there is a need or desire to transmit data between server and client in a secure manner. In such cases, cryptographic techniques (e.g., encryption) are used to provide the secure data transfer. As noted above, encryption techniques normally require that a server and a client perform a handshake operation in which security information is passed from client to server and from server to client. After the server and the client perform the handshake operation, the server and client are able to encrypt data at one end, transmit the encrypted data, and then decrypt the received data at the other end.

In the case of the wideband channels (WBC$_A$ and WBC$_B$) 260 and 264, the exchanging of security information via the handshake operation is easily achieved because the wideband channels are normally two-way channels. However, the narrowband channels (NBC$_A$ and NBC$_B$) 258 and 262 are often one-way channels that support transmissions from the server to the client but not from the client to server. As such, when the narrowband channels (NBC$_A$ and NBC$_B$) 258 and 262 are one-way channels, the exchanging of security information via the handshake operation cannot be performed. Additionally, even when a narrowband channel is a two-way channel, the latency or delay to perform the handshake operation over the narrowband channel is greater (as compared to a wideband channel) due to its often significantly lower bandwidth or data transfer rate than the wideband channel.

According to the invention, secure data transfer can be performed over one channel because the exchange of the security information for a handshake operation occurs over another channel. In one embodiment, the exchange of security information is performed over a two-way channel so that secure data transfer can be performed over a one-way channel. In another embodiment, the exchange of security information is performed over a wideband channel so that secure data transfer can be performed over a narrowband channel.

FIG. 3 is a flow diagram of narrowband secure data transmission processing 300 according to an embodiment of the invention. The narrowband secure data transmission processing 300 occurs between a client and a server and can, for example, be performed by the communication system 200 illustrated in FIG. 2a.

The narrowband secure data transmission processing 300 begins with a decision block 302. As an example, the server may request a secure narrowband connection when it desires to send (or "push") data to a particular client. When the decision block 302 determines that a secure narrowband

US 6,317,831 B1

9                                            10

connection has not been requested, then the narrowband secure data transmission processing 300 awaits the reception of such a request. In other words, the narrowband secure data transmission processing 300 is only utilized when secure data transmission are to occur over a narrowband channel, other non-secure transmissions or secure transmissions over wideband channels follow other processing known in the art.

Once the decision block 302 determines that a secure narrowband connection has been requested, then processing is invoked to carry out the narrowband secure data transmission processing 300. Specifically, the client and the server are connected 304 over a two-way wideband channel. Then, narrowband security information is exchanged 306 between the client and the server over the wideband channel. The security information typically contains keys and other crpytographic parameters used with encryption algorithms. One popular set of encryption algorithms include public-key encryption algorithms. It should be noted that the exchange of the security information is being performed over the wideband channel when the connection request is for the transmission of data over the narrowband channel. Following block 306, the client and server are able to set up a secure connection between the server and the client over the narrow band channel because the required handshake operation has been performed. In other words, the security information that has been exchanged over the wideband channel is used to set up the secure connection over the narrowband channel.

Next, a decision block 308 determines whether there is data to be transmitted. When the decision block 308 determines that there is presently no data to be transmitted, then the narrowband secure data transmission processing 300 awaits the availability of data. Once the decision block 308 determines that data is available to be transmitted, then the data to be transmitted is encrypted 310 based on the security information. After the data is encrypted, the encrypted data is transmitted 312 over the narrowband channel. Here, the connection between the server and the client over the narrowband channel is assumed to be already established. However, in other embodiments, prior to the transmission of the encrypted data over the narrowband channel, a connection between the server and client over the narrow band channel may need to be established.

Following block 312, a decision block 314 determines whether the connection over the narrowband channel is still open. For a variety of reasons, a connection is often closed, and these reasons include a time-out condition, an error condition, or for security reasons. When the decision block 314 determines that the connection is still open, the narrowband secure data transmission processing 300 returns to repeat the decision block 308 and subsequent blocks. On the other hand, once the decision block 314 determines that the connection is no longer open, then the narrowband secure data transmission processing 300 returns to repeat the decision block 302 and subsequent blocks so that secure connection is re-established.

The narrowband channel used with the narrowband secure data transmission processing 300 can be either a one-way (server to client) or a two-way channel. As noted above, the invention provides advantages in either situation, though the invention is particularly beneficial when the narrowband channel is only a one-way channel from server to client.

Given that the server 252 and the clients 254 and 256 are connected by at least a pair of channels (258–264) as shown in FIG. 2B, it is not uncommon for secure transmissions to be concurrently utilized over both of the channels between server and client. In such cases, each channel needs to effectuate a handshaking operation to exchange security information needed for the establishment of a secure connection. FIGS. 4 and 5 describe the establishment of dual secure connections for a pair of channels between a server and a client.

FIG. 4 is a flow diagram of client-side secure connection processing 400 according to an embodiment of the invention. The client-side secure connection processing 400 is, for example, performed by a client such as the client 254 or the client 256 illustrated in FIG. 2a. In this embodiment, it is assumed that both first and second channels between a client and a server are to be used to provide secure connections.

The client-side secure connection processing 400 initially sends 402 a secure session request to a server (e.g., the server 202 illustrated in FIG. 2). Here, the secure session request is a request to setup secure connections over first and second channels. A decision block 404 then determines whether a response to the secure session request has been received. Here, the client is awaiting a response from the server. When the decision block 404 determines that a response has not yet been received, the decision block 404 causes the client-side secure connection processing 400 to await the reception of such a response. The request and response operate to exchange security information as a first handshake operation in accordance with a security protocol. The security information, for example, would contain cryptographic parameters that specify keys, random numbers, algorithms, vectors and the like for various cryptographic techniques.

Once a response has been received, a first key block for a first channel between the server and the client is generated 406. The first key block is used to contain keys used to encrypt or authenticate data or blocks of data that are to be transmitted between the server and the client via the first channel. Thereafter, a secure session complete notification is sent 408 to the server. The secure session complete is a notification to the server that the client has acknowledge receipt of the response and is prepared for a secured session.

Next, a decision block 410 determines whether a secure session has been established for the first channel. A secure session is established the client requests and the server agrees to setup the secure session, and then does setup the secure session. When the decision block 410 determines that the secure session has been established, then the secured session for the first channel is ready.

Now, the secure session for a second channel is established. Security information for the second channel is also sent 412 from the client to the server. It should be noted that the security information is sent 412 to the server over the first channel. The reasons for using the first channel are (i) necessity when the second channel cannot transmit data to the server or (ii) a latency improvement when the second channel is a narrowband channel.

Next, a decision block 414 determines whether security information has been received from the server. The security information from the server is also received over the first channel. The security information from the server is in response to the security information sent to the server by the client. This exchange of security information is a second handshake operation in accordance with a security protocol. The decision block 414 causes the client-side secure connection processing 400 to await the reception of security information from the server. Once the decision block 414 determines that the security information has been received, a second key block for a second channel is generated 416.

US 6,317,831 B1

11

Again, the second key block contains session keys that are used to encrypt or authenticate data or blocks of data that are to be transmitted over the second channel in a secure manner. Following block **416**, the client-side secure connection processing **400** is complete and ends.

Additionally, when the decision block **410** determines that the secure session has not been established between the server and the client, then the client-side secure connection processing **400** issues **418** an error notification. Following block **418**, the client-side secure connection processing **400** is complete and ends.

FIG. **5** is the flow diagram of server-side secure connection processing **500** according to an embodiment of the invention. The server-side secure connection processing **500** is, for example, performed by a server such as the server **252** illustrated in FIG. 2B.

The server-side secure connection processing **500** begins with a decision block **502**. The decision block **502** determines whether a secure session request has been received. Typically, the secure session request will be issued by a client and then received by the server. The decision block **502** causes the server-side secure connection processing **500** to await the reception of a secure session request. Here, the secure session request is a request to setup secure connections over first and second channels.

Once a secure session request has been received, the server-side secure connection processing **500** continues. A first key block for a first channel is generated **504**. A response is then sent **506** to the client that has requested the secure session. The secure session request and the response operate to exchange security information as a first handshake operation in accordance with a security protocol. Examples of protocols for a wireless network environment are HDTP and WAP WTLS. The security information, for example, would contain cryptographic parameters that specify keys, random numbers, algorithms, vectors and the like for various cryptographic techniques.

Next, a decision block **508** determines whether a secure session complete notification has been received. The secure session complete protocol is sent by the client to the server when the client has established a secure session for the first channel. The decision block **508** causes the server-side secure connection processing **500** to await the reception of the secure session complete notification. A decision block **510** then determines whether a secure session is established. When the decision block **510** determines that a secure session has been established, a decision block **512** determines whether security information has been received. Here, the security information would be received at the server after having been transmitted by the client. The security information is for the second channel. The client would send the security information to the server as part of its communications with the server in accordance with a protocol to establish a secure session for the second channel. As an example, the protocol here can be a session layer protocol or a transport layer protocol (e.g., HDTP).

Once the decision block **512** determines that the security information for the second channel sent to the client has been received, then the server sends **514** security information for the second channel to the client. A second key block is then generated **516** for the second channel. Following block **516**, the server-side secure connection processing **500** is complete and ends.

Additionally, when the decision block **510** determines that a secure connection cannot be established between the server and the client, the server-side secure connection

12

processing **500** issues **518** an error notification. Following block **518**, the server-side secure connection processing **500** is complete and ends.

The sending and receiving of a secure session request as well as the sending and receiving of the security information are performed over the first channel. The information exchanged between client and server over the first channel is used to setup the secure communications between the client and server over the first channel and the second channel. The first key block is used to encrypt data transmitted over the first channel from the client to the server as well as to decrypt data received from the server over the first channel. The second key block is used to decrypt data received from the server over the second channel. In one embodiment, the first channel is a two-way channel and the second channel is a one-way channel. In another embodiment, the first channel is a two-way, wideband channel and the second channel is a two-way, narrowband channel.

In the case where the security protocol involved is HDTP, the secure session for the first channel is performed in ordinary course. The secure session for the second channel can piggyback on the client and server exchanges for the secure session for the first channel. Namely, HDTP uses HTTP type content transfer and thus headers (e.g., session headers) are normally exchanged between client and server. These headers can be used to exchange the security information for the second channel (blocks **414, 416, 512** and **514**).

In the case where WAP is used, the security protocol involved is WTLS and a session-level protocol is Wireless Session Protocol (WSP). WSP also performs uses HTTP type content transfers. When WSP and WTLS create a secure session, headers (e.g., session headers) are normally exchanged between client and server. As with HDTP, these headers can be used to exchange the security information for the second channel (blocks **414, 416, 512** and **514**).

Regardless of the specific protocol being used, a portion of the security information can be common (or shared) by both channels. In the case where the Diffie Hellman public-key encryption algorithm is used, the exchanges during the handshake operations include a key exchange and a random number exchange. Hence, normally, a key exchange and a random number exchange would be separately required for each channel. However, by sharing the same key for both channels, the second key exchange can be eliminated. Likewise, the sharing of the same random number can eliminate the random number exchange. The sharing of a portion of the security information improves latency or efficiency of the secure connection setup, but can result in a reduction in the strength of the security.

Moreover, it may be desirable to used the same security information for both (e.g., multiple) channels. In such cases, there need not be any exchange of security information for the second channel (or more channels) besides the security information exchanged for the first channel. Here, all the security information would be shared by the channels. Different connection identifiers would, however, distinguish the connections. For example, with respect to FIG. **4**, blocks **412** and **414** could be eliminated, and with respect to FIG. **5**, blocks **512** and **514** could be eliminated. Also, the generation of the second key block (blocks **416** and **516**), could be eliminated by sharing of a key bock (e.g., first key block). Thus, secure connections can be setup over both (or multiple) channels using the same cryptographic parameters, with the tradeoff being a reduction in strength of the security.

US 6,317,831 B1

13

FIG. 6 is a flow diagram of data transmission processing 600 according to an embodiment of the invention. In this embodiment, the data is typically transmitted over a second channel from the server to the client. As an example, the second channel is a one-way narrowband channel. The data transmission processing 600 follows the establishment of the secure session (connection) between the server and the client over the second channel as depicted in FIG. 4. Data transmission, if any, over the first channel is not shown.

The data transmission processing 600 begins with a decision block 602. The decision block 602 determines whether there is data to transmit over the second channel. When the decision block 602 determines that there is presently no data waiting to be transmitted over the second channel, then the data transmission processing 600 simply awaits the reception of such data.

Once the decision block 602 determines that there is data to be transmitted over the second channel, then the data transmission processing 600 proceeds so that the data is transmitted. Again, the secure session (connection) has already been setup for the second channel. Specifically, a block of the data is obtained 604. One or more keys from the second key block are obtained 606. Typically, an authentication key and an encryption key are obtained from the second key block. An initialization vector can also be obtained from the second key block. The initialization vector is used as a random seed for block-cipher encryption algorithms. Here, the second key block was generated in block 514 of the server-side secure connection processing 500 illustrated in FIG. 5. The second key block is located at the server.

Next, the block of data is encrypted and/or sign 608 using the key(s) obtained from the second key block. The particular signature technique used is, for example, a one-way hash algorithm. The particular encryption algorithm used can vary widely, but often public-key encryption algorithms are appropriate. In one embodiment, assuming both signature and encryption are desired, the block of data would be signed using the signature technique and the authentication key, and the block of data would be encrypted using the encryption algorithm and the encryption key, and then the two process blocks would be appended together.

Following block 608, the encrypted block of data is transmitted 610 over the second channel. Thereafter, a decision block 612 determines whether there is more data to be transmitted over the second channel. When the decision block 612 determines that there is more data to be transmitted, then the data transmission processing 600 returns to repeat the block 604 and subsequent blocks. On the other hand, when the decision block 612 determines that there is no more data to be transmitted over the second channel, then the data transmission processing 600 is complete and ends.

FIG. 7 is a flow diagram of data reception processing 700 according to an embodiment of the invention. In this embodiment, data is being received over a second channel. As an example, the second channel is a one-way, narrowband channel from the server to the client. In one implementation of the data reception processing 700, the processing is performed by a client such as the client 254 and 256 illustrated in FIG. 2B. The data reception processing 700 follows the data transmission processing 600, and thus the establishment of the secure session (connection) between the server and the client over the second channel as depicted in FIG. 4. Data reception, if any, over the first channel is not shown.

14

The data reception processing 700 begins with a decision block 702. The decision block 702 determines whether a block of data has been received over the second channel. The decision block 702 causes the data reception processing 700 to wait until at least one block of data has been received over the second channel. However, once the decision block 702 determines that at least one block of data has been received over the second channel, the data reception processing 700 continues so that the block of data can be processed. Namely, one or more keys are obtained 704 from the second key block. Typically, an authentication key and an encryption key are obtained from the second key block. An initialization vector that is used as a random seed for block-cipher encryption algorithms can also be obtained from the second key block. Here, the second key block is, for example, the second key block that was generated in block 414 of the client-side secure connection processing 400 illustrated in FIG. 4. In other words, the second key block here is local to the client.

Next, the block of data that has been received is decrypted and/or authenticated 706 using the key(s) that were obtained from the second key block. In one embodiment, assuming both signature and encryption were performed at the server side on the data being transmitted and now received at the client, the block of data received would be both signed and encrypted. Hence, in such an embodiment, the received block of data would be authenticated using the authentication key obtained 704 from the second key block at the client side, and the received block of data would also be decrypted using the encryption key also obtained 704 from the second key block at the client side.

After the block of data has been decrypted and/or authenticated 706, the decrypted block of data is stored 708 for subsequent use. Following block 708, the data reception processing 700 returns to repeat the decision block 702 and following blocks so that subsequent blocks of data can be processed as they are received over the second channel.

Carrier networks are commonly classified into packet-switched networks and circuit-switched networks. In packet-switched networks, communications between the carrier network and the wireless communication device can use Internet Protocol (IP) addressing because the wireless communication device has its own individual IP address. Circuit-switched networks, on the other hand, require the establishment of a circuit with the carrier network before the wireless communication device can communicate with the carrier network. In such networks, the wireless communication devices do not have a static IP address but instead have a dynamically assigned IP address or unique phone numbers. One example of a packet-switched carrier network is CDPD. One example of a circuit-switched network is Code Division Multiple Access (CDMA) and Global System for Mobile communications (GSM).

FIG. 8 is a block diagram of a communication system 800 according to an embodiment of the invention. The communication system 800 includes a network gateway 802 that facilitates access and retrieval of information from the Internet 208 to the wireless communication devices 202X, 202Y and 202Z. The network gateway operates similar to the network gateway 206 illustrated in FIG. 2A. The communication system 800, however, specifically pertains to the situation where the carrier network X 804 is a packet-switched network such as CDPD, the carrier network Y 806 is a SMS-type network using CDMA with an interface protocol of SMPP, and the carrier network C 808 is another SMS-type network that uses GSM with an interface protocol of UCP.

US 6,317,831 B1

15

Since the carrier network Y **806** and the carrier network Z **808** are circuit-switched networks using SMS, they use Small Message Server Centers (SMSCs) and Inter-Working Functions (IWF) to provide communication with the carrier networks. The use of the SMSCs and the IWFs are conventional and typically provided by the carrier networks so that messaging and interaction can be achieved with the carrier networks. Hence, the communication system **800** includes SMSC-Y **810** and SMSC-Z **812** which respectively provide message services to wireless communication devices coupled to the carrier network Y **806** and the carrier network Z **808**, respectively. The SMSCs **810** and **812** provide one-way notifications from the multi-network gateway **802** to the wireless communication devices on the carrier network Y **806** and the carrier network Z **808**, respectively. The IWF-B **814** and the IWF-C **816** are respectively used to provide two-way interaction between the network gateway **802** and the carrier network-Y **806** and the carrier network-Z **808**, respectively. The SMSC connections to the carrier networks are typically referred to as narrowband channels, whereas the IWF connections to the carrier networks are wideband channels. In this embodiment, the SMSC connections to the carrier networks are one-way, narrowband channels, whereas the IWF connections to the carrier networks are two-way, wideband channels.

FIG. 9 is a block diagram of a representative communication system **900** for use with the invention. The communication system **900** includes a wired section **902** and a wireless section **904**. The wired section **902** includes a network **906** and a network gateway **908**. In one embodiment, the network **906** is the Internet, which represents a large number of interconnected computers. In another embodiment, the network **906** is an intranet or private network of computers.

The network gateway **908** operates to provide a gateway from the wired section **902** and the wireless section **904**. The network gateway **908** serves as a primary transition point between the wireless communication of the wireless section **904** and the wired communication of the wired section **902**. The network gateway **908** receives the incoming content request from the carrier network **914** and performs protocol conversion as necessary. The network gateway **908** will normally perform some protocol translation and other account management and verification operations. The network gateway **908** includes an account information storage area **910** that stores account, configuration and other information. The section **904** includes a carrier network **914** and at least one remote wireless computing device **916**. The network gateway **908** also receives messages from the network **906** and forwards them to the appropriate remote computing devices.

The remote computing device **916** can, for example, be a mobile phone, a Personal Digital Assistant (PDA), or a portable general purpose computer. The remote wireless computing device **916** includes a display **918** for displaying screens or pages of information, a remote wireless browser **920**, and navigation buttons **922** and **924**. The remote wireless browser **920** is usually an application program that executes on the remote computing device **916**. The remote wireless browser **920** provides the screens or pages of information to be displayed on the display **918**. The navigation buttons **922** and **924** allow a user to navigate through or make selections from menus or lists being displayed on the display **918** by the remote wireless browser **920**. The remote wireless computing device **916** can also include an alphanumeric keypad (not shown) that allows a user to enter alphanumeric information, though such is not necessary as

16

alphanumeric information can also be entered using a dial screen displayed on the display **918** with selections being made using the navigation buttons **922** and **924**. By interacting with the remote wireless browser **920**, a user is able to access information located on the network **906**. According to the invention, secure sessions between at least over the wireless section **904**, namely between the remote wireless browser **920** and the network gateway **908**. As noted above, these secure sessions can be provided even on one-way channels through the carrier network **914**.

Typically, the wireless section **904** will include a plurality of remote wireless browsers **920**, each of which executes on a different remote computing device. The configuration and other information stored in the account information storage area **910** can store service limitations, security limitations, preference information, screen configuration information, and the like for each of the remote wireless browsers **920**. The account information storage area **910** can also store data or pages of data that are of interest to the remote wireless browsers **920**. The stored data or pages can operate as a cache of information previously requested from the network **906** or can operate as an information server within the network gateway **908**. For example, as an information server, the storage pages can represent pages to be displayed by the remote wireless browsers.

FIG. 10A is a block diagram of a network gateway **1000** suitable for use with the representative communication system **900** illustrated in FIG. 9. The network gateway **1000** can, for example, represent the network gateway **908** illustrated in FIG. 9 which is typically a server computer. To avoid obscuring aspects of the present invention, well known methods, procedures, components, and circuitry in the network gateway **1000** are not described in detail.

The network gateway **1000** includes a User Datagram Protocol (UDP) interface **1002** that couples to the carrier network **914**, an HTTP interface **1004** that couples to the network **906**, and a server module **1006** coupled between the UDP interface **1002** and the HTTP interface **1004**. The server module **1006** performs traditional server processing pass as well as protocol conversion processing. In particular, the protocol conversion processing includes protocol conversion between UDP and HTTP. The server module **1006** also performs the processing associated secure sessions described above with respect to FIGS. 5 and 5. Further, to assist the server module **1006** in its processing, the proxy server **1000** includes a random access memory (RAM) **1008** and a read-only memory (ROM) **1010**. Among other things, the RAM **1008** will store device identifiers, subscriber identifiers, configuration information, security information, and alias conversion information. In one embodiment, such information is stored in the RAM **1010** as a database. Also, the RAM **1010** can represent the account information storage area **910** illustrated in FIG. 9.

FIG. 10B is a block diagram of mobile device **1050** suitable for use with the representative communication system **900** illustrated in FIG. 9. The mobile device **1050** can, for example, correspond to the remote computing device **918** that operates the remote wireless browser **916** illustrated in FIG. 9.

The mobile device **1050** includes a UDP interface **1052** that couples to the carrier network **914** via a RF transceiver **1053** to receive incoming and outgoing signals. A device identifier (ID) storage **1054** supplies a device ID to the UDP interface **1052**. The device ID identifies a specific code that is associated with a particular mobile device **1050**. In addition, the mobile device **1050** includes a client module

**A160**

US 6,317,831 B1

17

1056 that performs many of the processing tasks performed by the mobile device 1050 including establishing a communication session with the carrier network 1014 and the network gateway 908, requesting and receiving data (e.g., pages) from the network 906, displaying information on a display of the remote computing device, and receiving user input. The client module 1056 is coupled to the UDP interface 1052 for the establishment of a communication session and the requesting and receiving of data. The client module 1056 also performs the processing associated with the transmission and reception of the messages transmitted from the gateway computer 908, 1000, including the secure session processing described above with respect to FIGS. 4 and 7. The client module 1056 controls the display driver 1058 to display information on the display 1060 to the user. Additionally, the client module 1056 is coupled to an input device 1062, a ROM 1064, and a RAM 1066. Preferably, among other things, the client module 1056 operates a network browser, such as a Handheld Device Markup Language (HDML) web browser. The input device 1062 allows a user of the mobile device 1050 to input data and thus make selections in controlling and using the mobile device 1050. The ROM 1064 stores predetermined data and processing instructions for the client module 1056. The RAM 1066 is used to provide temporary data storage for security information as well as for incoming and outgoing data being received and transmitted.

Although embodiments of the network gateway 1000 and the mobile device 1050 described in FIGS. 10A and 10B using UDP and HTTP protocols, it should be recognized that other protocols and other protocol stacks can be provided and utilized. Additional details on the design and construction of the network gateway 1000 and the mobile device 1050 are contained in U.S. patent application Ser. No. 08/570,210 entitled "METHOD AND ARCHITECTURE FOR AN INTERACTIVE TWO-WAY DATA COMMUNICATION NETWORK" by Alain Rossmann, which is hereby incorporated by reference.

The advantages of the invention are numerous. Several advantages that embodiments of the invention may include are as follows. One advantage of the invention is that a secure connection can be established over a one-way channel. Another advantage of the invention is that the establishment of a secured connection can be rapidly achieved, thus improving the latency for such operations as compared to conventional approaches. Yet another advantage of the invention is that a server is provided with the option of additional secure data paths to a client (e.g., mobile device), whereby the server can use either or both of the paths depending on particular selection criteria including cost, speed and availability.

The many features and advantages of the present invention are apparent from the written description, and thus, it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

What is claimed is:

1. A method for securely transmitting data between a client and a server over a narrowband channel, where the client and server are connectable by not only the narrowband channel but also by a wideband channel, said method comprising the acts of:

connecting the client and server over the wideband channel;

18

exchanging security information between the client and server over the wideband channel;

encrypting data to be transmitted from the server to the client using the security information at the server; and

transmitting the encrypted data from the server to the client over the narrowband channel.

2. A method as recited in claim 1, wherein said encrypting comprises:

forming a server-side narrowband channel key block based at least in part on the security information at the server; and

encrypting the data to be transmitted from the server to the client using the server-side narrowband channel key block.

3. A method as recited in claim 2, wherein said method further comprises:

forming a client-side narrowband channel key block based at least in part on the security information at the client;

receiving the encrypted data that has been transmitted from the server to the client over the narrowband channel; and

decrypting the encrypted data that has been received from the server over the narrowband channel.

4. A method as recited in claim 1, wherein said method further comprises:

transmitting different portions of the encrypted data from the server to the client over the narrowband channel and the wideband channel.

5. A method as recited in claim 4, wherein said encrypting comprises:

forming a server-side narrowband channel key block based at least in part on the security information at the server;

forming a server-side wideband channel key block based at least in part on the security information at the server;

encrypting the portion of the data to be transmitted from the server to the client over the narrowband channel using the server-side narrowband channel key block; and

encrypting the portion of the data to be transmitted from the server to the client over the wideband channel using the server-side wideband channel key block.

6. A method as recited in claim 5, wherein said method further comprises:

forming a client-side narrowband channel key block based at least in part on the security information at the client;

forming a client-side wideband channel key block based at least in part on the security information at the client;

receiving the encrypted data that has been transmitted from the server to the client over the narrowband channel;

decrypting the encrypted data that has been received from the server over the narrowband channel using the client-side narrowband channel key block;

receiving the encrypted data that has been transmitted from the server to the client over the wideband channel; and

decrypting the encrypted data that has been received from the server over the wideband channel using the client-side wideband channel key block.

7. A method as recited in claim 1, wherein said method further comprises:

US 6,317,831 B1

**19**

encrypting data to be transmitted from the client to the server using the security information at the client; and

transmitting the encrypted data from the client to the server over the narrowband channel.

**8.** A method as recited in claim **7**, wherein said encrypting of the data to be transmitted from the client to the server comprises:

forming a client-side narrowband channel key block based at least in part on the security information at the client that was received over the wideband channel; and

encrypting the data to be transmitted from the client to the server using the client-side narrowband channel key block.

**9.** A method as recited in claim **1**, wherein at least a portion of the narrowband channel and the wideband channel are wireless.

**10.** A method as recited in claim **1**, wherein the narrowband channel has a bandwidth less than one-half of the wideband channel.

**11.** A method as recited in claim **1**, wherein the narrowband channel is a one-way channel, and the wideband channel is a two-way channel.

**12.** A method as recited in claim **1**, wherein said method further comprises:

signing data to be transmitted from the server to the client based on the security information, and

wherein said transmitting operates to transmits the encrypted data and the signed data from the server to the client over the narrowband channel.

**13.** A method as recited in claim **12**, wherein the narrowband channel is a one-way channel, and the wideband channel is a two-way channel.

**14.** A method for transmitting data in a secure manner from a server to a client, said method comprising the acts of:

exchanging security information between the client and the server over a two-way channel between the client and the server;

encrypting data to be transmitted from the server to the client based on the security information; and

transmitting the encrypted data from the server to the client over a one-way channel between the client and the server that carries data from the server to the client, wherein the two-way channel is a wideband channel, and the one-way channel is a narrowband channel.

**15.** A method as recited in claim **14**, wherein the security information includes at least a key and a random number.

**16.** A method as recited in claim **14**, wherein the security information further includes an identification of an encryption technique.

**17.** A method as recited in claim **14**, wherein at least a portion of the narrowband channel and the wideband channel are wireless.

**18.** A method as recited in claim **17**, wherein the wideband channel is provided by a circuit-switched data network, and the narrowband channel is provided by a one-way short message service network.

**19.** A method for securely transmitting data between a client and a server over a narrowband channel, where the client and server are connectable by not only the narrowband channel but also by a wideband channel, said method comprising the acts of:

connecting the client and server over the wideband channel;

exchanging security information between the client and server over the wideband channel;

**20**

signing data to be transmitted from the server to the client based on the security information, and

transmitting the signed data from the server to the client over the narrowband channel.

**20.** A method as recited in claim **19**, wherein at least a portion of the narrowband channel and the wideband channel are wireless.

**21.** A method as recited in claim **20**, wherein the narrowband channel is a one-way channel, and the wideband channel is a two-way channel.

**22.** A wireless communication system, comprising:

a wired network having a plurality of server computers;

a wireless carrier network operatively connected to said wired network, said wireless carrier network supporting a narrowband channel and a wideband channel;

a network gateway coupled between said wired network and said wireless carrier network, said network gateway includes a secure connection processor that establishes a secure connection over the narrowband channel by exchanging security information over the wideband channel; and

a plurality of wireless mobile devices that can exchange data with the server computers on said wired network via said wireless carrier network and said network gateway,

wherein messages are supplied from said network gateway to said wireless mobile devices over the secure connection established over the narrowband channel.

**23.** A mobile device capable of connecting to a network of computers through a wireless link, said mobile device comprising:

a display screen that displays graphics and text;

a message buffer that temporarily stores a message from a computer on the network of computers, the message having a service identity associated therewith;

an application that utilizes the message received from the computer on the network of computers; and

a cryptographic controller that controls encryption or signature of outgoing messages and controls the decryption or authentication of incoming messages, said cryptographic controller operates to establish a secure connection over which it receives the incoming messages by using a narrowband channel, wherein a companion wideband channel is used to exchange security information needed to establish the secure connection over the narrowband channel.

**24.** A mobile device as recited in claim **23**, wherein said application is a browser application that permits a user to retrieve information from the computers on the network.

**25.** A computer readable medium including computer program code for securely transmitting data between a client and a server over a narrowband channel, where the client and server are connectable by not only the narrowband channel but also by a wideband channel, said computer readable medium comprises:

computer program code for connecting the client and server over the wideband channel;

computer program code for exchanging security information between the client and server over the wideband channel;

computer program code for cryptographically processing data to be transmitted using the security information; and

computer program code for transmitting the cryptographically processed data from the server to the client over the narrowband channel.

US 6,317,831 B1

21

26. A computer readable medium as recited in claim 25, wherein said computer program code for cryptographically processing comprises:

  computer program code for forming a narrowband channel key block based at least in part on the security information; and

  computer program code for encrypting the data to be transmitted using the narrowband channel key block.

27. A computer readable medium as recited in claim 26, wherein said computer program code for cryptographically processing further comprises:

  computer program code for signing data to be transmitted from the server to the client based on the security information.

28. A computer readable medium as recited in claim 26, wherein at least a portion of the narrowband channel and the wideband channel are wireless, and wherein the narrowband channel is a one-way channel, and the wideband channel is a two-way channel.

29. A computer readable medium including computer program code for transmitting data in a secure manner from a server to a client, said computer readable medium comprising:

22

  computer program code for exchanging security information between the client and the server over a wireless, wideband channel between the client and the server;

  computer program code for cryptographically processing data to be transmitted from the server to the client based on the security information; and

  computer program code for transmitting the cryptographically processed data from the server to the client over a wireless, narrowband channel between the client and the server that carries data from the server to the client.

30. A computer readable medium as recited in claim 29, wherein said computer program code for cryptographically processing the data to be transmitted performs at least one of encrypting and signing of the data.

31. A computer readable medium as recited in claim 29, wherein the wireless, wideband channel is a two-way channel, and the wireless, narrowband channel is a one-way channel.

32. A computer readable medium as recited in claim 31, wherein the wireless, wideband channel is provided by a circuit-switched data network, and the wireless, narrowband channel is provided by a one-way short message service network.

* * * * *



US006321092B1

(12) **United States Patent**

Fitch et al.

(10) Patent No.: **US 6,321,092 B1**

(45) Date of Patent: **Nov. 20, 2001**

(54) **MULTIPLE INPUT DATA MANAGEMENT FOR WIRELESS LOCATION-BASED APPLICATIONS**

(75) Inventors: **James Fitch**, Edmonds, WA (US); **David L. Hose**, Boulder; **Michael McKnight**, Westminster, both of CO (US)

(73) Assignee: **Signal Soft Corporation**, Boulder, CO (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/396,235**

(22) Filed: **Sep. 15, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/106,816, filed on Nov. 3, 1998.

(51) **Int. Cl.**[7] ................................................... **H04Q 7/20**

(52) **U.S. Cl.** ............................................. **455/456**; 342/357

(58) **Field of Search** ................................. 455/456, 422, 455/457, 517; 342/357, 450, 457

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| Re. 35,916 | 10/1998 | Dennison et al. ................... 455/456 |
| 4,700,374 | 10/1987 | Bini ................................... 379/60 |
| 5,043,736 | 8/1991 | Darnell et al. ................... 342/357 |
| 5,208,756 | 5/1993 | Song ................................ 364/449 |
| 5,223,844 * | 6/1993 | Mansell et al. ................... 455/456 |
| 5,235,633 | 8/1993 | Dennison et al. ................... 379/60 |
| 5,317,323 | 5/1994 | Kennedy et al. ................... 342/457 |
| 5,327,144 * | 7/1994 | Stilp et al. ....................... 342/457 |
| 5,388,147 | 2/1995 | Grimes .............................. 379/59 |
| 5,479,482 | 12/1995 | Grimes .............................. 379/59 |
| 5,515,419 | 5/1996 | Sheffer ............................. 379/58 |
| 5,537,460 | 7/1996 | Holliday, Jr. et al. ............ 379/59 |
| 5,546,445 | 8/1996 | Dennison et al. ................... 379/60 |
| 5,600,706 * | 2/1997 | Dunn et al. ....................... 342/450 |
| 5,608,410 * | 3/1997 | Stilp et al. ....................... 342/457 |
| 5,625,668 | 4/1997 | Loomis et al. ..................... 379/58 |
| 5,673,322 | 9/1997 | Pepe et al. ....................... 380/49 |
| 5,724,660 * | 3/1998 | Kauser et al. ..................... 455/456 |
| 5,732,354 * | 3/1998 | MacDonald ......................... 455/456 |
| 5,754,955 | 5/1998 | Ekbatani ........................... 455/422 |
| 5,815,814 | 9/1998 | Dennison et al. ................... 455/456 |
| 5,835,907 * | 11/1998 | Newman ............................. 455/456 |
| 5,844,522 * | 12/1998 | Sheffer et al. .................... 342/457 |
| 5,999,126 * | 12/1999 | Ito ................................. 455/456 |
| 6,097,958 * | 8/2000 | Bergen ............................. 455/456 |
| 6,108,555 * | 8/2000 | Maloney et al. .................... 455/456 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| WO 98/10307 | 3/1998 | (WO) | ................ G01S/3/02 |
| WO 98/10538 | 3/1998 | (WO) | ................ H04B/7/26 |

* cited by examiner

*Primary Examiner*—Nay Maung
*Assistant Examiner*—Quochien B. Vuong
(74) *Attorney, Agent, or Firm*—Marsh Fischmann & Breyfogle LLP

(57) **ABSTRACT**

Multiple location finding equipment (LFE) inputs are used to enhance the location information made available to wireless location-based applications. In one implementation, the invention is implemented in a wireless network including an MSC (112) for use in routing communications to or from wireless stations (102), a network platform (114) associated with the MSC (112), and a variety of LFE systems (104, 106, 108 and 110). A Location Finding System (LFS) (116) in accordance with the present invention is resident on the platform (114). The LFS (116) receives location information from the LFEs (104, 106, 108 and 110) and provides location information to wireless location based applications (118). In this regard, the LFS (116) can receive input information at varying time intervals of varying accuracies and in various formats, and can provide standardized outputs to the applications (118), for example, depending on the needs of the applications (118). Multiple inputs may also be co-processed for enhanced accuracy.

**20 Claims, 8 Drawing Sheets**





FIG.1



FIG.2



# FIG.3A



# FIG.3B



# FIG.3C



# FIG.3D



# FIG.3E



# FIG.4



FIG.5



FIG.6



FIG.7



# FIG.8



FIG.9

US 6,321,092 B1

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# MULTIPLE INPUT DATA MANAGEMENT FOR WIRELESS LOCATION-BASED APPLICATIONS

This applications claims benefit of Prov. No. 60/106,816 filed Nov. 3, 1998.

## FIELD OF THE INVENTION

The present invention relates in general to wireless location-based applications and, in particular, to a method and apparatus for use in processing multiple location finding equipment inputs and making the resulting location information available to wireless location-based applications.

## BACKGROUND OF THE INVENTION

Wireless communications networks generally allow for voice and/or data communication between wireless stations, e.g., wireless telephones (analog, digital cellular and PCS), pagers or data terminals that communicate using RF signals. In recent years, a number of location-based service systems have been implemented or proposed for wireless networks. Such systems generally involve determining location information for a wireless station and processing the location information to provide an output desired for a particular application.

Examples of such existing or proposed applications include emergency or "911" applications, location dependent call billing, cell-to-cell handoff and vehicle tracking. In 911 applications, the location of a wireless station is determined when the station is used to place an emergency call. The location is then transmitted to a local emergency dispatcher to assist in responding to the call. In typical location dependent call billing applications, the location of a wireless station is determined, for example, upon placing or receiving a call. This location is then transmitted to a billing system that determines an appropriate billing value based on the location of the wireless station. In handoff applications, wireless location is determined in order to coordinate handoff of call handling between network cells. Vehicle tracking applications are used, for example, to track the location of stolen vehicles. In this regard, the location of a car phone or the like in a stolen vehicle can be transmitted to the appropriate authorities to assist in recovering the vehicle.

From the foregoing, it will be appreciated that location-based service systems involve location finding equipment (LFE) and location-related applications. To some extent, the LFEs and applications have developed independently. In this regard, a number of types of LFEs exist and/or are in development. These include so-called angle of arrival (AOA) time difference of arrival (TDOA), handset global positioning system (GPS) and the use of cell/sector location. The types of equipment employed and the nature of the information received from such equipment vary in a number of ways. First, some of these equipment types, like GPS, are wireless station-based whereas others are "ground-based", usually infrastructure-based. Some can determine a wireless station's location at any time via a polling process, some require that the station be transmitting on the reverse traffic channel (voice channel), and others can only determine location at call origination, termination, and perhaps registration. Moreover, the accuracy with which location can be determined varies significantly from case to case. Accordingly, the outputs from the various LFE's vary in a number of ways including data format, accuracy and timeliness.

The nature of the information desired for particular applications also varies. For example, for certain applications

such as 911, accuracy and timeliness are important. For the applications such as vehicle tracking, continuous or frequent monitoring independent of call placement is a significant consideration. For other applications, such as call billing, location determination at call initiation and call termination or during handoff is generally sufficient.

Heretofore, developers have generally attempted to match available LFEs to particular applications in order to obtain the location information required by the application. This has not always resulted in the best use of available LFE resources for particular applications. Moreover, applications designed to work with a particular LFE can be disabled when information from that LFE is unavailable, e.g., due to limited coverage areas, malfunctions or local conditions interfering with a particular LFE modality. In addition, the conventional query and response mode of operation between applications and the associated LFEs has resulted in the use by applications of LFE dependent data formats, LFE limited data contents, and single LFE input location determinations.

## SUMMARY OF THE INVENTION

The present invention is directed to a method and apparatus for using multiple LFE information to enhance the location information made available to wireless location-based applications. The invention allows wireless location-based applications access to information based inputs from LFEs of different types, thereby enhancing the timeliness, accuracy and/or reliability of the requested location information. Moreover, in accordance with the present invention, applications are independent of particular LFEs and can access location information from various LFE sources without requiring specific adaptations, data formats, or indeed knowledge of the LFE sources employed, in order to access and use such location information. By virtue of such independence, new location finding technologies can be readily deployed and existing applications can exploit such new technologies without compatibility issues. The invention also allows multiple LFE inputs, from one or more LFEs, to be used to allow for wireless station tracking and reduced location uncertainty.

According to one aspect of the present invention, a method is provided for using multiple (i.e., two or more) LFEs to support a wireless location application. The method involves receiving first and second inputs from first and second LFEs, storing location information based on the inputs in memory, receiving a location request regarding a wireless station from a wireless location application, selectively retrieving the location information from memory, and outputting a response to the location request to wireless location application.

The first and second LFEs preferably may employ different location finding technologies, e.g., GPS, AOA, TDOA, and cell/sector technologies. The stored location information preferably includes at least location information and corresponding time information for particular wireless stations, and may further include location uncertainty information, travel speed information and travel direction information. In response to the location request from the wireless location application, location information may be retrieved from memory or, alternatively, one or more of the LFEs may be prompted to obtain location information. In this regard, the location request may include a specification regarding the desired location information, for example, indicating how recent or how accurate the information should be. If the memory includes information conforming to the specification, then such information is retrieved and output

US 6,321,092 B1

3

to the requesting application. Otherwise, appropriate information may be obtained by prompting one or more LFEs to locate the wireless station of interest.

In accordance with another aspect of the present invention, a processing system is interposed between the LFEs and the wireless location applications such that the applications can access location information in a manner that is independent of the location finding technology employed by the LFEs. The corresponding process implemented by the processing system involves: receiving LFE dependent location data (i.e., location data having a content and/or format dependent on the location finding technology employed) from multiple LFEs receiving a location request from a wireless location application seeking LFE independent location data (i.e., location data having a content and format independent of any particular location finding technology) and responding to the location request based on LFE dependent location data. The process implemented by the processing system may further involve generating and storing LFE independent location data based on the LFE dependent location data. The processing system may be resident on the location finding controllers associated with each LFE, on a separate platform and/or the processing system functionality may be distributed over multiple platforms.

According to a still further aspect of the present invention, multiple LFE inputs, are utilized to make a location determination regarding a wireless station. The corresponding method involves the steps of receiving a first location input from a first LFE including first location information and first uncertainty information, receiving a second location input from a second LFE including second location information and second uncertainty information and combining the first and second location inputs to provide a combined location input including combined location information and uncertainty information based on the first and second inputs. Preferably, the first and second inputs include raw location and uncertainty information obtained from LFE measurements prior to aggregation and related processing. One or both of the first and second inputs may constitute partial information, insufficient on its own to yield a location and uncertainty regarding the wireless station within the requirements of the wireless location application. For example, in the case of LFEs that determine location based on readings obtained relative to two or more cell sites, a reading from one of the cell sites may be used in conjunction with other location information, e.g., cell sector information, to make a location determination.

According to another aspect of the present invention, multiple LFE inputs, obtained at different times from the same or different LFEs, are utilized to derive tracking information such as for obtaining improved location determination accuracy. The associated method includes the steps of receiving a first LFE input including first location information and first corresponding time information for a particular wireless station, receiving a second LFE input including second location information and second time information for the wireless station, and using the first and second inputs to derive tracking information for the wireless station. The tracking information preferably includes information regarding the mobile station's speed of travel and direction of travel. This tracking information can be used in conjunction with subsequent LFE inputs for the wireless station to improve location determination accuracy and can also be used to interpolate wireless station location between location determinations, or to project future wireless station locations as may be desired for some applications. It will be appreciated that this tracking function and other functions

4

are facilitated by the provision of a system for receiving inputs from one or more LFEs, standardizing such inputs with regard to data content and format, and storing such information. In particular, such standardized and stored information can be readily analyzed to yield derivative information regarding wireless station position as well as statistical information for wireless stations of interest in the service area.

A system constructed in accordance with the present invention includes an input facility for receiving inputs from multiple LFEs, a memory such as a cache for storing information from the LFE inputs (e.g., a wireless station identification, a location, a time associated with that location, an uncertainty for that location, and travel speed and bearing), an interface for receiving location requests from wireless location applications and providing responses to such requests, and a processing subsystem for processing the LFE inputs and location requests. The apparatus may also include a facility for prompting LFEs to make location measurements in response to location requests. Among other things, the processing subsystem may convert the LFE inputs into a standard format, direct storage of data in the memory, derive tracking or other derivative information from multiple inputs, analyzing stored information relative to received location requests to determine whether the stored information includes information responsive to the requests and selectively directing the LFEs to make location measurements. The system may be resident on a single or multiple platform and the functionality may be spread among multiple applications.

BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present invention and further advantages thereof, reference is now made to the following detailed description taken in conjunctions with the drawings in which:

FIG. 1 is a schematic diagram of a wireless network implementing a location finding system in accordance with the present invention;

FIG. 2 is a schematic diagram illustrating a wireless location-based services system in accordance with the present invention;

FIGS. 3a–3e illustrate various location finding technologies that may be utilized in the context of the present invention;

FIG. 4 is a graphical illustration of the use of multiple LFE inputs to reduce location uncertainty in accordance with the present invention;

FIG. 5 is a graphical depiction of a location uncertainty analysis in accordance with the present invention; and

FIGS. 6–9 illustrate various wireless location interface signaling sequences in accordance with the present invention.

DETAILED DESCRIPTION

In the following description, particular embodiments and implementations of the present invention are set forth in the context of a telecommunications network. It will be appreciated however, that various aspects of the invention are more broadly applicable to other location based services environments.

Referring to FIG. 1, an wireless telecommunications network implementing the present invention is generally identified by the reference numeral 100. Generally, the network includes a mobile switching center (MSC) 112 for

US 6,321,092 B1

| 5 | 6 |

use in routing wireless communications to or from wireless stations **102**, a network platform **114** associated with the MSC **112** for implementing a variety of subscriber or network service functions, and a variety of location finding equipment (LFE) systems **104, 106, 108** and **110**. In the illustrated embodiment, the network platform is used to run a Location Manager (LM) **16** in accordance with the present invention and a number of wireless location applications **118**. Although the illustrated location finding system **116** and wireless location applications **118** are illustrated as being resident on the network platform **114**, it will be appreciated that the elements **116** and **118** may be located elsewhere in the network **100**, may be resident on separate platforms, or the functionality of each of these elements **116** and **118** may be spread over multiple platforms. In addition, other applications not depicted in FIG. **1** may be resident on the platform **114**.

As shown in FIG. 1, multiple LFE systems **104, 106, 108** and **110** may be associated with the network **100**. These LFE systems **104, 106, 108** and **110** may employ any of a variety of location finding technologies such as AOA, TDOA, GPS and cell/sector technologies and the various system **104, 106, 108** and **110** may be the same as or different from one another. It will be appreciated that the nature of the data obtained from the LFE systems **104, 106, 108** and **110** as well as the path by which the data is transmitted varies depending on the type of LFE employed, and the ability to accommodate a variety of LFEs is an important advantage of the present invention. Some types of LFEs include LFE equipment in the handset. Examples include certain GPS and TDOA systems. In such cases, location information may be encoded into signals transmitted from the handset to a cell site or other receiver, and the information may then be transferred to the platform **114** via the MSC **112** or otherwise. Other LFE systems, i.e., embedded systems use equipment associated with individual cell sties such as specialized antennae to make location determinations such as by triangulation and, again, the resulting location information may be transferred to the platform **114** via the MSC **112** or otherwise. Still other LFE systems employ a network of dedicated LFE equipment that is overlayed relative to the wireless network. Such systems may communicate location information to the platform **114** independent of the MSC **112** and network cell site equipment. In addition, some LFE technologies can be implemented via equipment resident in the handset, in cell sites or other network locations and/or in dedicated LFE sites such that the data pathway of the location information may vary even for a given LFE technology.

Three of the illustrated systems **104, 106** and **108** operate separate from the MSC **112**. For example, such systems may include network based systems AOA and TDOA systems and external systems such as GPS. Generally, the illustrated network based system such as AOA and TDOA systems determine the location of a wireless station **102** based on communications between the wireless station and the cell site equipment of multiple cell sites. For example, and as will be described in more detail below, such systems may receive information concerning a directional bearing of the wireless station **102** or a distance of the wireless station **102** relative to each of multiple cell sites. Based on such information, the location of the wireless station **102** can be determined by triangulation or similar geometric/mathematic techniques. External systems such as GPS systems, determine the wireless station location relative to an external system. In the case of GPS systems, the wireless station **102** is typically provided with a GPS receiver for

determining geographic position relative to the GPS satellite constellation. This location information is then transmitted across an air interface to the network **100**.

The illustrated cell sector system **110** may be associated with cell site equipment for communicating with the wireless station **102**. In this regard, the cell site equipment may include three or more directional antennas for communicating with wireless stations within subsections of the cell area. These directional antennas can be used to identify the subsection of a cell where the wireless station **102** is located. In addition, ranging information obtained from signal timing information may be obtained to identify a radius range from the cell site equipment where the wireless station **102** is located, thereby yielding a wireless station location in terms of a range of angles and a range of radii relative to the cell site equipment. This cell/sector location information can be transmitted to the LM **116** via the MSC **112** or possibly via other network information or structure.

As shown, the LM **116** receives location information from the various LFE systems **104, 106, 108** and **110**. The nature of such information and handling of such information is described in more detail below. Generally, however, such information is processed by the LM **116** to provide location outputs for use by any of various wireless location applications **118** in response to location requests from the applications **118**. Such applications may include any wireless location services applications such as 911, vehicle tracking and location-based billing programs.

FIG. 2 illustrates a location-based services system **200** in accordance with the present invention. An important aspect of the present invention relates to the operation of the LM **214** to receive inputs from multiple LFEs **202, 204** and **206** and provide location outputs to multiple applications **226, 228** and **230**. In accordance with the present invention, the LFEs **202, 204** and **206** may be based on different technologies, and may therefore provide different types of location information, in different data formats, with different accuracies based on different signals.

A number of different location finding technologies are depicted in FIGS. 3*a*–3*d* for purposes of illustration. FIG. 3*a* generally shows the coverage area **300** of a cell sector. As noted above, the cell site equipment for a particular cell of a wireless telecommunications system may include a number, e.g., three or more, of directional antennas. Each antenna thus covers an angular range relative to the cell site bounded by sides **302**. In the case of a three sector cell, each antenna may cover about 120°–150° relative to the cell site. In addition the coverage range for the antenna defines an outer perimeter **304** of the coverage area **300**. As shown, the range varies with respect to angle defining a somewhat jagged outer perimeter **304**. Accordingly, the actual uncertainty regarding the location of a wireless station located in the illustrated cell sector is defined by the coverage area **300**. The location determination output from a cell/sector LFE is therefore effectively defined by the coordinates of the coverage area **300**.

FIG. 3*b* depicts a TOA based LFE. In this case, the wireless station's range from a cell sector antenna is determined, based on time of signal arrival or signal transit time to within a radius range, e.g., about 1000 meters. Accordingly, the wireless station's location can be determined to be within an area bounded by sides **306** (based on the angular range of the cell sector antenna) and inner **308** and outer **310** arcs (defined by the ranging uncertainty). The output from a TOA based LFE is effectively defined by the coordinates of the sides **306** and the axes **308** and **310**.

US 6,321,092 B1

7

An AOA based LFE is generally illustrated in FIG. 3c. AOA based LFEs determine the location of a wireless station based on the angle of arrival of signals, generally indicated by rays 312 and 314, from the wireless station as measured by two or more cell sites 316 and 318. Each angle measurement has an angular uncertainty generally indicated by line segments 320 and 322. Consequently, the uncertainty region for a given location determination is defined by a polygon having 2n sides, where n is the number of cell sites 316 and 318 involved in the measurement.

FIG. 3d illustrates a TDOA based LFE although the illustrated system is cell site based. In TDOA systems, multiple cell sites measure the time of arrival of signals from a wireless station. Based on such measurements, each cell site can provide information regarding wireless station location in terms of a hyperbola 324 or 326 and an uncertainty, generally indicated by segments 328 and 330. The resulting uncertainty region is defined by a multi-sided region (where each wall is curved) having 2n walls, where n is the number of cell sites involved in the determination.

FIG. 3e illustrates a GPS based LFE. In GPS systems, the wireless station includes a GPS transceiver for receiving signals indicating the wireless station's location relative to multiple satellites in the GPS constellation. Based on these signals, the geographic coordinates of the wireless station's location is determined to an accuracy of perhaps 20 meters as generally indicated by circle 332. This information is then transmitted to the wireless network across an air interface.

Referring again to FIG. 2, each of the LFEs 202, 204 or 206 outputs location information to its respective LFC 208, 210 or 212. The nature of this "raw" LFE output depends in part on the type of LFE involved. For example, in the case of a cell sector system the output may be a sector identifier or coordinates; in the case of a TOA system, the output may be a sector identifier or coordinates and a radius; in an AOA system the output may be angular measurements and corresponding cell site identifiers/coordinates; in TDOA systems the output may define multiple hyperbolae; and in GPS systems the output may be geographic coordinates.

The LFCs 208, 210 and 212 collect and aggregate the "raw" location into a standard format which is then sent to the location cache (LC) 220 of the LM 214 for storage. Aggregation involves using the raw data to determine a wireless station location and uncertainty. For some LFE systems, such as GPS systems, this process is simple because location coordinates are reported and the uncertainty is known. For other LFE systems, aggregation is more involved. For example, in the case of TDOA, aggregation may involve receiving multiple hyperbola definitions and using these definitions to define a wireless station location and a multi-sided uncertainty region. The LFCs 208, 210 and 212 may be provided by the LFE vendors or their functionality may be incorporated into a subsystem of the LM 214.

In the context of the present invention, it is useful to express the location information in a standard format. Accordingly, the LFCs 208, 210 and 212 or a cooperating subsystem of the LM 214 associated with the LC 220, may implement a conversion facility for converting the determined (processed) location information of the LFCs 208, 210 and 212 into standardized location information expressed, for example, as geographical location coordinates and a region of uncertainty. The uncertainty region may be of any shape (e.g., polygonal) depending, for example, on the nature of the LFE(s) employed. Once such type of uncertainty region is a circular region that can be

8

characterized by an uncertainty radius. In the illustrated embodiment, two dimensional location coordinates are defined (e.g., latitude and longitude) together with an uncertainty radius applied relative to the location coordinates. It will be appreciated that the standard format may allow for altitude coordinates, non-circular uncertainty regions and other parameters.

Referring again to FIGS. 3a–3e, examples of these coordinates and circular uncertainty regions are graphically depicted. In particular, in each case, a location "L" and standardized uncertainty region "C" are geometrically defined such that the standardized uncertainty region C circumscribes the actual uncertainty region associated with that location finding technology. In this regard, the location L may be defined first (e.g., as the intersection of rays 312 and 314 in FIG. 3c) and then the minimum radius circle C may be defined to circumscribe the actual uncertainty region; the standardized uncertainty region C may be defined first (e.g., as the minimum radius circle required to circumscribe the actual uncertainty region) and then L be defined as the center of the circle C; or any other appropriate geometric solutions/approximations may be employed.

This standardized location information is then stored in a database in LC 220. Specifically, the location coordinates for a wireless station and corresponding uncertainties can be stored in a field, in a relational database, or can otherwise be indexed to a wireless station identifier, e.g., a cellular telephone Electronic Serial Number/Mobile Identification Number (ESN/MIN). The coordinates and uncertainty may be expressed in terms of any appropriate units. For example, the coordinates may be expressed as latitude and longitude values in units of $10^{-6}$ degrees and the uncertainty may be expressed in units of meters.

The stored, standardized information can be used to perform a number of multiple input analyses. Three examples of such facilities are generally indicated by the velocity 216, multi-input processing 217 and tracking 218 facilities of LM 214. The velocity facility 216 involves determining and storing speed information and direction (bearing) information for a wireless station based on multiple LFE inputs for the station. Because of the standardized format, such determinations can be easily made relative to inputs from the same or different LFEs 104, 106 and/or 108. The velocity information can be obtained based on knowledge of the change in position and the change in time (determined by way of the time stamps associated with the location information) and may be expressed in terms of latitudinal and longitudinal velocity components in units of meters per second, together with velocity uncertainty terms. The direction information can be directly obtained from the location information, or can be based on a ratio of the velocity components, using standard trigonometric principles. It will be appreciated that such speed and direction information may be useful for a variety of applications such as vehicle tracking.

The multi-input processing facility 217 can be used to improve location accuracy based on multiple inputs from the same or, more preferably, different LFEs 202, 204 and/or 206. That is, if two locations with two uncertainties can be obtained for a given wireless station at a given time, a reduced uncertainty can be calculated as the overlap of the two original uncertainties. A complicating factor is that the locations and uncertainties stored in the LC 220 for a given wireless station will typically not represent location determinations for the same time. Because wireless stations are generally mobile, an additional element of uncertainty is introduced.

US 6,321,092 B1

9

The illustrated multi-input processing facility **217** takes time into account. This is accomplished by:

1. accessing the LC **220** to obtain two (or more) sets of location information for a given wireless station;

2. identifying a location, uncertainty and time for each set of information;

3. determining a time difference between the times of the information sets;

4. calculating an element of location uncertainty associated with the time difference; and

5. applying the calculated element of location uncertainty to the earlier location information to obtain time translated location information. This time translated location information can then be compared to the later location information in an uncertainty overlap analysis, as described below, to obtain a reduced uncertainty.

Various processes can be employed to calculate the additional, time-related element of location uncertainty. A simple case involves assuming a maximum rate of travel. For example, a maximum rate of travel of 70 miles per hour may be assumed to account for travel of a mobile phone in a vehicle. The uncertainty associated with an earlier location determination may then be expanded by a value determined by multiplying the maximum rate of travel by the time difference between the two measurements to be compared. Different maximum travel rates may be assumed for different conditions, for example, a lower rate may be assumed for city locations than for suburban locations, a lower rate may be assumed for peak traffic periods, or a lower rate may be assumed for mobile stations that are not generally used on fast moving vehicles. Also, wireless station speed and direction information as described above or other tracking information as described below may be used to reduce the time-related element of uncertainty.

Once such a time translation process has been employed to normalize multiple LFE inputs relative to a given time, an uncertainty overlap analysis can be implemented. Such an analysis is graphically illustrated in FIGS. 4 and 5. Referring first to FIG. 4, the smaller circle represents a location and uncertainty associated with a later LFE input taken to be at time $t_1$. The larger circle **402** represents a location and uncertainty associated with a time translated location information based on an earlier LFE input taken to be at time $t_0$. Circle **402** is illustrated as having a larger uncertainty than circle **400** to account for the additional time and travel related element of uncertainty associated with the time translation. The shaded overlap area **404** represents the reduced uncertainty achieved by using multiple inputs. That is, statistically, if circle **400** represents a 95% confidence level regarding the position of the station at $t_1$ and circle **402** represents a nearly 95% confidence level regarding the position of the station at $t_1$, the position of the station can be determined to be in the shaded area **404** with a high level of confidence.

FIG. 5 illustrates a mathematical process for combining the original uncertainties to obtain a more accurate position and uncertainty. Mathematically, the problem is to compute the intersection of the circular uncertainty regions, and express the result as a location with an uncertainty (e.g., a circular uncertainty circumscribing the intersection region). To simplify the mathematics, the geometric arrangement of FIG. 4 is translated to provide a first axis (x in FIG. 5) that extends through the centerpoints of the circular uncertainty regions **500** and **502** (generally, the coordinates of the originally determined locations) and an orthogonal axis (y) intersecting the center of the larger (in this case later)

10

circular uncertainty region **502**. The mathematical equations for the boundaries of circular uncertainty regions **500** and **502** are:

$$x^2 + y^2 = r_1^2 \tag{1}$$

$$(x - x_0)^2 + y^2 = r_2^2 \tag{2}$$

It will be appreciated that the values of $r_1$, $r_2$ and $x_0$ are known as these are the uncertainty of the time translated information, the uncertainty of the later LFE input and the difference between $r_1$ and $r_2$, respectively. Equations (1) and (2) can then be simultaneously solved to obtain x and y, where x is the new location and y is the radius of the new uncertainty region. Finally, these values can be translated back into Earth coordinates. This mathematical analysis can be used for cases where $x \leq x_0$ and $x_0 \leq r_1 + r_2$. In other cases, the most recent or most accurate of the LFE inputs can be utilized.

The illustrated LM **214** also includes a tracking facility **218**. Such tracking involves using historical information (at least two sets of location information) and using such information to reduce the uncertainty associated with current measurements. That is, by tracking movement of a wireless station, information can be obtained that is useful in analyzing the uncertainty of current measurements. In a simple case, where tracking information indicates that a wireless station is moving in a straight line (or otherwise on a definable course) or at a constant speed, then curve fitting techniques or other simple algorithms can be employed to obtain a degree of confidence concerning current location. Moreover, interpolation and extrapolation techniques can be employed to determine location at times between measurements or in the future. Such information may be useful to determine when a wireless station crossed or will cross a boundary as may be desired, for example, for location-based billing applications or network management applications (for handling hand-off between adjacent cells). It will thus be appreciated that the information stored in the LC **220** may include wireless station identifiers, locations, uncertainties, confidence levels, travel speeds, travel directions, times and other parameters. Data may be purged from the LC upon reaching a certain age in order to remove visitor data and other unnecessary data.

The velocity facility **216**, multi-input processing facility **217**, and tracking facility **218** may use the raw information data transmitted from the LFEs **202**, **204** and **206** to the LFCs **208**, **210** and **212** in place of, or in addition to, the LFC outputs. For example, the multi-input processing facility **217** may use a hyperbola definition from a TDOA system in combination with an angle from an AOA system (or other combination of partial LFE outputs) if such combination yields an improved location accuracy or otherwise provides a suitable location determination. Similarly, it may be preferred to use the raw data for velocity or tracking calculations as such data is mathematically closer to the moving wireless station and may more accurately reflect station movement.

Referring again to FIG. 2, the illustrated system **200** includes a wireless location interface (WLI) **224** that allows wireless location applications **226**, **228** and **230** to selectively access information stored in the LC **220** or prompt one or more of LFEs **202**, **204** and/or **206** to initiate a location determination. The WLI **224** provides a standard format for submitting location requests to the LM **214** and receiving responses from the LM **214** independent of the location finding technology(ies) employed. In this manner, the applications can make use of the best or most appropriate location

US 6,321,092 B1

11

information available originating from any available LFE source without concern for LFE dependent data formats or compatibility issues. Moreover, new location finding technologies can be readily incorporated into the system **200** and used by the applications **226**, **228** and **230** without significant accommodations for the existing applications **226**, **228** and **230**, as long as provision is made for providing data to the LC **220** in the form described above.

The WLI **224** of the illustrated implementation allows the applications to include a specification with a location request regarding the desired location information. For example, the specification may include one or more of the following: the timeliness of the location information (e.g., not older than [date stamp parameter]), the accuracy of the information (e.g., uncertainty not exceeding [uncertainty parameters]), confidence (confidence at least equal to [confidence parameter]). Alternatively, the request may specify the use of the most recent available information, most accurate available information, etc. In addition, the location request can specify whether the request is for one-time only location information or ongoing monitoring of a mobile station, whether the LM **214** should wait for the next available update or force a location determination, whether redundant or unnecessary updates should be filtered (e.g., do not send updates more often than once a minute or if wireless station has moved less than 50 meters), and what the priority of the request is. In this manner, ongoing monitoring may be employed, for example, by applications such as vehicle tracking and 911, and event triggered requests can be used for other applications such as location based billing. In each case, the desired location parameters can be specified.

FIGS. 6–9 show messaging sequences for various location request situations. Specifically, FIG. 6 shows a series of messages for a location request where the application waits for the next available location determination. The process is initiated by transmitting a WLARequestedLocationInvoke message from one of the WLAs to the LC. This message may include parameter fields for Wireless Station Identification, WLA Identification, Location Request Filter, Location Request Mode (check LC or force LFE location determination), Geographic Extremes (where to look for wireless station), Request Priority (processing priority relative to other pending requests) and Fallback Timeout (time that WLA will wait for a current location determination before accepting the information stored in the LC).

In the case of FIG. 6, where the WLA waits for the next available location determination, the next message may be a system access or other triggering signal from the wireless station to the LFE. In response, the LFC sends raw location measurement information to the LFE which, in turn, provides a location update to the LC. The LM then responds to the location request from the WLA with a WLARequestLocationReturn Result message. This message may include the following parameters: Geographic Location, Location Uncertainty, Location Determination Technology, Time Stamp, Velocity, Velocity Uncertainty, and Fallback Timeout Occurred Flag.

FIG. 7 illustrates a sequence of messages associated with a forced LFE access. The illustrated sequence is initiated by a WLARequestLocationInvoke as described above. In response, the LM transmits a QueryLocationInvoke message to the LFC to force an LFE determination, and the LFC confirms receipt of this message with a QueryLocationReturnResult message. The parameters of the QueryLocationInvoke message may include Wireless Station ID, Geographic Extremes and Measurement Priority (relative to other pending measurement requests). The LFC then sends

12

a One-time Measurement Request message to the LFE to instruct the LFE to obtain location information for the wireless station of interest. In cases where ongoing monitoring is desired, this message may be sent repeatedly or periodically as indicated by multiple arrowheads in the Figure. In order to obtain a location measurement, it is generally necessary to cause the wireless station to transmit an RF signal for detection by the LFE or to communicate location data to the wireless network. This can be achieved by conducting a polling process using an LRF which requests all wireless stations to register. In this regard, the LFC issues a Force System Access message to the LRF which, in turn, transmits the Force System Access message to the wireless station. In response, a system access signal is transmitted by the wireless station and detected by the LFE. The LFE then transmits Location Measurement Information to the LFC. This may be repeated in the case of ongoing monitoring. The LFC provides a Location Update to the LC and, finally, the LM transmits a WLARequestLocationReturnResult as described above to the WLA.

FIG. **8** represents the case where a location request can be responded to based on the data stored in the LC. This occurs, for example, where the cached data satisfies the request specification or the request specifically seeks data from the LC. Very simply, the illustrated message sequence involves transmission of a WLARequestLocationInvoke message from the WLA to the LM and a responsive WLARequestLocationReturnResult. It will be appreciated that this case allows for a very fast response. Moreover, it is anticipated that the cached data will be sufficient in many cases for many WLAs.

FIG. **9** shows a typical message sequence for the case where a WLA requests ongoing updates regarding the location of a wireless station. The update period is initiated upon transmission of a WLARequestRegisterInvoke message from the WLA to the LM and receiving a WLARequestRegisterReturnResult in confirmation; and terminates upon transmission of a WLARequestUnregisterInvoke message and receiving a WLARequestUnregisterReturnResult in confirmation. The parameters included in the Register message can include the wireless station ID, update interval, whether wireless station access should be forced, etc. As shown in the Figure, the LM receives Location Updates from time-to-time from the Location Determination Technology (LDT). It will be noted that only those Updates occurring between Registration and Unregistration are communicated to the WLA. In this regard, the Updates are communicated from the LM to the WLA via a LMLocationUpdateInvoke message and a LMLocationUpdateReturn Result is transmitted in confirmation.

The system **200** also includes a Geographic Information System (GIS) based module **222** for use in correlating geographic coordinate information to mapping information, e.g., street addresses, service area grids, city street grids (including one-way or two-way traffic flow information, speed limit information, etc.) or other mapping information. For example, it may be desired to convert the geographic coordinates of a 911 call to a street address for use by a dispatcher, or to correlate a call placement location to a wireless network billing zone. In this regard, the GIS module **222** may communicate with the LFCs **208**, **210**, and **212**, the LFC **214** and/or the WLAs **226**, **228** and **230** to correlate location information to GIS information, and to correlate GIS information to application-specific information such as wireless network billing zones. A suitable GIS based module **222** is marketed under the trademark MAPS by SignalSoft Corporation of Boulder, Colo.

US 6,321,092 B1

13

While various embodiments of the present invention have been described in detail, it is apparent that further modifications and adaptations of the invention will occur to those skilled in the art. However, it is to be expressly understood that such modifications and adaptations are within the spirit and scope of the present invention.

What is claimed is:

1. A method for use in a wireless network to obtain requested location information regarding a wireless station from any of various location sources and provide the requested location information to a wireless location application, the wireless network being associated with at least a first source of location information and a second source of location information for providing information regarding locations of wireless stations in the network, the method comprising the steps of:

   first receiving a location request regarding said wireless station from said wireless location application, said location request seeking said requested location information;

   second receiving a first location input based on first location information from said first source, and a second location input based on second location information provided by said second source, wherein said first location information and said second location information are provided in different formats relating to identification of wireless station locations;

   wherein said first location finding equipment employs a first location finding technology and said second location finding equipment employs a second location finding technology different than said first location finding technology, and said step of second receiving comprises standardizing information obtained from said first location finding equipment and second location finding equipment to provide said respective first and second location inputs, wherein said first and second location inputs include location information in a standardized format;

   storing data in memory relating to said first location input and said second location input;

   obtaining said requested location information by selectively retrieving data from said memory based on said location request; and

   outputting said requested location information to said wireless location application, wherein said wireless location application is supported by said first location finding equipment and said second location finding equipment, wherein said step of first receiving comprises providing an interface defining a format for receiving a location request from said wireless location application, said format allowing said wireless location application to specify at least one parameter regarding said request location information, and receiving said location request in accordance with the defined format.

2. A method as set forth in claim 1, wherein said step of second receiving comprises providing a first location finding controller associated with said first source for receiving data from said first source in a first data format, providing a second location finding controller associated with said second source for receiving second data from said second source in a second format, and operating said first and second location finding controllers to convert said respective first and second data into standardized location data.

3. A method as set forth in claim 1, wherein said step of storing comprises storing information for individual wireless stations including at least a location and a time.

14

4. A method as set forth in claim 1, wherein said step of storing comprises storing information for individual wireless stations including an uncertainty regarding location.

5. A method as set forth in claim 1, wherein said step of storing comprises information for individual wireless stations including one of a travel speed and a travel direction.

6. A method as set forth in claim 1, wherein said step of first receiving comprises obtaining information regarding the identity of a wireless station and a specification concerning the requested location information.

7. A method as set forth in claim 1, wherein said step of obtaining comprises identifying said parameter of the location request regarding the desired location information and determining whether the stored data includes information conforming to the parameter.

8. A method as set forth in claim 1, wherein said step of obtaining comprises prompting one of the first source and the second source to obtain location information regarding the wireless station in response to the location request.

9. A method as set forth in claim 1, wherein said step of outputting comprises providing an output including at least a wireless station identification and a location of the wireless station.

10. A method as set forth in claim 1, wherein said step of outputting comprises providing an output including a time and an uncertainty regarding location.

11. A method as set forth in claim 1, wherein said step of outputting comprises providing an output including one of a speed of travel and direction of travel for the wireless station.

12. A method as set forth in claim 1, further comprising combining multiple location finding equipment inputs for the wireless station to make a location determination.

13. A method as set forth in claim 12, wherein said step of combining comprises obtaining a first set of information including first location information and first time information for said wireless station, obtaining a second set of information including second location information and second time information for said wireless station, determining a time difference between said first and second sets of information, and adjusting one of said first and second sets of information based on said time difference.

14. A method as set forth in claim 13, wherein said adjusting comprising calculating one of a change in position and an uncertainty in position based on said time difference.

15. A method as set forth in claim 12, wherein said step of combining comprises obtaining a first set of position information including a position and an uncertainty, obtaining a second set of information including a position and an uncertainty and combining said first set and said second set to yield a third set including a position and an uncertainty for said wireless station, wherein said third set includes a reduced uncertainty relative to said first and second sets.

16. A method as set forth in claim 12, wherein said first location finding technology involves a first location finding controller for receiving first raw location data from said first source and aggregating said first raw data to provide said first location input and said second location finding technology involves a second location finding controller for receiving second raw location data from said second source and aggregating said second raw data to provide said second location input, and said step of combining comprises obtaining said first raw data from said first source, obtaining said second raw data from said second source, and said step of combining further comprises using one of said first raw data and said second raw data to obtain derived location information.

US 6,321,092 B1

15

**17**. A method as set forth in claim **1**, further comprising the step of obtaining tracking information regarding movement of said wireless station, and using said tracking information to derive location information.

**18**. A method as set forth in claim **17**, wherein said step of deriving tracking information comprises receiving first location information obtained for a first time and obtaining second location information obtained for a second time and deriving said tracking information based on said first and second location information wherein said tracking information comprises at least one of speed of travel information and direction of travel information.

**19**. A method for use in a wireless network to obtain requested location information regarding a wireless station from any of various location sources and provide the requested location information to a wireless location application, the wireless network being associated with at least a first source of location information and a second source of location information for providing information regarding locations of wireless stations in the network, the method comprising the steps of:

receiving a first location input based on first location information from said first source and a second location input based on second location information provided by said second source wherein, said first location information and said second location information are provided in different formats relating to identification of wireless station locations;

combining said first location input from said first location finding equipment and said second location input from said second location finding equipment; and

outputting said requested location information to said wireless location application based on said step of combining said first location input and said second location input, wherein said first location finding equipment employs a first location finding technology and said second location finding equipment employs a second location finding technology different than said first location finding technology, said first location finding technology involves a first location finding technology, said first location finding technology involves a first location finding controller for receiving first raw location data from said first location finding equipment and aggregating said first raw data to provide said first location input and said second location finding technology involves a second location finding

16

controller for receiving second raw location data information from said second location finding equipment and aggregating said second raw data to provide said second location input, and said step of combining comprises obtaining said first raw data from said first location finding equipment, obtaining said second raw data from said first location finding equipment, obtaining said second raw data from said second location finding equipment, and said step of combining comprises using one of said first raw data and said second raw data to obtain derived location information.

**20**. A method for use in a wireless network to obtain requested location information regarding a wireless station and provide the requested location information to a wireless location application, the wireless network being associated with location finding equipment for providing information regarding locations of wireless stations in a network service area, the method comprising the steps of:

receiving a plurality of device dependent location inputs provided by said location finding equipment, each of said device dependent inputs having one of a data structure and a data content dependent on a type of the location finding equipment;

receiving a device independent location request from said wireless location application, the device independent location request being in accordance with a standard protocol defining requested location information independent of any particular type of location finding equipment,

storing data in memory based on said plurality of device dependent location inputs;

obtaining said requested location information by performing a query of said data based on said device dependent location inputs and selectively retrieving data from said memory based on said device independent location request; and

outputting said requested device independent location information to said wireless location application, wherein wireless location equipment independent information is provided to wireless location applications based on wireless location equipment dependent inputs such that said application can operate free from restriction to a particular type of the location finding equipment.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,321,092 B1                          Page 1 of 1
DATED        : November 20, 2001
INVENTOR(S)  : Fitch et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Title page,
Item [73], delete the words "Signal Soft" and insert therefor -- SignalSoft --.

Signed and Sealed this

Nineteenth Day of March, 2002

Attest:

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

*Attesting Officer*

**A181**

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.   : 6,321,092 B1                                    Page 1 of  1
DATED         : November 20, 2001
INVENTOR(S)  : Fitch et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Title page,
Item [75], delete the words "**David L. Hose**" and insert therefor -- **David A. Hose**  --.

Signed and Sealed this

Twenty-fifth Day of June, 2002

*Attest:*

JAMES E. ROGAN
*Director of the United States Patent and Trademark Office*

*Attesting Officer*

**A182**



US006532446B1

(12) **United States Patent**
King

(10) **Patent No.:** **US 6,532,446 B1**
(45) **Date of Patent:** **Mar. 11, 2003**

(54) **SERVER BASED SPEECH RECOGNITION USER INTERFACE FOR WIRELESS DEVICES**

(75) Inventor: **Peter F. King**, Half Moon Bay, CA (US)

(73) Assignee: **Openwave Systems Inc.**, Redwood City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 121 days.

(21) Appl. No.: **09/643,558**

(22) Filed: **Aug. 21, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/167,290, filed on Nov. 24, 1999.

(51) **Int. Cl.**[7] ........................ **G10L 21/06**; G10L 15/22; G10L 15/26

(52) **U.S. Cl.** .................... **704/270.1**; 704/231; 704/235; 704/275

(58) **Field of Search** ................................ 704/231–245, 704/258, 260, 270, 270.1, 273, 235, 275; 379/357.01, 88.14; 455/433, 405; 709/206

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,335,276 A | * | 8/1994 | Thompson et al. | .... 379/357.01 |
| 5,651,056 A | * | 7/1997 | Eting et al. | ................. 704/270 |
| 5,928,325 A | * | 7/1999 | Shaughnessy et al. | ...... 709/206 |
| H1895 H | * | 10/2000 | Hoffpauir et al. | ........... 455/433 |
| 6,167,251 A | * | 12/2000 | Segal et al. | ................. 455/405 |
| 6,351,523 B1 | * | 2/2002 | Detlef | ..................... 379/88.14 |

FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| EP | 0854418 A2 | 7/1998 | | |
| GB | 2323693 A | 9/1998 | | |
| JP | 06-037711 | * 2/1994 | ........... | H04B/7/26 |
| JP | 2001-268241 | * 9/2001 | .......... | G10L/13/00 |
| WO | WO 95/17746 A1 | 6/1995 | | |

OTHER PUBLICATIONS

Reinhold Haeb–Umbach, "Robust Speech Recognition for Wireless Networks and Mobile Telephony," ESCA, Euro-speech97, pp. 2427–2430, Rhodes, Greece, Sep. 22, 1997, XP–001045185.

* cited by examiner

*Primary Examiner*—Doris H. To
*Assistant Examiner*—Daniel Nolan
(74) *Attorney, Agent, or Firm*—Blakely, Sokoloff, Taylor & Zafman LLP

(57) **ABSTRACT**

A wireless communication system that utilizes a remote voice recognition server system to translate voice input received from serviced mobile devices into a symbolic data file (e.g. alpha-numeric or control characters) that can be processed by the mobile devices. The translation process begins by establishing a voice communication channel between the serviced mobile device and the voice recognition server. A user of the mobile device then begins speaking in a fashion that may be detected by the voice recognition server system. Upon detecting the user's speech, the voice recognition server system translates the speech into a symbolic data file, which is then forwarded to the user through a separate data communication channel. The user, upon receiving the symbolic data file at the mobile device, reviews and edits the content and further utilizes the file as desired.

**52 Claims, 8 Drawing Sheets**





*Figure 1*



*Figure 2A*



*Figure 2B*



*Figure 3*



*Figure 4*



*Figure 5*



**Figure 6**



*Figure 7*

US 6,532,446 B1

1

# SERVER BASED SPEECH RECOGNITION USER INTERFACE FOR WIRELESS DEVICES

This application hereby claims the benefit of the filing date of a provisional application entitled, "Voice Recognition Based User Interface for Wireless Devices," serial No. 60/167,290, filed on Nov. 24, 1999. The provisional application is hereby incorporated by reference into the present application.

## BACKGROUND OF THE INVENTION

### 1. Field of Invention

This invention generally relates to data communications, and in particular to a two-way wireless communication device that utilizes network based speech recognition resources to augment the local user interface.

### 2. Discussion of Related Art

The use of hypertext based technologies has spread to the domain of wireless communication systems. Two-way wireless communication devices, also described as mobile devices herein, and wireless network protocols have been designed to permit interactive access to remote information services (e.g. commercial databases, email, on-line shopping), through a variety of wireless and wire-line networks, most notably the Internet and private networks.

Many mobile devices (e.g. cellular telephones) are mass-market consumer oriented-devices. Their user interface should thus be simple and easy to use without limiting the functionality of the device. Currently, the primary method of data entry for most mobile devices is a keypad that is relatively inefficient when used to input lengthy alphanumeric character strings. Due to size constraints and cost considerations, the keypads of these mobile devices are not a particularly user friendly interface for drafting messages requiring substantial user input (e.g. email messages). Keypads of this type usually have between 12 and 24 keys, a sufficient number for numeric inputs but very inefficient when dealing with the alphanumeric data entries required for network capable devices.

A user requesting information from the Internet generally navigates the World Wide Web using a browser. For example, a user requesting information on Stanford University using a search engine would have to input a search string which includes a Uniform Resource Locator (URL) of the search engine followed by "Stanford University".

The search string may include quite a few characters, in some cases over 40 characters. A user would have no problem inputting a string of this type using a standard desktop computer keyboard and browser (e.g. NETSCAPE or EXPLORER). However, the same user operating the keypad of a mobile device to input the same string would be severely hampered by the compact keypad and the close spacing between the keys.

One of the common uses of the Internet is email. A user who desires to send an email message having the size of the paragraph above would have to input over 400 characters. Using the standard keyboard of a desktop computer, a user may be able to input that number of characters in less than two minutes (assuming the user could type with an average degree of skill). Inputting the same number of keystrokes on the keypad of a mobile device could take considerably longer and become very tedious and prone to error.

Recent advances in speech recognition (SR) technology and increases in hardware capabilities are making the devel-

2

opment of speech recognition based user interfaces for desktop systems commercially viable. SR technology takes spoken words and translates them into a format, which can easily be manipulated and displayed by digital systems. There have been efforts to equip compact mobile devices with SR technology, however, these efforts have generally required costly device modifications such as extra components (e.g. a DSP chip) or increased processing and storage capability. A typical cellular phone has computational resources equivalent to less than one percent of what is provided in a typical desktop or portable computer. A phone of this type running a scaled down SR application would only be able to recognize a small-predefined group of spoken words without modifying the device components.

Speech recognition software currently available for desktop and laptop computers (e.g. NATURALLY SPEAKING from Dragon System, Inc., PLAINTALK from Apple Computer, VIA VOICE from IBM and FREESPEECH from Philips Talk) are expensive and would represent a significant portion of the costs of a mobile device equipped with a comparable software application.

Placing a speech recognition software application in each mobile device and modifying its hardware components to run that application creates a financial disincentive for the handset manufacturers to incorporate SR features in their devices. These modifications would add considerable cost to the final price of the mobile device, possibly pricing them out of the target price range usually occupied by mass-market mobile devices (e.g. cellular telephones).

In terms of hardware resources, these applications can require up to 60 Mbytes of memory for each language supported. Additionally most of the commercially available speech recognition software applications are designed to function on systems having relatively fast processors.

There is thus a great need for apparatuses and methods that enable mobile devices to interact in a more efficient manner with digital computer networks. The ability to utilize speech recognition services in conjunction with the standard mobile device user interface (e.g. a phone keypad), without having to significantly modify hardware resources or costs, would dramatically improve the usability and commercial viability of network capable mobile devices having limited resources.

## SUMMARY OF THE INVENTION

The present invention relates to a wireless communication system that utilizes a remote speech recognition server system to translate voice input received from mobile devices into a symbolic data file (e.g. alpha-numeric or control characters) that can be processed by the mobile devices. The translation process begins by establishing a voice communication channel between a mobile device and the speech recognition server. A user of the mobile device then begins speaking in a fashion that may be detected by the speech recognition server system. Upon detecting the user's speech, the speech recognition server system translates the speech into a symbolic data file, which is then sent to the user through a separate data communication channel. The user, upon receiving the symbolic data file at the mobile device, reviews and edits the content of the symbolic data file and further utilizes the file as desired. For example a user could use the symbolic data file to fill in fields in an email or a browser request field.

The invention can be implemented in numerous ways, including as a method, an apparatus or device, a user interface, a computer readable memory and a system. Several embodiments of the invention are discussed below.

US 6,532,446 B1

3

According to one embodiment, the present invention is a method for obtaining speech recognition services for a mobile device not having the resources and/or software for performing speech recognition processing locally. The method comprises using local applications resident within the mobile device to establish and coordinate a voice channel between the subject mobile device and a remote server system running a speech recognition application (referred to herein as a speech recognition server system).

Upon establishment of the voice channel the user of the subject mobile device is queued to begin speaking into the microphone of the mobile device (e.g. a cellular phone). Voiced input received at the speech recognition server system, as a result of this interaction, is converted into a symbolic data file. This process may be assisted by previously stored user specific data files. The symbolic data file is then sent back to the originating mobile device or a designated third party device through a separately established and coordinated data communication channel. The symbolic data file may be used to interact with local applications on the mobile device or to interact with network resources (e.g. servers on the Internet or a private network).

Other objects and advantages, together with the foregoing are attained in the exercise of the invention in the following description and accompanying drawings.

BRIEF DESCRIPTION OF DRAWINGS

The present invention will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein the reference numerals illustrate the structural elements, and in which:

FIG. 1 illustrates a schematic configuration in which the present invention may be practiced;

FIG. 2A depicts display and user interface components of a typical voice capable mobile device;

FIG. 2B illustrates a functional block diagram of an exemplary voice capable mobile device;

FIG. 3 illustrates a functional block diagram of a link server device according to a preferred embodiment of the present invention;

FIG. 4 is a schematic diagram showing exemplary processing stages for the speech recognition server in accordance with an exemplary embodiment of the present invention;

FIG. 5 shows representative screen displays, which illustrate operations relating to the interaction of a mobile device with a speech recognition server system;

FIG. 6 illustrates a process flowchart from the perspective of the mobile device according to an embodiment of the present invention; and

FIG. 7 illustrates a process flowchart from the perspective of the speech recognition server according to an embodiment the present invention.

DETAILED DESCRIPTION OF THE INVENTION

In the following detailed description of the present invention, numerous specific details are set forth in order to provide a thorough understanding of the present invention. However, it will become obvious to those skilled in the art that the present invention may be practiced without these specific details. In other instances, well known methods, procedures, components, and circuitry have not been described in detail to avoid unnecessarily obscuring aspects

4

of the present invention. The detailed description of the present invention in the following are presented largely in terms of procedures, steps, logic blocks, processing, and other symbolic representations that resemble data processing devices coupled to networks. These process descriptions and representations are the means used by those experienced or skilled in the art to most effectively convey the substance of their work to others skilled in the art.

The invention pertains to systems and methods, which enable a mobile device to access speech recognition services from a networked speech recognition server system. According to one embodiment of the present invention, speech recognition services are accessed by establishing a voice channel between the user of a mobile device desiring speech recognition services and a networked speech recognition server system.

Once a voice channel is established, the user of the mobile device is given a queue to begin speaking when the speech recognition server system is ready to receive a speech signal. The received speech signal is processed by the speech recognition server system using speech recognition techniques well known in the art (e.g. template matching, Fourier transforms or linear predictive coding (LPC)) and a symbolic data file is generated.

A symbolic data file is a file containing a plurality of letters, phonemes, words, figures, objects, functions, control characters or other conventional marks designating an object, quantity, operation, function, phoneme, word, phrase or any combination thereof having some relationship to the received speech signal as interpreted by the speech recognition system. Speech recognition systems generally use voice templates, Fourier Transform coding, or a linear predictive coding scheme to map the voiced input components to pre-stored symbolic building blocks. Examples of symbolic data files include ASCII files and binary data files.

To facilitate a description of the present invention, it is useful to recite some of the features of a communication system in which the invention may be practiced. FIGS. 1 through 4 provide an overview of the principal system components.

Referring to FIG. 1 a block diagram of a typical communication system 100 according to one embodiment of the present invention is displayed. Mobile devices 102 and 103 receive phone calls through a voice communication channel and hypermedia information (e.g. Hyper Text Markup Language (HTML) documents, Compact Hypertext Transport Protocol (cHTML) documents, Extensible Markup Language (XML) documents, Handheld Device Markup Language (HDML) documents, or Wireless Markup Language (WML) documents, or other similar data types) from remote server devices through broad-band and narrow-band (e.g. SMS) data communication channels which may include link server device 106 and Short Message Service center (SMSC) 107.

Mobile devices 102 and 103 each have a display and a user interface. Additionally, mobile devices 102 and 103 may have a micro-browser (e.g. a micro-browser from Openwave Systems Inc., 1400 Seaport Boulevard, Redwood City, Calif., 94063) stored in a local memory (also referred to as a client module) which enables the device to process hypermedia information received from remote server devices.

As shown in FIG. 1, mobile devices 102 and 103 may be coupled to link server device 106 through a wireless carrier network 104 (also referred to herein as a wireless network). Mobile devices 102 and 103 may be taken from a group,

US 6,532,446 B1

5

which includes mobile phones, palm sized computing devices and personal digital assistants with voice transmission and/or reception capabilities. Voice capabilities are defined as the capabilities equipped in a mobile device that allow a user to communicate voice based information to and from remote destinations (e.g. to another user or a device).

Access to the voice communication channel generally requires that the user and/or device be recognized by wireless carrier network 104. Network recognition involves the exchange of identification information between a subject mobile device and wireless carrier network 104. Generally, the identification information for the user and/or mobile device in question is stored in the memory of the device and is transmitted automatically when the user attempts to access the network.

Wireless carrier network 104 may be any of the well known wireless communication networks (e.g. cellular digital packet data (CDPD) network, Global System for Mobile Communication (GSM) network, Code Division Multiple Access (CDMA) network, Personal Handy Phone System (PHS) or Time Division Multiple Access (TDMA) network). Link server device 106 is further coupled to a wired network 108 to which a speech recognition server system 109 and a plurality of networked servers represented by network server 113 are coupled.

Speech recognition server system 109 is comprised of a server device 110 and storage facilities 112 capable of storing, among other things, user specific files associated with a plurality of user's serviced by a carrier entity. The user specific files are utilized in conjunction with speech recognition processing and in one embodiment are part of the present invention.

Examples of user specific files might include user specific speech recognition templates, one or more user specified language dictionaries (e.g. French, English, German or Cantonese) and one or more user specific dictionaries or lists of an individual user's frequently used words. These files may be uploaded and managed using a networked multimedia computer (e.g. multimedia computer 140) or through the user interface of the serviced mobile device. For example, voice templates are generated by having the user read a predetermined script into a voice-enabled device. User preferences (e.g. languages of choice) may be input using menu selection screens presented to the user on the display of the mobile device or another device connected to the speech recognition server system via a wired network.

For simplicity, antenna 121 represents a wireless carrier infrastructure that generally comprises a base station and an operations and maintenance center. The base station controls radio or telecommunication links with mobile devices 102 and 103. The operations and maintenance center comprises a mobile switching center, which switches calls between the mobile devices and other fixed or mobile network users. Further the operations and maintenance center manages mobile account services, such as authentication, and oversees the proper operation and setup of the wireless network. Each of the hardware components and processes in carrier infrastructure 121 are known to those skilled in the art and will not be described herein to avoid unnecessarily obscuring aspects of the present invention.

The communication protocols used by airnet 104 may, for example, be Wireless Access Protocol (WAP) or Handheld Device Transport Protocol (HDTP). Wired network 108 is a land-based network that may be the Internet, a private network or a data network of any private network. Typically the communication protocol supporting landnet 118 may be

6

Transmission Control Protocol (TCP/IP), Hypertext Transport Protocol (HTTP), or Secure Hypertext Transport Protocol (sHTTP).

Link server device 106 and network server 113 are typically computer work stations, for example, a SPARC station from Sun Microsystems Inc. with networking libraries and Internet connectivity. Network server 113 is representative of a plurality of networked servers coupled to landnet 108 and is capable of providing access to hypermedia information including information for mobile devices 102 and 103.

Link server device 106 is depicted as a stand alone device and therefore is often referred to as a network gateway or wireless data server. Link server 106 can be configured to operate as a bridge between wireless network 104 and wired network 108. It should be pointed out that the functions of link server device 106 may be performed by other server devices connected to wired network 108 with hardware well known in the art providing the connection between wireless network 104 and wired network 108.

The voice communication channel previously described is generally represented by voice channel 126. This communication channel is generally established and coordinated using the infrastructure and procedures generally known in the art for setting up a phone call.

There are generally two types of data communication channels providing service to mobile devices 102 and 103. Data communication channel 128 is representative of a wideband data communication channel. Data communication channel 130 is representative of a narrowband data communication channel e.g. (a Short Message Communication (SMS) service channel). Either of these data communication paths can be used to deliver data to and from mobile devices 102 and 103.

According to the preferred embodiment of the present invention a mobile device (e.g. mobile device 102 or 103) desiring to receive speech recognition services from speech recognition server system 109, first establishes a voice channel generally represented by voice channel 126. The contact information for speech recognition server system 109 (e.g. a phone number or a uniform resource indicator (URI)) may be embedded in software loaded on the mobile device, retrieved from link server device 106 or input by the user directly.

Once a voice channel is established between the requesting mobile device and speech recognition server system 109, user information is sent to the speech recognition server system. This allows previously stored user specific files for the requesting mobile device to be accessed and utilized. The user information may be transmitted on a separate data communication channel (e.g. data communication channels 128 or 130) or input by the user. The user specific files generally provide for features specific to a particular user account. For example, the user can specify one or more languages of choice for speech recognition processing.

Once the user specific files for the subject mobile device/user are retrieved, the user is prompted to provide a voiced input (e.g. begin speaking). It is important to note at this point that the user may utilize the user interface of the mobile device (e.g. a phone keypad) while utilizing speech recognition services. When the user has completed their input interaction (voice and physical input) with the mobile device, an indication may be provided by the user (voiced or key input) to conclude the input session. Speech recognition server system 109 then converts the voiced input into a symbolic data file, which can be sent to the requesting mobile device via link server 106.

US 6,532,446 B1

7

As previously stated, the symbolic data file is a file containing a plurality of letters, phonemes, words, figures, objects, functions, control characters or other conventional marks designating an object, quantity, operation, function, phoneme, word, phrase or any combination thereof having some relationship to the received speech signal as interpreted by the speech recognition system. Speech recognition systems generally use voice templates, Fourier Transform coding, or a linear predictive coding scheme to map the voiced input components to pre-stored symbolic building blocks. Examples of symbolic data files include ASCII files and binary data files.

The symbolic data file may initially be sent to link server device 106, which may perform additional processing prior to sending the symbolic data file to the requesting mobile device via wideband channel 128 or narrowband channel 130. The user of the mobile device may then review the received symbolic data file and utilize it as desired.

The accuracy of the speech recognition application used by speech recognition server system 109 will vary depending on the translation methodology used and the size and language of the language dictionaries used. Generally, speaker dependent methodologies (e.g. template matching) have accuracy's as high as 98 percent and speaker-independent methodologies (e.g. Fourier transforms and linear predictive coding (LPC)) have accuracy's in the range of 90 to 95 percent.

In accordance with the principles of the present invention, users of mobile devices (e.g. mobile devices 102 and 103) may access speech recognition services on those mobile devices without the significant hardware or software modifications that might be required if the speech recognition application were executed by the device. Additionally, since the software performing speech recognition processing is resident on an accessible remote server device with superior processing speed (as compared to that of the mobile device) and large storage capacity, the user of the device can be provided with the functionality and resources associated with a full featured speech recognition application. For example, the speech recognition application may have access to large language dictionaries, selectable language dictionaries for multiple languages and user specific files (e.g. voice templates and user customized dictionaries and lists).

FIG. 2A depicts an exemplary mobile device 200 that may correspond to one of mobile devices (102 or 103) in FIG. 1. Mobile device 200 includes a display screen 204, an extended phone-styled keypad 210, cursor navigation keys 222 and 224, a pair of softkeys 208A and 208B, an earpiece 212A and a microphone 212B. Screen display 204 is typically a Liquid Crystal Display (LCD) 220 screen capable of displaying textual information and certain graphics. Extended phone keypad 210 includes, preferably, a regular phone keypad with additional keys providing additional characters (e.g. a space) and functions (e.g. back or clear).

Cursor navigation keys 222 and 224 allow a user to reposition a cursor or an element indicator 216, for example, to activate one of the applications displayed on screen display 204. Generic keys 208A and 208B are typically used to perform application specific functions as indicated by softkey function identifiers 214 and 215. It should be understood, by those having ordinary skill in the art, that having a regular phone keypad is not a requirement to practice the present invention. Some mobile devices sometimes have no physical keys at all, such as those palm-sized computing devices that use soft keys or icons as an input mechanism.

8

Upon establishing a communication session with an associated link server device (e.g., link server device 106 of FIG. 1) mobile device 200 typically receives one or more markup language card decks to assist the user with device interactions. Depending on the implementation preference, the markup language card decks, alternatively referred to as screen descriptive commands files, may be in a markup language that includes, but is not limited to, Handheld Device Markup Language (HDML), Hypertext Markup Language (HTML), compact HTML, Wireless Markup Language (WML), Standard Generalized Markup Language (SGML) or Extensible Markup Language (XML). Alternatively, the data file may be a stripped, compressed, compiled or converted version of a corresponding markup file.

Text 220 appearing on LCD screen 204 in FIG. 2A is an example of a markup language card deck. In this example the user is offered a choice of the following selections:

1) Bookmarks

2) Search Int.

3) Email

4) News

Each of the selections is typically linked to a resource on the network or to a local software application. A user may make a selection from the menu above using navigation keys 222 and 224 with the user's selection indicated by element indicator 216. This same method may be utilized to provide user prompts for interacting with remote server devices (e.g. speech recognition server system 109 of FIG. 1).

Referring now to FIG. 2B, a more detailed description of mobile device 250, which may be mobile devices 102 or 103 of FIG. 1 and 200 of FIG. 2A, is provided. Mobile device 250 includes a Wireless Control Protocol (WCP) interface 252 that couples to a carrier wireless network 104 to receive incoming and outgoing signals. Device identifier (ID) storage 254 stores and supplies a device ID to WCP interface 252 for the purpose of identifying mobile device 250 to outside entities (e.g. link server device 106 of FIG. 1). The device ID is a specific code that is associated with mobile device 250 and directly corresponds to the device ID in an associated user account typically provided in an associated link server device (e.g. 106 of FIG. 1).

Mobile device 250 includes a processor 268, encoder/decoder circuitry 264, working memory 258 and a client module 256. Client module 256 is representative of software components loaded on or into device memory resources, which performs many of the processing tasks performed by mobile device 250 including; establishing a communication session with a link server device via wireless carrier network 104, operating and maintaining local applications, displaying information on a display screen 260 of mobile device 250, and receiving user input from keypad 262. Client module 256 may be loaded into the memory of mobile device 250 in much the same fashion as software is loaded on a computing device.

In addition, mobile device 250 includes voice circuitry 266 for converting voice activity to electrical impulses which may be transmitted and received on digital and analog communication systems. These components and their functions are well known in the art and will not be discussed further.

In accordance with the principles of the present invention, the software loaded on mobile device 200 includes a component, which provides assistance to the user relating to interactions with the server device running the speech recognition application. The software providing this assistance

US 6,532,446 B1

9

may be loaded as part of the microbrowser or other application, or as a stand alone application. This application may be responsible for tasks such as retrieving and storing contact information for server devices providing services, management of received symbolic data files, and input/ alteration of user preferences. User assistance may be in the form of screen displayed information, audible or tactile prompts and/or softkey mapped functions, for example.

For example, a user desiring to utilize speech recognition services in conjunction with an application (e.g. an email message) may access the application of interest and activate a softkey to access speech recognition services. The function associated with the softkey would then retrieve the contact information for the server device running the speech recognition application, if not already stored, and the process would proceed as described above. This example is provided for purposes of illustration and should not be interpreted as limiting the scope of the present invention.

FIG. 3 schematically illustrates the principle components of link server device 340, which may correspond to link server device 106 of FIG. 1. Link server device 340 is a server computer that operates as a network gateway between wired network 300 and wireless network 320. To avoid obscuring the principle aspects of the present invention, well-known methods, procedures, components and circuitry in link server device 340 are not described in detail.

Link server device 340 includes a Land Control Protocol (LCP) interface 358 that couples to wired network 300, and a Wireless Control Protocol (WCP) interface 341 that couples to wireless network 320. A server module 310 is coupled between the LCP interface 358 and the WCP interface 341.

Server module 310 performs traditional server processing as well as protocol conversion processing from one communication protocol to another communication protocol. Message processor 316 is the component responsible for protocol conversions and associated tasks. In the case of protocol conversions (e.g. between HDTP and HTTP), the conversion is generally a data mapping process. It will be understood by those skilled in the art that WCP interface 341 can be replaced by other interface modules depending on the wireless networks and protocols used. The same is true of LCP interface 358 when the type of wired network and protocol vary.

Server module 310 also includes an account manager 312 and an account interface 314. Account manager 312 manages a plurality of user accounts, typically one for each of the mobile devices serviced by link server device 340. It should be understood that the user account information may be stored in another network server coupled the link server device 340. In other words, the user accounts can be kept in a database that is physically placed in any computing device coupled to link server device 340 via a wired network.

Each of the mobile devices serviced by link server device 340 is assigned an identification (ID) or device ID. A device ID can be a phone number of the device or an IP address or a combination of an IP address and a port number, for example: 204.163.165.132:01905 where 204.163.165.132 is the IP address and 01905 is the port number. The device ID is further associated with a subscriber ID created and administrated by the carrier controlling link server device 340 as part of the procedures involved in activating a subscriber account for mobile device. The subscriber ID may be associated with, and utilized to, access the user specific files (e.g. 112 of FIG. 1) associated with a particular user or device.

The subscriber ID may take the form of, for example, 861234567-10900__pn.mobile.att.net by AT&T Wireless

10

Service, and is a unique identification to a mobile device. The account manager 312 is responsible for creating a user account for a mobile device that allows for secure communications with link server device 340. In this case, account manager 312 ensures the proper level secure access for the serviced mobile device to services provided by link server device 340.

Link server device 340 also includes a processor 318 and storage resource 320 as the primary hardware components. Processor 318 performs operations under the control of the server module 310. It will be understood to those skilled in the art that link server device 340 may include one or more processors (e.g., processor 318), working memory (e.g., storage resource 320), buses, interfaces, and other components and that server module 310 represents one or more software modules loaded into the working memory of link server device 340 to perform designated functions. The same distinction is equally applicable to the client module and hardware components of the subject mobile devices.

Typically the landnet communication protocol (LCP) supported in landnet 300 may include Transmission Control Protocol (TCP), HyperText Transfer Protocol (HTTP) or Secure HyperText Transfer Protocol (HTTPS), and the wireless communication protocol (WCP) may include (TCP), (HTTP) or (HTTPS), Handheld Device Transport Protocol (HDTP) or Wireless Session Protocol (WSP). In the case that LCP is different from WCP, server module 310 includes a mapping module (i.e. a mapper) responsible for mapping from one protocol to another so that a mobile device coupled to wireless network 320 can communicate with a device coupled to wired network 300.

Once the received speech signal is processed by speech recognition server system (not shown), a symbolic data file is generated and sent to link server device 340. The symbolic data file is received by message processor 316 via LCP interface 358. Message processor 316 acting under a control engine 322, converts the symbolic data file to a data format that may be optimally (in terms of the protocol requirements of the wireless network and the device characteristics of the requesting mobile device) transported on wireless network 320. The symbolic data file can be in a format comprehensible by message processor 316, for example, in a markup language (e.g. HTML) or a text file (e.g. ASCII), when received from the speech recognition server system. The processed symbolic data file, which may be reformatted so as to be more compatible with the requesting mobile device, is then sent to the requesting mobile device or to a designated third party device.

Referring to FIG. 4, there are shown functional modules of an exemplary speech recognition server system 460 (which may correspond speech recognition server system 109 of FIG. 1) that performs the following processes: 1) Speech Detection, 2) Speech Analysis, 3) Pattern Matching and 4) Symbolic File Generation. During speech detection 462, Speech recognition server system 460 detects the presence of a speech signal at its input. Upon detection, the received speech signal goes through the speech analysis process 464, where it is reduced to quantifiable indices suitable for pattern matching. During the pattern matching stage 466, the quantifiable indices are compared to user voice templates (if using a template based speech recognition process) stored in storage device 480 that may include various language dictionaries and a plurality of user specific files. A text generator 468, generated the symbolic data file which is sent to link server device 340 via wired network 300 (see FIG. 3) as previously described. It will be understood, by persons of ordinary skill in the art, that other

US 6,532,446 B1

11                                                    12

speech recognition schemes (e.g. Fourier transforms or linear predictive coding (LPC)) may be used without deviating from the scope of the invention. Persons of ordinary skill in the art will also understand that the link server device (e.g. **106** of FIG. **1**) may perform the functions of the speech recognition server system (e.g. **109** of FIG. **1**).

FIG. **5** illustrates a plurality of exemplary screen displays relating to the interaction of a mobile device requesting speech recognition services and a speech recognition server system. Initially screen display **500** allows a user to select between manual entry **504** and SR (speech recognition) assisted entry **508**. User selections are indicated by selection indicator **512**. In this example, SR assisted entry **512** may be selected by activating the softkey associated with softkey function identifier **516**. This selection retrieves the contact information for the speech recognition server system providing service. In this example the contact information is comprised of a phone number (e.g. 650-555-7272). One of ordinary skill in the art will understand that the contact information may also be comprised of a Uniform Resource Identifier (URI) or similar unique identifier. Associated user and/or device identification information, utilized for accessing user specific files, may be transmitted in the background (e.g. using a separate data communication channel or the voice communication channel) or input by the user.

Upon retrieval of the speech recognition server system contact information **522**, as shown in screen display **520**, a voice channel may be established by activating the softkey associated with softkey function identifier **524** ("OK"). Screen display **530** illustrates types of information, which could be provided to the user of the requesting mobile device. Character string **532** provides the user with information relating to the status of establishing a communication session with the speech recognition server system providing service. Character string **534** provides the user with information relating to the settings utilized to process the user's request. This could be comprised of a simple character string (e.g. "Initializing Default Settings") or a plurality of interactive and non-interactive displays which allow a user to input selections (e.g. a language of choice). When the servicing speech recognition server system is ready to receive input a prompt **536** ("begin speaking") is presented to the user. A user may end the input session by activating the softkey associated with softkey function identifier **538**.

Speech recognition services may be configured to interact with particular applications resident on the requesting mobile device. For example, processed symbolic data files may be generated to serve as inputs for specific fields in an application such as an email. Additionally, once an active voice channel has been established for speech recognition services, the user may change the application using the service without having to secure and re-establish the voice communication channel. For example, the user may switch between an email program and a personal organizer. This feature reduces user cost and network congestion.

Referring now to FIG. **6** and FIG. **7**, there are respectively illustrated process flowcharts that describe the operations of the mobile device and the speech recognition server according to one embodiment of the present invention. Both FIG. **6** and FIG. **7** should be understood in conjunction with FIG. **1**.

In accordance with the preferred embodiment of the present invention, a user desiring speech recognition services would indicate using the local user interface (e.g. by pressing a key) to the mobile device that speech recognition services are required. In response, the mobile device would initiate or generate a request for the speech recognition service. Generally the user would indicate that speech recognition services are required in conjunction with a desired task being performed using resident applications (e.g. email or web browsing). Information returned to the mobile device as a result of the request may be incorporated within a document associated with the task being performed.

The request process causes a voice channel to be established between the mobile device requesting service and the speech recognition server system providing the service. Once the voice channel is established and the user is queued to begin speaking, the user may begin an input interaction with the mobile device which may include physical input using the local user interface (e.g. a phone keypad) in addition to the speech input. Upon completion of the initial input interaction with the mobile device the user may choose to maintain the open status of the voice channel open and perform another task or terminate the voice channel.

FIG. **6** is a flow diagram, which illustrates the process **600** utilized by a mobile device (e.g. mobile devices **102** and **103**) to interact with a remote speech recognition server system (e.g. speech recognition server system **109**) from the perspective of the mobile device. At **604** a determination is made as to whether there is an active voice channel between the subject mobile device and the speech recognition server system providing services. This process usually occurs in the background under software control.

If there is an active voice channel, then the user is prompted to provide an input at **608** indicating whether the user desires the active voice channel to be disabled. This would be the case where the user does not require SR services for the planned input interaction with the mobile device.

If the user decides to disable the voice channel then it is disabled at **612**. The user then proceeds with physical input **628** using the device's user interface (e.g. the keypad). At **622** a decision is made as to whether user input (e.g. physical input **628**) has been registered (e.g. input accepted by the device). If the user input is registered then it processed at **632** and the user is prompted to provide an input at **636** indicating whether to continue the input session or terminate it. If the user selects termination then a determination is made as to the status of established voice channels/circuits at **640** (i.e. is the voice channel/circuit active). As was previously described, this check usually occurs in the background. In the sequence described above there is not an active voice channel so the process would be terminated.

If at **608** the user decides not to disable the voice channel, as would be the case where a user intends to utilize speech recognition services for a mobile device input interaction, then the user provides voice input **624** and physical input **628** and a determination is made at **622** as to whether the user's input has been registered. If the user input's has been registered then it processed at **632** and the user is prompted to provide an indication at **636** as to whether the user desires to continue the input session or terminate it. If the user selects termination then a determination is made as to the status of any established voice channels/circuits at **640**. If a voice circuit was established, then at 664 the voice circuit is closed. Upon termination, active voice channels/circuits are secured. The process is then terminated.

If the user decides not to terminate the input session at **636** then the process returns to the beginning of process **600**.

If a determination is made at **604** that there is not an active voice channel, then the user is prompted to provide an indication at **614** as to whether the user desires an active voice channel to be established. This would be the case where the user requires speech recognition services for an input interaction with the mobile device.

US 6,532,446 B1

13

If at **614** the user requests a voice channel for the input interaction then one is established at **618**. The user then provides voice input **624** and physical input **628** and a determination is made at **622** as to whether the user's input has been registered. If the user's input has been registered then it is processed at **632** and the user is prompted to provide an indication at **636** whether to continue the input session or terminate. If the user selects termination then a determination is made, as previously described as to the status of any established voice channels/circuits at **640**. Upon termination, active voice channels/circuits are secured. The process is then terminated.

If at **614** the user does not request a voice channel for the impending input interaction, as would be the case where the user does not require speech recognition services, the user then proceeds with physical input **628** using the mobile device user interface (e.g. the keypad). At **622** a determination is made as to whether user input (e.g. physical input **628**) has been registered. If the user input has been registered then it processed at **632** and a decision is made at **636** whether to continue the input session or terminate it. The process is then terminated.

If the user decides not to terminate the input session at **636** then the process returns to the beginning of process **600**.

If in any of these exemplary interactions described above, the user input is not registered at **622**, then the user is prompted to provide an indication at **636** as to whether or not they desire to terminate the session with the speech recognition server system.

Once a voice channel between the speech recognition system providing service and a mobile device requesting service is established, the speech recognition server system may retrieve any user specific files associated with the user of the mobile device (e.g. language preferences, template files etc.) and use these to process the incoming voice input. The speech recognition server system then detects and processes incoming voice signals associated with the request for service. The incoming voice signal is converted into a symbolic data file using a template matching process, Fourier transform method, linear predictive coding scheme or any suitable speech recognition coding scheme and sent to the requesting mobile device (or a designated third party device) using a data communication channel that may include an intermediate server device (e.g. link server device **106** of FIG. 1).

The symbolic data file may be in a format that is suitable for processing by the requesting mobile device (e.g. cHTML, WML or HDML) or may be in a format suitable for processing by an intermediate server device (e.g. HTML, WML, XML, ASCII etc.). In the latter case the intermediate server device may perform any conversion process required if any.

According to the principles of the present invention, a user interacting with a mobile device would be able to access remotely available speech recognition services based in a server device running a speech recognition application (e.g. a speech recognition server system). Software stored on the phone (e.g. a microbrowser) assists the user in this interaction by retrieving and managing contact information for the server device and by providing prompts and performing functions related to interactions with the speech recognition server system. Using this system and method, mobile devices having limited processing and storage capability have access to full featured speech recognition applications running on powerful computer workstations.

FIG. 7 is a flow diagram, which illustrates the process **700** utilized by a speech recognition server system (e.g. speech

14

recognition server system **109**) to interact with a mobile device (e.g. mobile device **102**) from the perspective of the speech recognition server system. At **704** a determination is made (i.e. by a software process) as to whether a voice circuit/channel has been established between the speech recognition server system (e.g. speech recognition server system **109**) and a mobile device requesting services (e.g. mobile device **102**).

If at **704** it is determined that a voice circuit/channel has been established with a mobile device requesting services then another determination is made at **708** as to whether a speech signal has been detected. If a speech signal is detected at **708** the received speech input **716** is utilized to generate a symbolic data file at **712**.

As previously stated, the symbolic data file is a file containing a plurality of letters, phonemes, words, figures, objects, functions, control characters or other conventional marks designating an object, quantity, operation, function, phoneme, word, phrase or any combination thereof having some relationship to the received speech signal as interpreted by the speech recognition system. Voice recognition systems generally use voice templates, Fourier Transform coding, or a linear predictive coding scheme to map the voiced input components to pre-stored symbolic building blocks. Examples of symbolic data files include ASCII files and binary data files.

The symbolic data file is then sent to the requesting mobile device (or designated third party device) at **720**. At **724** it is determined whether a termination command has been received from the mobile device requesting services. If a termination command is received then the process is ended. If a termination command is not received then the process continues to look for an incoming speech signal at **708**. If at **708** a speech signal is not received within a pre-determined time period then a determination is made at **728** as to whether a termination command has been received. If a termination command has been received then the process is terminated. Of course the system could have predetermined time-outs or cycle limits that could result in process termination even if a termination command has not been received.

If at **704** it is determined that a voice circuit/channel has not been established with a mobile device requesting services then the speech recognition server system awaits the establishment of an active voice channel with a mobile device desiring speech recognition services.

According to the principles of the present invention, the speech recognition server system functions as an extension of the user interface of the mobile device. For example a user can choose to use speech recognition services for lengthy interactions that would under normal circumstances require considerable time and effort to input using the local user interface. In addition, since the resources of the mobile device do not limit the speed recognition application used, the user can be provided access to a vast vocabulary.

The advantages of the present invention are numerous. Different implementations may yield one or more of the following advantages. One advantage of the present invention is that users of certain mobile devices (e.g. devices with limited processing and storage capability) are enabled to utilize a fully functional speech recognition application running on a remote server device to augment the standard device user interface.

Another advantage of the present invention is that since the speech recognition application utilized is not restricted by the processing and storage limitations of the mobile device, the user may be provided with the functionality of a

US 6,532,446 B1

15

full feature speech recognition application running on a more powerful computer. Advantages associated with this functionality include providing the user with multiple language dictionaries having large vocabularies and personalized dictionaries. Additionally, since the speech recognition application is not stored on the mobile device, there is little or no impact on the per-unit cost of the mobile device. Still another advantage of the present invention is that the carriers providing this service can charge the users a small service fee for access to it.

Yet another advantage of the present invention is that a user can utilize speech recognition services and the local user interface (e.g. a phone keypad) concurrently, thus providing the user with maximum flexibility. For example, the user can input a voice signal and intermingle symbols from the local user interface.

The many features and advantages of the present invention are apparent from the written description, and thus, it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

I claim:

1. A method of providing speech recognition services to a wireless communication device having a display screen and a user interface, comprising:

receiving a request from the wireless communication device for speech recognition services at a server device running a speech recognition application;

retrieving a voice input signal associated with the request from a first communication path;

converting the voice input signal into a symbolic data file using the speech recognition application; and

sending the symbolic data file to the wireless communication device using a second communication path.

2. A method as recited in claim 1, wherein the first communication path is established on a wireless communication network.

3. A method as recited in claim 2, wherein the wireless network is selected from a group consisting of cellular digital packet data (CDPD) network, Global System for Mobile Communication (GSM) network, Code Division Multiple Access (CDMA) network, Personal Handy Phone System (PHS) and Time Division Multiple Access (TDMA) network.

4. A method as recited in claim 1, wherein the symbolic data file is a markup language file.

5. A method as recited in claim 4, wherein the markup language file is selected from a group consisting of Handheld Device Markup Language (HDML), Hypertext Markup Language (HTML), compact HTML (cHTML), Wireless Markup Language (WML), Standard Generalized Markup Language (SGML) and Extensible Markup Language (XML).

6. A method as recited in claim 1, wherein the symbolic data file is a binary data file.

7. A method as recited in claim 1, wherein the symbolic data file is an ASCII formatted data file.

8. A method as recited in claim 1, wherein the second communication path includes a link server device connected to the server device running the speech recognition application by a wired network using a first communication protocol and to the wireless communication device by a wireless network using a second communication protocol.

16

9. A method as recited in claim 8, wherein the first communication protocol is selected from a group consisting of Transmission Control Protocol/Internet Protocol (TCP/IP), Hypertext Transport Protocol (HTTP) and Secure Hypertext Transport Protocol (sHTTP).

10. A method as recited in claim 8, wherein the second communication protocol is a wireless communication protocol.

11. A method as recited in claim 10, wherein the wireless communication protocol is selected from a group consisting of Wireless Access Protocol (WAP) and Handheld Device Transport Protocol (HDTP).

12. A method as recited in claim 1, wherein the request received from the wireless communication device includes user specific identification information.

13. A method as recited in claim 12, wherein the user specific identification information is utilized to retrieve user specific files to process the request for speech recognition services.

14. A method as recited in claim 1, wherein the request received from the wireless communication device includes device specific identification information.

15. A method as recited in claim 14, wherein the device specific identification information is utilized to retrieve user specific files to process the request for speech recognition services.

16. A method as recited in claim 14, wherein the device specific identification information is selected from a group consisting of a phone number and a Uniform Resource Identifier (URI).

17. A method as recited in claim 1, wherein the wireless communication device is a mobile phone.

18. A method as recited in claim 17, wherein the mobile phone includes a microprocessor and a storage area for software.

19. A method as recited in claim 18, wherein the microprocessor utilizes the software stored in the storage area to control a phone function and a local application.

20. A method as recited in claim 19, wherein the local application provides functions relating to obtaining speech recognition services.

21. A method of providing speech recognition services to a wireless communication device having a display screen and a user interface, comprising:

retrieving contact information for a server device running a speech recognition application;

generating a request for speech recognition services from the server device associated with the retrieved contact information;

sending the request for speech recognition services to the server device associated with the retrieved contact information;

establishing a voice communication channel between the wireless communication device and the server device associated with the retrieved contact information;

receiving input from a user using the wireless communication device, at least a portion of the input including a voice component;

transmitting the user input to the server device for processing by the speech recognition application;

receiving a symbolic data file from the server device associated with the retrieved contact information, the symbolic data file including a processed output of speech recognition processing of the user input by the server device;

processing the received symbolic data file using local resources of the wireless communication device; and

US 6,532,446 B1

17

displaying at least a portion of the processed symbolic data file to the user.

**22.** A method as recited in claim **21**, wherein the contact information is selected from a group consisting of a phone number and a Uniform Resource Identifier (URI).

**23.** A method as recited in claim **21**, wherein the voice communication channel is established on a wireless network.

**24.** A method as recited in claim **23**, wherein the wireless network is selected from a group consisting of cellular digital packet data (CDPD) network, Global System for Mobile Communication (GSM) network, Code Division Multiple Access (CDMA) network, Personal Handy Phone System (PHS) and Time Division Multiple Access (TDMA) network.

**25.** A method as recited in claim **24**, wherein the received symbolic data file is a markup language file.

**26.** A method as recited in claim **25**, wherein the markup language file is selected from a group consisting of Handheld Device Markup Language (HDML), Hypertext Markup Language (HTML), compact HTML (cHTML), Wireless Markup Language (WML), Standard Generalized Markup Language (SGML) and Extensible Markup Language (XML).

**27.** A method as recited in claim **24**, wherein the symbolic data file is a binary data file.

**28.** A method as recited in claim **24**, wherein the symbolic data file is an ASCII formatted data file.

**29.** A computer readable medium on which is encoded computer program code for generating a request for speech recognition services for a wireless communication device, comprising:

computer program code for retrieving contact information for a server device providing speech recognition services;

computer program code for generating a request for speech recognition services from the server device associated with the retrieved contact information;

computer program code for sending the request for speech recognition services to the server device;

computer program code for receiving voice input from a user of the wireless communication device, the input being associated with the request for speech recognition services; and

computer program code for establishing a voice communication session between the wireless communication device and the server device;

computer program code for transmitting the received voice input to the server device for speech recognition processing;

computer program code for processing a symbolic data file received from the server device, the symbolic data file including processed output of the speech recognition processing by the server device; and

computer program code to display at least a portion of the processed symbolic data file of the processed symbolic data file to the user.

**30.** A computer readable medium as recited in claim **29**, wherein the contact information is selected from a group consisting of a phone number and a Uniform Resource Identifier (URI).

**31.** A computer readable medium on which is encoded computer program code for providing speech recognition services to a wireless communication device, comprising:

computer program code for processing a request for speech recognition services received from a mobile device;

18

computer program code for receiving a voice input associated with the request for speech recognition services;

computer program code for converting the received voice input into a symbolic data file; and

computer program code for sending the symbolic data file to the mobile device originating the request.

**32.** A computer readable medium as recited in claim **31**, wherein the symbolic data file is a markup language file.

**33.** A computer readable medium as recited in claim **32**, wherein the markup language file is selected from a group consisting of Handheld Device Markup Language (HDML), Hypertext Markup Language (HTML), compact HTML (cHTML), Wireless Markup Language (WML), Standard Generalized Markup Language (SGML) and Extensible Markup Language (XML).

**34.** A computer readable medium as recited in claim **31**, further comprising:

computer program code for retrieving user specific files associated with the request; and

computer program code for utilizing the user specific files in the conversion process to convert the voice input into a symbolic data file.

**35.** A computer readable medium as recited in claim **34**, wherein the user specific files contain user preferences.

**36.** A computer readable medium as recited in claim **34**, wherein the user specific files contain user voice templates.

**37.** A wireless communication system providing speech recognition services, comprising:

a wireless communication device providing voice input for speech recognition processing on a first communication path and receiving a symbolic data file representing the processed voice input on a second communication path; and

a server device running a speech recognition application receiving voice input from the wireless communication device on the first communication path, converting the received voice input into a symbolic data file and sending the symbolic data file to the wireless device using the second communication path.

**38.** A wireless communication system as recited in claim **37**, wherein the first communication path is established on a wireless network.

**39.** A wireless communication system as recited in claim **38**, wherein the wireless network is selected from a group consisting of cellular digital packet data (CDPD) network, Global System for Mobile Communication (GSM) network, Code Division Multiple Access (CDMA) network, Personal Handy Phone System (PHS) and Time Division Multiple Access (TDMA) network.

**40.** A wireless communication system as recited in claim **39**, wherein the second communication path includes a link server device connected to the server device running the speech recognition application by a wired network using a first communication protocol and to the wireless communication device by a wireless network using a second communication protocol.

**41.** A wireless communication system as recited in claim **40**, wherein the first communication protocol is selected from a group consisting of Transmission Control Protocol/Internet Protocol (TCP/IP), Hypertext Transport Protocol (HTTP) and Secure Hypertext Transport Protocol (sHTTP).

**42.** A wireless communication system as recited in claim **40**, wherein the second communication protocol is a wireless communication protocol.

**43.** A wireless communication system as recited in claim **42**, wherein the wireless communication protocol is selected

US 6,532,446 B1

19

20

from a group consisting of Wireless Access Protocol (WAP) and Handheld Device Transport Protocol (HDTP).

**44.** A wireless communication system as recited in claim **37**, wherein the wireless communication device is a mobile phone.

**45.** A wireless communication system as recited in claim **44**, wherein the mobile phone includes a microprocessor and a storage area for software.

**46.** A wireless communication system as recited in claim **45**, wherein the microprocessor utilizes the software stored in the storage area to control a phone function and a local application.

**47.** A wireless communication system as recited in claim **46**, wherein the local application provides functions relating to obtaining speech recognition services.

**48.** An apparatus for providing speech recognition services to a wireless communication device, the apparatus comprising:

a processing system; and

a memory coupled to the processing system, storing a speech recognition application, which when executed by the processing system causes the apparatus to:

receive a request from the wireless communication device for speech recognition services;

retrieve a voice input signal associated with the request from a first communication path;

convert the voice input signal into a symbolic file using the speech recognition application; and

send the symbolic data file to the wireless communication device using a second communication path.

**49.** An apparatus as recited in claim **48**, wherein the second communication path includes a link server device connected to the apparatus by a wired network using a first communication protocol and to the wireless communication device by a wireless network using a second communication protocol.

**50.** An apparatus as recited in claim **49**, wherein the received symbolic data file is a markup language file.

**51.** An apparatus as recited in claim **50**, wherein the markup language file is selected from a group consisting of Handheld Device Markup Language (HDML), Hypertext Markup Language (HTML), compact HTML (cHTML), Wireless Markup Language (WML), Standard Generalized Markup Language (SGML), and Extensible Markup Language (XML).

**52.** An apparatus as recited in claim **50**, wherein the symbolic data file is a binary data file.

\*     \*     \*     \*     \*



US006647260B2

(12) **United States Patent**
Dusse et al.

(10) Patent No.: **US 6,647,260 B2**
(45) Date of Patent: **Nov. 11, 2003**

(54) **METHOD AND SYSTEM FACILITATING WEB BASED PROVISIONING OF TWO-WAY MOBILE COMMUNICATIONS DEVICES**

(75) Inventors: **Steve Dusse**, Woodside, CA (US); **Peter F. King**, Half Moon Bay, CA (US); **Bruce V. Schwartz**, San Mateo, CA (US); **Bruce K. Martin, Jr.**, Palo Alto, CA (US)

(73) Assignee: **Openwave Systems Inc.**, Redwood City, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/289,559**

(22) Filed: **Apr. 9, 1999**

(65) **Prior Publication Data**

US 2002/0068554 A1 Jun. 6, 2002

(51) Int. Cl.[7] ......................... **H04M 3/00**; G06F 15/16; H04L 9/00

(52) U.S. Cl. ...................... **455/419**; 455/411; 709/219; 713/169

(58) Field of Search ................................. 455/419, 418, 455/414, 466, 411, 517, 410; 370/338, 352, 401, 402, 403, 404, 313; 709/218, 219, 223, 225, 227; 713/168, 169, 201

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 5,485,505 | A | * | 1/1996 | Norman et al. | 455/419 |
| 5,586,260 | A | * | 12/1996 | Hu | 713/201 |
| 5,603,084 | A | * | 2/1997 | Henry, Jr. et al. | 455/419 |
| 5,673,322 | A | | 9/1997 | Pepe et al. | |
| 5,719,918 | A | | 2/1998 | Serbetciouglu et al. | 455/466 |
| 5,727,159 | A | * | 3/1998 | Kikinis | 709/246 |
| 5,732,074 | A | * | 3/1998 | Spaur et al. | 370/401 |
| 5,742,905 | A | | 4/1998 | Pepe et al. | 455/461 |
| 5,809,415 | A | * | 9/1998 | Rossmann | 370/352 |

| | | | | | |
|---|---|---|---|---|---|
| 5,812,953 | A | * | 9/1998 | Griffith et al. | 455/550 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| EP | 0 804 045 | * | 10/1997 | | H04Q/7/22 |
| EP | 1043905 | | 10/2000 | | |
| EP | 1091606 | | 4/2001 | | |
| WO | 95/15065 | | 6/1995 | | H04Q/7/22 |
| WO | 97/13382 | * | 4/1997 | | H04Q/7/22 |
| WO | 97/28662 | | 8/1997 | | H04Q/7/22 |
| WO | 98/58506 | * | 12/1998 | | H04Q/7/22 |
| WO | 99/07173 | | 2/1999 | | H04Q/7/38 |
| WO | 01/39526 | A1 * | 5/2001 | | H04Q/7/06 |

OTHER PUBLICATIONS

"Mobile Management Server", pp. 1–4, downloaded from http://www.phone.com/products/mms/html on Mar. 5, 2001.

Primary Examiner—William Trost
Assistant Examiner—Rafael Perez-Gutierrez
(74) Attorney, Agent, or Firm—Blakely, Sokoloff, Taylor & Zafman LLP

(57) **ABSTRACT**

A system and method for provisioning a two-way mobile communications device having a display screen and user interface that is initiated from the device to be provisioned. The device to be provisioned establishes a secure communications session with a provisioning server device. The subject communications path may utilize an intermediate server device. The user of the device is then presented with a plurality of input and choice screens, which may be used in conjunction with the user interface to provide user information, select device features and services. The user information and selected feature and service requests are then forwarded to the provisioning server device. The provisioning server device processes the received information and generates provisioning packages, registration requests, and notifications for the subject mobile device and for any associated server device providing services. The provisioning packages may comprise software modules, parameters and any required security information.

**42 Claims, 9 Drawing Sheets**



## US 6,647,260 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,841,764 | A | | 11/1998 | Roderique et al. ........... 370/310 |
| 5,848,064 | A | * | 12/1998 | Cowan ........................ 370/338 |
| 5,875,394 | A | * | 2/1999 | Daly et al. ................... 455/419 |
| 5,943,399 | A | * | 8/1999 | Bannister et al. ......... 379/88.17 |
| 5,956,636 | A | * | 9/1999 | Lipsit ......................... 455/419 |
| 6,031,830 | A | * | 2/2000 | Cowan ........................ 370/338 |
| 6,049,821 | A | * | 4/2000 | Theriault et al. ........... 709/203 |
| 6,065,120 | A | * | 5/2000 | Laursen et al. ............. 713/201 |
| 6,138,009 | A | * | 10/2000 | Birgerson ................... 455/419 |
| 6,138,158 | A | * | 10/2000 | Boyle et al. ................ 709/219 |
| 6,148,405 | A | * | 11/2000 | Liao et al. .................. 713/201 |
| 6,151,628 | A | * | 11/2000 | Xu et al. .................... 713/201 |
| 6,173,316 | B1 | * | 1/2001 | De Boor et al. ............ 709/219 |
| 6,195,366 | B1 | * | 2/2001 | Kayashima et al. ........ 370/401 |
| 6,195,546 | B1 | * | 2/2001 | Leung et al. ................ 455/419 |
| 6,195,547 | B1 | * | 2/2001 | Corriveau et al. .......... 455/419 |
| 6,233,608 | B1 | * | 5/2001 | Laursen et al. ............. 709/217 |
| 6,253,326 | B1 | * | 6/2001 | Lincke et al. ............... 713/168 |
| 6,275,693 | B1 | * | 8/2001 | Lin et al. .................... 455/414 |
| 6,295,291 | B1 | * | 9/2001 | Larkins ...................... 709/219 |
| 6,343,323 | B1 | * | 1/2002 | Kalpio et al. ............... 709/217 |
| 6,421,781 | B1 | * | 7/2002 | Fox et al. ................... 713/201 |
| 2001/0032254 | A1 | * | 10/2001 | Hawkins .................... 709/219 |
| 2002/0068554 | A1 | * | 6/2002 | Dusse ........................ 455/419 |

* cited by examiner



*Fig. 1*

*Fig. 2*



*Fig. 3*



*Fig. 4*



*Fig. 5*



*Fig. 6*



Fig. 7A



*Fig. 7B*



*Fig. 7C*

US 6,647,260 B2

**1**

# METHOD AND SYSTEM FACILITATING WEB BASED PROVISIONING OF TWO-WAY MOBILE COMMUNICATIONS DEVICES

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to two-way mobile communication devices and, more particularly, to a method and system for provisioning the features and services available to the two-way mobile communication devices.

### 2. Description of the Related Art

For persons and businesses requiring instant access to information, the Internet and Intranets have provided a vehicle for near real-time delivery of information from an enormous number of sources. For many of those same individuals, two-way mobile communication devices (e.g., cellular phones, two-way pagers, Personal Digital Assistants (PDAs), and handheld computing devices) have provided a means for communicating irrespective of locality. It was only natural for these two exploding mediums to come together in a manner such that two-way mobile communication devices have become one of a plurality of entry vehicles into the Internet and Intranets.

The current generation of two-way mobile communication devices have microprocessors, information storage capability, and run one or more software applications. Examples of software applications used in these devices include micro-browsers, address books, and email clients. Additionally, this generation of two-way mobile communication devices has access to a plurality of services via the Internet and Intranets.

Before a consumer can use one of these devices, a number of parameters must be provisioned into the device in order to enable communication services and applications and in order to distinguish the device from others within the communications network. In addition to provisioning the two-way mobile communication device, it is also necessary to provision network elements in the communications network which are responsible for effecting mobile communications services and applications (e.g., billing plan, voice mail, call forwarding, email, information services etc.).

As with any other service-related industry, consumers demand convenience in the provisioning process. From the consumer's perspective it would be preferable to be able to walk into a store and select from an assortment of devices and services without being pressured by a sales person pushing a particular device or service.

Unfortunately, there are other concerns that effect the manner and procedures involved in provisioning the two-way mobile communications devices and services. Fraud is a $1 billion dollar problem for the telecommunications industry. In 1997, about $600 million was lost due to cloning fraud and another $400 million was lost from subscription fraud (Corsair Communications).

Thus, there exists a need for a method and system for provisioning two-way mobile communications devices and services that is convenient for consumers and secure for the service providers and device manufacturers.

## SUMMARY OF THE INVENTION

In view of the above, it is one of the objects in the present invention to provide a method and system for provisioning two-way mobile communications devices and services that provides convenience for consumers without compromising the carrier's and service provider's sensitive provisioning information.

**2**

According to one aspect of the present invention, a system and method for provisioning a two-way mobile communications device having a display screen and user interface that is initiated from the device to be provisioned. The device to be provisioned establishes a secure communications session with a provisioning server device. The subject communications path may utilize an intermediate server device. The user of the device is then presented with a plurality of input and choice screens, which may be used in conjunction with the user interface to input user information and select device features and services. The user information and selected features and services are then forwarded to a provisioning server device. The provisioning server device processes the received information and generates provisioning content and notifications for the subject mobile device and for any associated server device providing service(s). The provisioning packages may be comprised of software modules and any required security information.

According to another aspect of the present invention, a system and method for provisioning a two-way mobile communications device having a display screen and user interface that is initiated from a remote server device. The remote server device establishes a secure communications session with a provisioning server device and provides the provisioning server with user information and features and services for which the two-way mobile communications device is to be provisioned for. The provisioning server device processes the received information and generates provisioning packages and notifications for the two-way mobile communications device and for any associated server device providing services. Preferably the provisioning packages may comprise software modules, parameters, and any required security information. User information may be provided to the remote server device through a system utilizing a telephone and an Interactive Voice Response Unit (IVRU) or from a user to a representative who forwards the information to the provisioning server device.

The advantages of the invention are numerous. Different embodiments or implementations may yield one or more of the following advantages. One advantage of the present invention is that the user of a two-way mobile communications device can initially provision features and services without having to go to a retail establishment. Another advantage of the present invention is that the user can change the features and services associated with their two-way mobile communications device after the initial provisioning. Still another advantage of the present invention is that the carrier can remotely change the features and services associated with a two-way mobile communications device and provide a system for notifying the user of the changes made.

Other aspects and advantages of the invention will become apparent from the following detailed description taken in conjunction with the accompanying drawings, which illustrate by way of example, the principles of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein like referenced numerals designate the structural elements, and in which:

FIG. 1 illustrates a communications system, which may be utilized to practice the present invention;

FIG. 2 illustrates a schematic of a two-way mobile communications device according to an embodiment of the present invention;

3

FIG. 3 illustrates a block diagram of the principle components of an exemplary two-way mobile communications device;

FIG. 4 schematically illustrates the relationship between the provisioning server and the other system components;

FIG. 5 schematically illustrates the mechanism for exchanging information between the two way mobile communications device and the provisioning server;

FIG. 6 schematically illustrates the mechanism for exchanging information between a service server and the provisioning server;

FIG. 7A is a flow chart, which describes a two-way mobile communications device request for provisioning;

FIG. 7B is a flow chart, which describes the provisioning of the features requested by the two-way mobile communications device; and

FIG. 7C is a flow chart, which describes the provisioning of the services requested by the two-way mobile communications device.

## DETAILED DESCRIPTION OF THE INVENTION

The invention pertains to systems and methods, which enables the provisioning of a two-way mobile communications device having a display screen and user interface. According to one embodiment of the present invention, a provisioning transaction is initiated by a request to a provisioning server device from the two-way mobile communications device to be provisioned. The provisioning request may be forwarded through a proxy server device, which acts as a trusted third party in authenticating the principle participants. The provisioning request includes information input by the user using the user interface and device identification information resident in the mobile communication device. User input information may include personal identification information and financial information (e.g., credit card numbers, bank account numbers etc.) requiring verification by an outside processing entity (e.g., TRW). Upon verification of the user information and the device information, the provisioning server device processes the provisioning request. This processing may require the delivery of software modules and registration information to the provisioned two-way mobile communications device and any server devices (e.g., service servers) providing service. During the process, the user of the device may receive notifications relating to the state of processing and the services and features provisioned. These notifications may be pushed to the provisioned device through a narrow-band data channel (e.g., Short Message Service (SMS)).

The two-way mobile communication device, also referred to as two-way interactive communication devices, wireless client devices, and mobile devices, include but are not limited to personal digital assistants, palm-sized computing devices, cellular phones, two-way pagers, and wireless capable remote controllers. Such devices typically have significantly less memory and processing capability than is found in desktop and laptop computers. These mobile devices typically have a small display screen and a keypad with a reduced character set, as opposed to the full function keyboards and monitors associated with desktop or laptop computers.

Embodiments of the invention are discussed below with reference to FIGS. 1–7C. However those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for exemplary pur-

4

poses as the invention extends beyond the embodiments discussed below.

To facilitate a description of the present invention, it is deemed necessary to recite some of the features of a communications system in which the invention may be practiced. Referring to FIG. 1 a block diagram of a typical communications system according to one embodiment of the present invention is displayed. Mobile device 100 (e.g., a cellular telephone, a two-way pager, a personal digital assistant, or a palm-sized computer) receives phone calls through a voice communications channel and hypermedia information (e.g., Hyper Text Markup Language (HTML) documents, Compact Hypertext Transport Protocol (cHTML) documents, Extensible Markup Language (XML) documents, Handheld Device Markup Language (HDML) documents, or Wireless Markup Language (WML) documents) from remote server devices through broad-band and narrow-band (e.g., SMS) data communications channels which may include proxy server device 108 and Short Message Service center (SMSC) 110. Mobile device 100 has a display 102 and a user interface 103. Additionally, mobile device 100 may have a micro-browser (e.g., a micro-browser from Unwired Planet, Inc. 800 Chesapeake Drive, Redwood City, Calif., 94063) stored in a local memory which enables it to process hypermedia information received from remote server devices.

Information is exchanged between mobile devices 100 and remote server devices (e.g., provisioning server 120 and service server 122) using airnet 104 and landnet 118. Airnet 104 may be, for example, a cellular digital packet data network (CDPD), a Global System for Mobile (GSM) network, a Code Division Multiple Access (CDMA) network, a Time Division Multiple Access (TDMA) network, a Personal Digital Cellular (PDC) network or a Personal Handy-phone System (PHS) network. The communications protocols used by airnet 104 may, for example, be Wireless Access Protocol (WAP) or Handheld Device Transport Protocol (HDTP). Landnet 118 is a land-based network that may be the Internet, an Intranet or a data network of any private network. Typically the communication protocol supporting landnet 118 may be Transmission Control Protocol (TCP/IP), Hypertext Transport Protocol (HTTP), or Secure Hypertext Transport Protocol (sHTTP).

The data communication path between airnet 104 and landnet 118 may be bridged by proxy server device 108, which coordinates the exchange of information on the wide-band and narrow-band communications channels providing communication with mobile device 100. The narrow-band channel may be used for the exchange of content requiring limited bandwidth transmission services (e.g., Short Message Service (SMS)) and the wide-band channel is used for all other exchanges. An additional server device (e.g., Short Message Service Center (SMSC)) 110 generally coordinates communications on the narrow-band channel.

Proxy server device 108 and SMSC 110 may be, for example, a SPARC workstation from Sun Microsystems, Inc. (http://www.sun.com). As previously stated proxy server device 108 acts as a bridge between airnet 104 and remote devices connected by landnet 118. It should be pointed out, however, that the functions of proxy server device 108 and SMSC 110 may be performed by network server devices connected to landnet 118 with hardware well known in the art providing the connection between airnet 104 and landnet 118.

According to one embodiment of the present invention, mobile device 100 is initially unprovisioned when obtained

US 6,647,260 B2

5

(e.g., at a retail store or via the mail) by a user. When mobile device 100 is initially turned on a communications session is established with proxy server device 108 and a provisioning application is activated which displays scripts on display screen 102 of mobile device 100 prompting the user to input provisioning related information via user interface 103. The provisioning related information and pre-stored device identification information (also referred to as a provisioning request herein) are forwarded to provisioning server 120 via proxy server device 108 using a secure communications session. The secure communications session is facilitated by a previously stored uniform resource identifier (URI) associated with provisioning server 120 and authentication services provided by proxy server device 108.

The provisioning request contains information relating to the mobile device features and services desired by the user. Additionally, the provisioning request may contain the accounting information (e.g., credit card information, bankcards etc.) used to establish a user account. The provided accounting information can be verified by applications resident on provisioning server 120 or by outside financial services, which are accessible via landnet 118 (e.g., TRW). Once the information in the provisioning request is verified, provisioning content is forwarded to mobile device 100 and provided to any network element (e.g., service server 122) providing service to mobile device 100 as a result of the services requested. Additionally, the user may be provided with periodic status updates relating to the processing of the provisioning request and information relating to the features and services actually provisioned.

Mobile device 100 is pre-provisioned with the content required to communicate with an automated Customer Service Center (E-CARE) 112 via data and voice communications channels. The E-CARE center 112 may provide assistance to the user during the provisioning process. One embodiment of an E-CARE center is disclosed in U.S. patent application Ser. No. 09/093,944 entitled "Visual Interface to Mobile Account Services" and is hereby incorporated by reference.

With reference now to FIG. 2, mobile device 200 (e.g. a cellular telephone, a two-way pager, a personal digital assistant, or a palm-sized computer) comprises a display screen 204, a user interface 216, a speaker 224, and microphone 228. Display screen 204 contains hyper media information 208, a hypermedia selection identifier ">"210 and softkey identifiers 212 and 214. User interface 214 has function keys (e.g., "MENU", "BACK"), alphanumeric keys, and navigation keys (↑ and ↓). Additionally, function keys 216 and 220 are utilized for soft key inputs.

Hypermedia information 208 is illustrative of the type of an entry screen relating to the provisioning application. Hypermedia information 208 is comprised of a plurality of selectable identifiers corresponding to selections available in the provisioning application. It is important to note that each of the identifiers is associated with a Uniform Resource identifier (URI) and the associated URIs may be for the same provisioning server device or different provisioning server devices. The navigation keys (↑ and ↓) are used to navigate the list of selectable identifiers where hypermedia selection identifier ">" 210 indicates the selected item. The provisioning application allows the user to pick and chose desired device features and services (selections 2 and 3 on screen 204) or to select predetermined device and service configurations (selection 1 on screen 204).

Referring now to FIG. 3, a more detailed description of mobile device 300, which may be mobile device 100 of FIG.

6

1, is provided. Mobile device 300 includes memory 312 that stores data and/or software for performing many of the functions of the device 300 when executed by a processor 302. Mobile device 300 also includes a Wireless Control Protocol (WCP) interface 328 that couples to a carrier network via airnet 320 to receive incoming and outgoing signals. Device identifier (ID) storage 316 stores and supplies a device ID to WCP interface 328 for the purpose of identifying mobile device 300 to outside entities (e.g., proxy server device 108 of FIG. 1). The device ID identifies a specific code that is associated with mobile device 300 and directly corresponds to the device ID in the user account typically provided in an associated proxy server device (e.g., 108 of FIG. 1). In addition, mobile device 300 includes a client module 304 that performs many of the processing tasks performed by mobile device 300 including: establishing a communication session with a proxy server device via airnet 320, operating and maintaining a resident address book, displaying information on a display screen 308 thereof, and receiving user input from keypad 306. The client module 304 is coupled to WCP interface 328 for the establishment of a communication session and the requesting and receiving of data. The device 300 further includes voice circuitry 318 for inputting and outputting audio, and an encoder/decoder 310 coupled between processor 302 and voice circuitry 318 for encoding and decoding audio signals.

FIG. 4 schematically illustrates the relationship between the provisioning server 430, which may correspond to provisioning server 120 of FIG. 1, and the other components of the communications system. It is important to note at this point that the functions of provisioning server 430 may be incorporated in proxy server device 408 or another device with direct or indirect access to airnet 404. Provisioning server 430 is comprised of Land Control Protocol (LCP) interfaces 434 and 448, processor 438, storage device 442 and a provisioning kernel 444 comprised of a plurality of software modules. More specifically, the provisioning kernel is comprised of a Registration Module, a Services Module, and a Device Feature Module.

The Registration Module coordinates the processing of the provisioning request in terms of verifying the request components (e.g., device identification information, accounting and information) and matching the requested device features and services with available features and services. It is important to note at this point that the provisioning content required to process the request may be resident on the provisioning server receiving the request or on any server device accessible via landnet 450.

Provisioning content relating to mobile device features are retrieved from the Device Feature Module. The provisioning content relating to requests for device features takes the form of software modules, which modify the resident features of mobile device 400 or activation information required to initialize previously installed non-operational applications. Once the features of mobile device 400 have been provisioned, a notification is provided to billing center 460. The provisioned features are also displayed on the display of mobile device 400.

Provisioning content relating to services are retrieved from the Services Module. The provisioning content relating to requests for services takes the form of a request to register a new user. This request is comprised of the URI of service server providing the service (e.g., service server 422) and registration information relating to the user of mobile device 400. Once mobile device 400 has been registered, a notification is provided to billing center 460. Additional notifications and information required to access the provisioned

US 6,647,260 B2

7

services (e.g., passwords) are sent to mobile device **400** through a narrow band channel (e.g., an SMS message).

FIG. 5 schematically illustrates the exchange of provisioning content between mobile device **500**, which may be mobile device **100** of FIG. **1** and provisioning server **530**, which may be provisioning server **120** of FIG. **1**. Mobile device **500** generates a provisioning request which is then forwarded to provisioning server **530** via the message send manager **520** resident in mobile device **500** and the message receive manager **546** resident in provisioning server **530**. As previously stated, information relating to the mobile device (e.g., a pre-stored device identification number) and information required to establish a user account (e.g., credit card information) are verified prior to processing the provisioning request if the phone has not previously been provisioned. The information verification process can be performed by applications resident in provisioning kernel **534** using information stored in storage device **538**. Additionally the verification process can be performed by outside entities accessible through a landnet (e.g., the Internet or an Intranet).

The provisioning request received from mobile device **500** contains requests for specific device features and services. Applications resident within provisioning kernel **534** match the requested features and services with available features and services listed in database **542**. The content relating to the features and services listed in database **542** need not be resident on provisioning server **530**. The content may be resident on a remote server device accessible through a landnet (not shown). If requested features or services are not resident within database **542** or if there is some conflict with the features or services requested then a notification message (e.g., SMS message) is sent to mobile device **500**. Content relating to matching device features and services is forwarded to the requesting mobile device via message send manager **550** and message receive manager **512** and is stored in storage **508**. The content may be comprised of software modules and information required to communicate with limited access commercial server devices. Additionally, mobile device **500** is registered with the limited access server devices providing requested services and registered with a billing entity.

FIG. 6 schematically illustrates the exchange of information between service server **660**, which may be service server **122** of FIG. **1** and provisioning server **630**, which may be provisioning server **120** of FIG. **1**. Provisioning server **630** forwards a user registration request to service server **660** via a message send manager **650** and message receive manager **662**. Provisioning server **630** and service server **660** are connected by a landnet (e.g., the Internet or an Intranet) which is not shown in the drawing. Mutual authentication of the participants involved in the transaction are by methods well known in the art. User information and information relating to requested services is stored in database **642**. The information is forwarded to service server **660** where it is stored in storage **668** and used to register the user for the requested services. Acknowledgments regarding the user's registration and provisioning content **672** (e.g. passwords security information, etc.) are forwarded to provisioning server **630** by a registration kernel **664** via message send manager **674** and message receive manager **646**. Provisioning server **630** forwards the provisioning content and any related notifications to the requesting mobile device.

Once the initial device features and services are provisioned, account information is registered with a billing entity. Changes to the features or services may be initiated at any time by the user or by an authorized administering entity using the systems and methods described above.

8

Corresponding changes to the billing account will be made concurrently. Additionally, offers relating to feature and service upgrades can be forwarded to the device user via a narrowband channel (e.g., an SMS message).

It is important to note at this point that the exchange of information between the mobile device requesting provisioning (e.g., **100** of FIG. **1**), the provisioning server (e.g., **120** of FIG. **1**) and the service server (e.g., **122** of FIG. **1**) is conducted using mutually exclusive secure communications sessions. In effect the provisioning server acts as a trusted third party in registering the requesting mobile device with the service server providing the requested service.

FIG. 7A illustrates a process flow chart which describes the process **700** used by a mobile device (e.g., mobile device **100** of FIG. **1**) to generate a provisioning request. At **702** a secure communications session is established between the requesting mobile device and the provisioning server (e.g., provisioning server **120** of FIG. **1**). At **704** the identity of both participants is mutually authenticated. If mutual authentication fails the session is terminated at **706**. If mutual authentication is successful, the device identification information and user information are forwarded, at **708**, to the provisioning server where they are verified at **710**. If either the device information or the user information fails the verification process then the session is terminated at **712**. If the verification process is successful then the provisioning request is processed at **714**. Feature provisioning (**716**-A) is described in FIG. **7B**, service provisioning (**718**-B) is described in FIG. **7C** and package provisioning provisions, at **720**, a predetermined group of features and services using the process described in FIGS. **7B** and **7C**.

Referring now to FIG. **7B**, the process **730** of feature provisioning is described. Upon processing of the provisioning request, terms, conditions, and related information notifications are pushed to the requesting mobile device using the narrowband channel (e.g., an SMS message) at **732** for approval by the user prior to implementation. Additionally this information may forwarded to the user through a predetermined email address or facsimile number. If the user declines at **734**, then the session is terminated at **736**. If the user accepts then, at **738**, a notification to that effect is forwarded to the requesting mobile device through a narrowband channel and the provisioning content is forwarded to the mobile device via a wideband channel. The provisioning content is provisioned at **740** and a determination is made at **742** as to whether the provisioning content was implemented successfully. If the implementation fails then the user has the option of requesting a retransmission at **748** via a request generated at **750**. If the implementation is successful then a confirmation message is generated at **744** and forwarded to the provisioning server at **746**.

Referring now to FIG. **7C** the process **760** utilized by the provisioning server (e.g., **120** of FIG. **1**) to register a requesting mobile device (e.g., **100** of FIG. **1**) with a server device providing service (e.g., **122** of FIG. **1**) is described. At **762** a communications session is established between the provisioning server and the service server where the two are subjected to a mutual authentication process at **764**. If the mutual authentication process fails then the session is terminated at **766**. If mutual authentication is successful then user registration information is forwarded to the service server **768**. The registration request is processed at **770** and if the device is successfully registered (**772**) then a registration confirmation notification is generated at **774** and forwarded to the provisioning server at **776**. If registration fails (**772**) due to corrupted registration information or

US 6,647,260 B2

**9**

missing information then the user has the option of re-sending a registration request at **778**. This is done by the service server which generates a request for the missing or corrupted information at **780**.

The present invention has been described in sufficient detail with a certain degree of particularity. It is understood to those skilled in the art that the present disclosure of embodiments has been made by way of example only and that numerous changes in the arrangement and combination of parts as well as steps may be resorted without departing from the spirit and scope of the invention as claimed. Accordingly, the scope of the present invention is defined by the appended claims rather than the foregoing description of one embodiment.

What is claimed is:

1. A method for provisioning a two-way mobile communications device having a display and a user interface, the method being performed by the two-way mobile communications device and comprising:

   receiving user information required to establish a user account;

   displaying a list of selectable identifiers on the display, each selectable identifier corresponding to a selectable service or feature for which the two-way mobile communications device can be provisioned;

   receiving a user's selection of a selectable identifier from the list;

   generating a provisioning request comprising the user information and the user's selection;

   establishing a communications link with a provisioning server;

   providing authentication information to enable a remote server to authenticate the two-way mobile communications device;

   sending the provisioning request to the provisioning server over the communications link;

   receiving a reply to the provisioning request; and

   provisioning the two-way mobile communications device with a feature or service based on the reply.

2. The method of claim 1, wherein receiving the reply comprises receiving software to enable the services; and provisioning the two-way mobile communications device comprises installing the software in the two-way mobile communications device.

3. The method of claim 1, wherein receiving the reply comprises receiving activation information to render operational previously installed non-operational software in the two-way mobile communications device.

4. The method of claim 3, wherein provisioning the two-way mobile communications device comprises activating the non-operational software with the activation information.

5. The method of claim 1, wherein establishing the communications link with the provisioning server is accomplished via a wide area communications network.

6. The method of claim 5, wherein the wide area communications network comprises the Internet.

7. The method of claim 6, wherein establishing the communications link is accomplished via a proxy server.

8. The method of claim 7, wherein the proxy server acts as a gateway to bridge communications between an airnet with which the two-way mobile communications device communicates and the wide area communications network with which the provisioning server communicates.

9. The method of claim 8, wherein the remote server, the proxy server, and the provisioning server are included in a single server device.

**10**

10. The method of claim 9, wherein the selectable identifiers further correspond to selectable service packages, each package comprising predetermined feature and services configurations for the two-way mobile communications device.

11. The method of claim 10, wherein each selectable identifier comprises an identifier of a corresponding provisioning server.

12. The method of claim 11, wherein the identifier is a uniform resource locator.

13. The method of claim 1, wherein receiving the reply comprises receiving terms and conditions on which a service provider is prepared to provide services.

14. The method of claim 13, further comprising receiving the user's approval of the terms and conditions; and forwarding the user's approval to the provisioning server.

15. The method of claim 1, wherein receiving the reply comprises receiving a notification indicating which services and features have been provisioned.

16. The method of claim 1, wherein receiving the reply comprises receiving a notification relating to a state of processing of the provisioning request.

17. The method of claim 1, wherein establishing the communications link comprises establishing a secure communications link.

18. The method of claim 1, wherein receiving the reply is accomplished on a narrow band channel.

19. The method of claim 18, wherein the narrow band channel is an SMS channel.

20. A provisioning server comprising a processor and a memory coupled thereto, the memory storing instructions which when executed by the processor cause the processor to perform a method comprising:

   receiving an authentication request from a proxy server;

   sending authentication information to the proxy server in response to the authentication request;

   receiving a provisioning request from a two-way mobile communications device as a forwarded message from the proxy server, the provisioning request comprising user information required to establish a user account, device information identifying the two-way mobile communications device, and a user selection indicating a user's selection of services to be provisioned;

   verifying the user information and device information; and

   provisioning the two-way mobile communications device with the user's selection of services.

21. The provisioning server of claim 20, wherein provisioning the two-way mobile communications device comprises generating notifications relating to terms and conditions associated with a service in the user selection; forwarding the generated notifications to the two-way mobile communications device; and receiving user acceptance of the terms and conditions.

22. The provisioning server of claim 20, wherein provisioning the two-way mobile communications device comprises establishing a communications link with a service server providing a service which has been requested in the provisioning request; and sending a request to the service server requesting registration of the user for the service.

23. The provisioning server of claim 22, wherein the communications link is a secure communication link.

24. The provisioning server of claim 20, wherein provisioning the two-way mobile communications device comprises sending activation information required to activate previously stored non-operational applications in the two-way mobile communications device.

US 6,647,260 B2

11

25. The provisioning server of claim 20, wherein provisioning the two-way mobile communications device comprises sending software modules to the two-way mobile communications device to enable the requested services.

26. A method for processing a provisioning request from a two-way mobile communications device, the method comprising:

receiving at a provisioning server, an authentication request from a proxy server;

sending authentication information to the proxy server in response to the authentication request;

receiving the provisioning request from the two-way mobile communications device as a forwarded message from the proxy server, the provisioning request comprising user information required to establish a user account, device information identifying the two-way mobile communications device, and a user selection indicating a user's selection of services to be provisioned;

verifying the user information and device information; and

provisioning the two-way mobile communications device with the user's selection of services.

27. The method of claim 26, wherein provisioning the two-way mobile communications device comprises generating notifications relating to terms and conditions associated with a service in the user selection; forwarding the generated notification to the two-way mobile communications device; and receiving user acceptance of the terms and conditions.

28. The method of claim 26, wherein provisioning the two-way mobile communications device comprises establishing a secure communications link with a service server providing a service which has been requested in the provisioning request; and sending a request to the service server requesting registration of the user for the service.

29. The method of claim 26, wherein provisioning the two-way mobile communications device comprises sending activation information required to activate previously stored non-operational applications in the two-way mobile communications device.

30. The method of claim 26, wherein provisioning the two-way mobile communications device comprises sending software modules to the two-way mobile communications device to enable the requested services.

31. The method of claim 26, wherein the provisioning server is connected to a landnet and the proxy server bridges communications between the landnet and an airnet to which the two-way mobile communications device is connected.

32. The method of claim 26, wherein the user selection further comprises the user's selection of features of the two-way mobile communications device the user wishes activated.

33. A method for provisioning a two-way mobile communications device, the method comprising:

12

receiving a provisioning request from the two-way mobile communications device;

mutually authenticating the two-way mobile communications device and a provisioning server; and

forwarding the provisioning request to the provisioning server only if the mutual authentication was successful; wherein the receiving, the mutual authenticating, and the forwarding is performed by a proxy server which bridges communications between a first communications network and a second communications network.

34. The method of claim 33, wherein the first communications network is an airnet; and the second communications network is a wide area communications network.

35. The method of claim 34, wherein receiving the provisioning request is via the airnet and forwarding the provisioning request is via the wide area communications network.

36. The method of claim 35, wherein the proxy server exchanges information between the two-way mobile communication device and the provisioning server via mutually exclusive secure communications sessions with the two-way mobile communications device and the provisioning server, respectively.

37. The method of claim 36, wherein the proxy server and the provisioning server are included in a single server device.

38. A proxy server comprising a processor and a memory coupled thereto, the memory storing instructions which when executed by the processor cause the processor to perform a method comprising:

receiving a provisioning request from a two-way mobile communications device;

mutually authenticating the two-way mobile communications device and a provisioning server; and

forwarding the provisioning request to the provisioning server only if the mutual authentication was successful.

39. The proxy server of claim 38, wherein the proxy server bridges communications between a first communications network and a second communications network.

40. The proxy server of claim 39, wherein the first communications network is an airnet; and the second communications network is a wide area communications network.

41. The proxy server of claim 40, wherein receiving the provisioning request is via the airnet; and forwarding the provisioning request is via the wide area communications network.

42. The proxy server of claim 41, which operates to exchange information between the two-way mobile communications device and the provisioning server via mutually exclusive secure communications sessions with the two-way mobile communications device and the provisioning server, respectively.

*  *  *  *  *

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNWIRED PLANET, LLC,

       Plaintiff,

    v.

APPLE INC,

       Defendant.

Case No.  13-cv-04134-VC

**ORDER RE FURTHER BRIEFING**

In the '446 patent, the first paragraph of the Summary of the Invention describes "the present invention" as requiring voice input to travel over a voice channel, and, as the Court's claim construction order notes, "[t]he patent consistently maintains the distinction between voice input being sent over a voice channel to the server device, and a data file which is then sent back to the mobile device over a data channel."  Therefore, the Court construed "voice input" as "speech provided over a voice channel."

The patent is clear that a voice channel is required, but it is not clear about what precisely a voice channel is.  The patent states that a voice channel "is generally established and coordinated using the infrastructure and procedures generally known in the art for setting up a phone call." '446 Patent, 6:21-24.  So it is undisputed that a cellular phone call is made over a voice channel. But the patent suggests – and the parties seem to agree – that other types of voice transmission can also be sent over a voice channel.  For instance, the patent teaches that "palm sized computing devices and personal digital assistants with voice transmission and/or reception capabilities" can send voice input over a voice channel to an outside server.  *Id.* at 5:1-3.  These devices do not make cellular telephone calls, which means that a voice channel can be used for other types of voice transmissions as well.  But it is not clear to the Court, either from the patent or from the parties' briefs, what types of voice transmissions besides a cellular call take place over a voice

United States District Court
Northern District of California

channel.  Apple suggests that Unwired's infringement theory would render the term "voice channel" meaningless, because it would mean that any time voice input is transmitted, it necessarily travels over a voice channel.  Unwired, on the other hand, suggests that Apple's infringement defense relies on an understanding of voice channel as being limited to the type of channel used for telephone calls.

The Court invites the parties to submit an additional brief to help the Court better understand what a voice channel is and what types of voice transmissions take place over it.  The brief should address the following questions:

- Does VoIP technology send voice input over a voice channel?  Is there a different answer depending on whether or not VoIP uses TCP/IP protocols?
- Other than a cellular telephone call, what are other examples of voice input being sent over a voice channel?
- What are examples of voice input being sent over a data channel?
- Are there discernible limits on what constitutes a voice channel, and, if so, what are they?

The briefs should not exceed six double-spaced pages.  The briefs should reference any evidence in the summary judgment record relevant to these questions, but they should not rely on any evidence not already in the record.  They are due on Friday, April 31, 2015 at 5:00 p.m.

**IT IS SO ORDERED.**

Dated: April 29, 2015

VINCE CHHABRIA
United States District Judge

United States District Court
Northern District of California

## CERTIFICATE OF SERVICE

I certify that on September 9, 2015, the foregoing NON-CONFIDENTIAL

BRIEF OF PLAINTIFF-APPELLANT UNWIRED PLANET L.L.C. was served

by operation of the Court's CM/ECF system per FED. R. APP. P. 25.


Date: September 9, 2015


*/s/ Theodore Stevenson, III*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing NON-CONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT UNWIRED PLANET L.L.C.:

1.      complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B). This brief contains 13,824 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and FED. CIR. R. 32(b). Microsoft Word 2010 was used to calculate the word count.

2.      complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.


Date: September 9, 2015

*/s/ Theodore Stevenson, III*